# In the United States Court of Federal Claims

No. 11-555 C
Filed: July 27, 2017

| | |
|---|---|
| **********************************<br><br>RDA CONSTRUCTION CORP.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant.<br><br>********************************** | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Accord and Satisfaction;<br>Breach of Contract;<br>Cardinal Change;<br>Contract Disputes Act ("CDA"),<br>    41 U.S.C. §§ 7101–7109;<br>False Claims Act ("FCA"),<br>    31 U.S.C. §§ 3729–3733;<br>Federal Acquisition Regulations ("FAR")<br>    52.233-1 (Disputes), 52.236-2<br>    (Differing Cite Conditions), 52.236-3<br>    (Site Investigation and Conditions<br>    Affecting Work), 52.236-13(Accident<br>    Prevention), 252.236-7001(Contract<br>    Drawings and Specifications), 52.249-<br>    10 (Default on Fixed-Price<br>    Construction Contract);<br>Rule of the United States Court of<br>    Federal Claims ("RCFC") 12(b)(1);<br>Special Plea in Fraud, 28 U.S.C. § 2514;<br>Tucker Act Jurisdiction over Contract<br>    Disputes, 28 U.S.C. § 1491(a)(2);<br>United States Court of Federal Claims'<br>    Jurisdiction to Adjudicate Government<br>    Set-Offs, 28 U.S.C. §§ 1503, 2508. |

**Cornelius J. O'Brien**, Eckert Seamans Cherin & Mellott, LLC, Pittsburgh, Pennsylvania, Counsel for Plaintiff.

**Daniel B. Volk**, United States Department of Justice, Washington, D.C., Counsel for the Government.

### POST TRIAL MEMORANDUM OPINION AND FINAL ORDER

This post trial liability decision adjudicates a protracted dispute between RDA Construction Corp. ("RDA") and the United States Department of the Navy, Naval Facilities Engineering Command ("the NAVFAC"), arising from an October 13, 2009 Contract, requiring RDA to demolish, remove, and construct a wharf at the Naval Station in Newport, Rhode Island ("Newport Naval Station").

To facilitate review of this Post Trial Liability Memorandum Opinion And Order, the court has provided the following outline:

I.  RELEVANT FACTUAL BACKGROUND.

    A.  The Deteriorating And Dangerous Conditions At The Newport Naval Station Wharf.

    B.  On May 18, 2009, The Naval Facilities Command Issued Solicitation No. N40085-09-B-7002.

    C.  On June 4, 2009 and June 11, 2009, The Naval Facilities Command Conducted Two Site Visits Of The Newport Naval Station Wharf.

    D.  On June 30, 2009, RDA Construction Corp. Submitted A Bid.

    E.  On October 13, 2009, RDA Construction Corp. Signed Contract No. N40085-09-B-7002.

    F.  On November 18, 2009, The Appledore Report Was Disclosed To RDA Construction Corp.

    G.  On April 21, 2010, RDA Construction Corp. Filed A Certified Claim.

    H.  On May 17, 2010, The Naval Facilities Command Approved RDA Construction Corp.'s Baseline Schedule.

    I.  On August 31, 2010, RDA Construction Corp.'s April 21, 2010 Certified Claim Was Denied.

    J.  On September 20, 2010, RDA Construction Corp. Informed The Naval Facilities Command That Underground Obstructions Were Encountered, So Work Stopped.

    K.  On March 10, 2011, The Naval Facilities Command Instructed RDA To Submit A Cost Proposal To Remove The Obstructions And Continue Work.

    L.  In Late March 2011, RDA Construction Corp.'s Quality Control Manager And Site Safety Health Officer Quit.

    M.  On June 7, 2011 And August 19, 2011, The Naval Facilities Command Issued Contract Modifications 4 and 5 To The October 13, 2009 Contract.

    N.  On August 31, 2011, RDA Construction Corp. Filed A Complaint In The United States Court Of Federal Claims.

    O.  On September 14, 2011, RDA Construction Corp. Experienced A Third Accident At The Project Site.

    P.  From March 20, 2012 To November 8, 2012, The Naval Facilities Command Issued Contract Modifications 6–12.

    Q.  On February 21, 2013, The Naval Facility Command Terminated The October 13, 2009 Contract.

R.     On July 3, 2013, RDA Construction Corp. Filed A Second Certified Claim.

S.     On April 15, 2015, The Naval Facility Command's Contracting Officer Determined That RDA Construction Corp. Was Liable For Liquidated Damages.

II.     PROCEDURAL HISTORY.

III.     DISCUSSION.

    A.     Jurisdiction.

        1.     Whether The Claims Alleged In The May 7, 2015 Second Amended Complaint Arise Under The Contract Disputes Act.

        2.     Whether The Claims Alleged In The May 7, 2015 Second Amended Complaint Were Submitted To The Contracting Officer For A Final Decision.

            a.     Regarding Counts I–IV.

            b.     Regarding Counts V–IX.

            c.     Regarding Damages.

    B.     Standing.

    C.     The Claims Alleged In RDA Construction Corp.'s May 7, 2015 Second Amended Complaint.

        1.     Count I: Whether The Naval Facilities Command Had A Duty To Disclose The Appledore Report And The Fay, Spofford & Thorndike Report.

            a.     Plaintiff's Argument.

            b.     The Government's Response.

            c.     Plaintiff's Reply.

            d.     The Court's Resolution.

        2.     Count II: Whether RDA Construction Corp. Is Entitled To An Equitable Adjustment Under The October 13, 2009 Contract's Differing Site Conditions Clause.

            a.     Plaintiff's Argument.

            b.     The Government's Response.

            c.     The Court's Resolution.

        3.     Counts III And IV: Whether The Naval Facilities Command Misrepresented The Condition Of The Wharf And The Purpose Of The October 13, 2009 Contract.

            a.     Plaintiff's Argument.

            b.     The Government's Response.

c.    The Court's Resolution.

4.    Count V: Whether The Naval Facilities Command's November 7, 2012
Directive Was A Cardinal Change To The October 13, 2009 Contract.

a.    Plaintiff's Argument.

b.    The Government's Response.

c.    The Court's Resolution.

5.    Counts VI, VII and VIII: Whether The NAVFAC Violated The Duty Of Good
Faith And Fair Dealing.

a.    Plaintiff's Argument.

b.    The Government's Response.

c.    The Court's Resolution.

i.    Regarding Price And Schedule Changes To The October 13, 2009
Contact, Because Of The NAVFAC's Failure To Disclose The
Appledore Report And FST Report.

ii.   Regarding Rescinding Approval Of RDA Construction Corp.'s
Baseline Schedule.

iii.  Regarding Extraction Of The Broken H-Pile Sections.

iv.   Regarding Obstruction Drilling.

v.    Regarding Work Suspension After The September 14, 2011 Safety
Mishap.

vi.   Regarding Approval Of RDA Construction Corp.'s Quality Control
Manager And Site Safety And Health Officer.

vii.  Regarding The Re-Inspection Of The Manitowoc 4100 Crane.

6.    Count IX: Whether RDA Construction Corp. Was Entitled To An Extension Of
The Contract Completion Date For Excusable Delays.

IV.   DISCUSSION OF THE COUNTERCLAIMS ALLEGED IN THE GOVERNMENT'S
JUNE 12, 2015 ANSWER.

A.    Jurisdiction.

B.    Standing.

C.    Counterclaim I: Whether The Naval Facilities Command Is Entitled To Recover
Liquidated Damages For The Cost Of Completing The October 13, 2009 Contract.

1.    The Government's Argument.

2.    Plaintiff's Response.

3. The Government's Reply.

4. The Court's Resolution.

 a. Whether RDA Was Entitled To An Extension Of The Contract Completion Date.

 b. Whether The Naval Facilities Command's February 21, 2013 Termination Of The October 13, 2009 Contract For Default Should Be Converted Into A Termination For Convenience.

  i. Whether The February 21, 2013 Notice Of Termination Was "Fair And Impartial," Pursuant To 48 C.F.R. § 1.602-2.

  ii. Whether The Naval Facilities Command Established That RDA Construction Was In Default As Of The Termination Date.

  iii. Whether The Naval Facilities Command Breached The October 13, 2009 Contract Thereby Relieving RDA Construction Corp. Of Any Consequences Stemming From The February 21, 2013 Default Termination.

 c. The Quantum Of Liquidated Damages That The Naval Facilities Command Is Entitled To Recover.

D. Counterclaim II:  Whether RDA Construction Corp. Is Liable For Damages Under The Contract Dispute Act's Anti-Fraud Provision, 41 U.S.C. § 7103(c)(2).

1. The Government's Argument.

2. Plaintiff's Response.

3. The Court's Resolution.

 a. Whether RDA Construction Corp.'s Crane Re-Inspection Claim Was "Baseless."

 b. Whether RDA Construction Corp.'s Crane Re-Inspection Claim Was "Indefensibly Inflated."

 c. Whether RDA Construction Corp.'s Crane Re-Inspection Claim Was "Premised On Affirmative Misrepresentations Of Fact."

E. Counterclaim III: Whether RDA Construction Corp. Forfeited All Claims Against The United States Under The Special Plea In Fraud Statute, 28 U.S.C. § 2514.

F. Counterclaim IV: Whether RDA Construction Corp. Violated The False Claims Act.

1. The Government's Argument.

2. Plaintiff's Response.

3. The Court's Resolution.

a.    Whether RDA Construction Corp. Falsely Certified That Its Deck Removal Work Complied With The October 13, 2009 Contract.

b.    Whether RDA Construction Corp. Falsely Certified That Its Rock Fill Removal Work Complied With The October 13, 2009 Contract.

   i.    Regarding Rock Fill Removal.

   ii.   Regarding The Hydrographic Survey.

c.    Whether RDA Construction Corp. Falsely Certified That It Made Timely Payments To Its Subcontractors.

d.    Whether RDA Construction Corp.'s July 3, 2013 Certified Claim For Costs Incurred To Re-Inspect The Manitowoc 4100 Crane Was Baseless, Inflated And Premised On Factual Misrepresentations.

V.    CONCLUSION.

*       *       *

I.    **RELEVANT FACTUAL BACKGROUND.**[1]

A.    **The Deteriorating And Dangerous Conditions At The Newport Naval Station Wharf.**

In 1958, the NAVFAC built a steel-reinforced concrete structure, known as the "marginal wharf" ("wharf"), and a metal-sheet pile bulkhead[2] along 850 feet of Narragansett Bay shoreline, located between Piers 1 and 2 of the Newport Naval Station.  PX 12 at 1–2.

---

[1] The facts discussed herein were derived from evidence adduced at a trial held on November 16–19, 2015 and December 7–10, 2015 in Boston, Massachusetts and in January 4–6, 2016 and July 11, 2016 in Washington, D.C. (TR at 1–2854).  The witnesses for each party are identified in Court Exhibit A.  During trial, the parties also introduced 1,463 exhibits into evidence. (PX 1–262; DX 1–759).

[2] A "bulkhead" is "a retaining wall along a waterfront."  Bulkhead, MERRIAM-WEBSTER'S ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/bulkhead (last visited March 22, 2017).



DX 7 at 7.

As depicted below, the bulkhead is a seawall comprised of metal sheet-piles that were secured by steel rods anchored into concrete structures beneath the sea floor.



PX 12 at 3.

The wharf is a concrete structure, supported by 248 steel H-piles.[3]  DX 1 at 82–91.  As illustrated below, each pile was encased in a concrete "jacket" from the top to below the waterline.

_____

[3] A "H-pile" is a steel beam with an "H"-shaped cross section and is driven into the earth by a pile driver.  *See* H-Pile, MERRIAM-WEBSTER'S ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/H%E2%80%93pile (last visited March 22, 2017).



PX 12 at 4; DX 1 at 82–91.

In April 2005, Appledore Marine Engineering, Inc. issued a report that was commissioned by the NAVFAC, titled: "Underwater Facilities Inspection And Assessment of the Newport Naval Station" ("the Appledore Report").  PX 12.  The Appledore Report found "approximately ten percent of the concrete piles [supporting the wharf were] missing their fiberglass shell forms with failed or partially failed concrete encasement exposing the reinforcing steel and encased steel H-pile."  PX 12 at 15–16.  The Appledore Report advised the NAVFAC that

> [b]elow the concrete jackets, the steel H-piles typically [had] advanced deterioration with significant loss of cross-sectional area.  A Level I inspection of [all] the piles identified piles with buckled flanges,[4] knife-edging and surface pitting.[5]  Several piles exhibit[ed] complete deterioration of the flanges . . . .  Based on the degree of deterioration found during the Level I inspection, a special in-depth Level II inspection was conducted on all 248 steel H-piles including the removal of marine growth and steel thickness measurements.

PX 12 at 16.

The Appledore Report also found that the state of deteriorated H-piles "could only be observed during [an] underwater inspection" and was widespread *i.e.*, forty-six percent of the H-piles could not safely carry any vehicular loads.  PX 12 at 21, 25.  Significantly, "these piles [were]

---

[4] A "flange" is "a rib or rim for strength, for guiding, or for attachment to another object." Flange, MERRIAM-WEBSTER'S ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/flange (last visited March 22, 2017).

[5] "Pitting corrosion is a localized form of corrosion by which cavities or 'holes' are produced in the material.  Pitting . . . is more difficult to detect, predict and design against [than uniform corrosion]."   Pitting Corrosion, NATIONAL ASSOCIATION OF CORROSION ENGINEERS CORROSION BASICS, https://www.nace.org/Pitting-Corrosion/ (last visited March 22, 2017).

overstressed beyond their allowable load capacities simply from the weight of the [wharf.]" PX 12 at 24.  As a result, "catastrophic collapse [was] possible." PX 12 at 25.

In addition, the Appledore Report found that the metal-sheet pile bulkhead exhibited "advanced deterioration and defects." PX 12 at 12.  Where the bulkhead was accessible for inspection, there were "large corrosion holes . . . allowing backfill to wash through the bulkhead" and "[i]t [was] likely [that] portions of the bulkhead obscured from view . . . [had] similar advanced deterioration." PX 12 at 12.  The earth fill retained by the bulkhead between Piers 1 and 2 also had a large sinkhole up to eight feet wide and seven feet deep, and "sinkholes occur[ed] along the entire length of the . . . bulkhead." PX 12 at 14.

On August 29, 2008, Fay, Spofford & Thorndike, LLC ("FST") conducted a second evaluation of the wharf for the NAVFAC ("the FST Report"). PX 19.  The FST Report was not an independent evaluation, but primarily was based on information contained in the Appledore Report. PX 19 at 3.  The FST Report found that the "overall condition of the wharf superstructure [was] good to fair." PX 19 at 2.  But, the FST Report "recommended that the wharf not be used during construction." PX 19 at 1.

**B.      On May 18, 2009, The Naval Facilities Command Issued Solicitation No. N40085-09-B-7002.**

On May 18, 2009, the NAVFAC issued Solicitation No. N40085-09-B-7002 ("the Solicitation") to restore the Newport Naval Station by:

- demolishing the wharf and metal-sheet pile bulkhead between Piers 1 and 2 of the Newport Naval Station;[6]

- removing underwater rock and sediment along the project site;

- constructing a new metal-sheet bulkhead; and

- constructing a parking area, storm drainage and other infrastructure, required to support ship berthing.

DX 1 at 9.

---

[6] The Solicitation required complete removal of the existing H-piles supporting the wharf and bulkhead.  DX 1 at 82 (Demolition Note 3: "REMOVE PILES IN THEIR ENTIRETY"); PX 12 at 3 (picture).  In addition, bidders were instructed that during demolition, "[d]ebris shall not be allowed to fall into the water.  Debris that does fall into the water shall be removed by the end of the work day." DX 1 at 82.

The Solicitation included a set of drawings and specifications; bidders were required to conform contract work to the instructions listed in those documents.[7]   DX 1 at 35–36.   The Solicitation warned potential bidders that

> [o]missions from the drawings or specifications or the misdescription of details of work that are manifestly necessary to carry out the intent of the drawings and specifications, or that are customarily performed, *shall not relieve the Contractor from performing* such omitted or misdescribed details of the work.   The Contractor shall perform such details as if fully and correctly set forth and described in the drawings and specifications.

DX 1 at 36 (emphasis added) (quoting 48 C.F.R. 252.236-7001(d)).

The Solicitation also incorporated Federal Acquisition Regulation ("FAR") 52.236-3(a),[8] requiring that potential bidders conduct their own investigations of site conditions.   DX 1 at 14.

---

[7] The Solicitation included thirty-eight technical drawings and specifications: (1) Title Sheet; (2) Locus Plan; (3) Design Loads; (4) Limit of Work Plan; (5) Demolition & Removals; (6) Existing Site Conditions Notes; (7) Existing Site Conditions; (8) Existing Site Conditions; (9) Existing Site Conditions; (10) Existing Site Conditions; (11) Existing Site Conditions; (12) Existing Site Conditions; (13) Hydrographic Survey Plan; (14) Soil Erosion & Sediment Control Plan; (15) Soil Erosion & Sediment Control Details; (16) Boring Location Plan & Logs; (17) Demolition Plan & Sections; (18) Rock Fill Removal Plan; (19) Demolition Details; (20) Site Grading, Paving & Draining Plan; (21) Sanitary Sewer Plan & Details; (22) Water Plan & Details; (23) Storm Sewer Plan & Details; (24) General Plan, Legend & Notes; (25) Bulkhead Plan; (26) Sheet Pile Plan & Elevation; (27) Sheet Pile Plan & Elevation; (28) Bulkhead Details; (29) Bulkhead Details; (30) Bulkhead Details; (31) Concrete Details; (32) Manhole Details; (33) Anode Location Plan; (34) Electrical Site Plan; (35) Bonding Locations & Details; (36)   Reference Drawing; (37) Reference Drawing; and (38) Reference Drawing.   DX 1 at 36.

[8] FAR 52.236-3(a) provides that

> [t]he Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to (1) conditions bearing upon transportation, disposal, handling, and storage of materials; (2) the availability of labor, water, electric power, and roads; (3) uncertainties of weather, river stages, tides, or similar physical conditions at the site; (4) the conformation and conditions of the ground; and (5) the character of equipment and facilities needed preliminary to and during work performance.   The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract.   Any failure of the Contractor to take the actions described and

In addition, the Solicitation contained a release of liability for "any conclusions or interpretations" arising from the information provided by the NAVFAC. DX 14 at 1. This release included FAR 52.236-3(b) warning potential bidders that

> [t]he Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government. Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract.

48 C.F.R. 52.236-3(b).

Neither the Appledore Report nor the FST Report nor their findings were provided by the NAVFAC to potential bidders.

**C.      On June 4, 2009 and June 11, 2009, The Naval Facilities Command Conducted Two Site Visits Of The Newport Naval Station Wharf.**

On June 4, 2009 and June 11, 2009, the NAVFAC allowed prospective bidders to investigate site conditions. DX 1 at 517, 520. At the beginning of each visit, Travis J. Germano, a NAVFAC Construction Manager, provided bidders with a brief safety presentation and then took them to the site. TR at 2223 (Germano). Prospective bidders were encouraged to walk the entire length between Piers 1 and 2 and investigate the wharf's conditions carefully. TR at 2225 (Germano). They also were instructed to submit any questions in writing, so that everyone would have access to the same information. TR at 2223 (Germano).

At the site, hazardous conditions around the wharf were marked by yellow sawhorses, orange construction fencing, and/or concrete barriers. TR at 2226 (Germano).

---

acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the Government.

48 C.F.R. 52.236-3(a).



DX 742.10 (photograph of the wharf taken on May 19, 2008, prior to the June 4 and June 11, 2009 site visits and RDA's commencement of performance on February 5, 2010).



DX 742.25 (photograph of the wharf taken on December 8, 2009, after the June 4 and June 11, 2009 site visits, but prior to RDA's commencement of performance on February 5, 2010).

Exposed steel was visible where the wharf's concrete structure showed deterioration.  TR at 2226 (Germano).



DX 742.18 (photograph of deteriorated H-piles taken on November 29, 2009, after the June 4 and June 11, 2009 site visits, but prior to RDA's commencement of performance on February 5, 2010).



DX at 742.17 (photograph of deteriorated H-piles taken on November 29, 2009, after the June 4 and June 11, 2009 site visits, but prior to RDA's commencement of performance on February 5, 2010).

In addition, there were large sinkholes located along seventy-five percent of the bulkhead. TR at 2224–25 (Germano). Several bidders climbed into these sinkholes to inspect the existing seawall and conditions underneath the wharf. TR at 2224–25 (Germano).



DX 742.7 (photograph of sinkhole taken on May 19, 2008, prior to the June 4 and June 11, 2009 site visits and RDA's commencement of performance on February 5, 2010).

An Estimator for RDA testified that he inspected the entire project site and paid special attention to the condition of the concrete deck and H-piles. TR at 79–80, 127–28 (Wood). But, RDA did not submit any questions to the NAVFAC, because RDA wanted to keep its bidding strategy secret. TR at 1474 ("We didn't ask any questions because you are trying to keep your competitive advantage and your thought process to yourself. You are not trying to let everybody know what you are thinking." (Kelley)).

### D.      On June 30, 2009, RDA Construction Corp. Submitted A Bid.

On June 30, 2009, RDA submitted a bid for $7,162,524. DX 18 at 1. On July 7, 2009, the NAVFAC informed RDA that it was "the apparent low bidder" and requested that RDA provide:

a.      Identification of the Contractor's personnel and management to be used on this contract.

b.      The Contractor's technical and management plans for performing required services.

c.      Description of Contractor's facilities and equipment.

d.      Summary of the Contractor's experience in performing work of the type required by this specification.

e.      Current financial statements and data, including financial institution, point of contact, and phone number.

f.      Other work presently under contract.

g.      Prior contracts for similar work, and the names, addresses and telephone numbers of individuals with the organization issuing the contract who may be contacted for information concerning the Contractor's performance.

DX 22 at 1–2.

On July 9, 2009, the NAVFAC informed RDA that its bid price "was substantially lower than the Government estimate" and requested that RDA "review [its] bid worksheets for . . . possible errors or omissions, assure [itself] that [it] fully underst[ood] the scope of work, and that [it] . . . include[d] . . . reasonable amounts to accomplish [the] work [required by the Solicitation]." DX 22 at 2.  If RDA considered its bid price to be correct, RDA was instructed to provide a written confirmation of the price and a statement to the NAVFAC "waiv[ing] any and all claims of a bid mistake after award of the contract."  DX 22 at 2.  After reviewing its bid, RDA informed the NAVFAC that "no clerical mistake was made in our calculations" and "[RDA] will honor the bid price and will not file any claims because of a bid mistake[.]"  DX 22 at 3.

On July 13, 2009, RDA also provided the NAVFAC with Technical And Management Plans stating that

RDA plans on performing the work both from the land site and the waterside.  The demolition of the deck and beams will be done from the land while the removal of the piles will be done from the water.  For the driving of the sheets and the installation of the king piles, RDA plans to do this from the land with a barge in front of the work to assist in the performance.  The diving crew will work off of floats in front of their work.  All deliveries of materials will be done from land. RDA will self perform most of the work, but will hire qualified subcontractors for the specialty work, *i.e.* soil anchor, paving, *etc.*  RDA will complete this project well ahead of 18 months as allowed in the contract.

DX 23 at 20.

**E.      On October 13, 2009, RDA Construction Corp. Signed Contract No. N40085-09-B-7002.**

On September 30, 2009, the NAVFAC awarded Contract No. N40085-09-C-7002 ("the Contract") to RDA.  DX 1 at 536–37.  On October 13, 2009, RDA signed the Contract.  DX 1 at 537.  On October 15, 2009, the NAVFAC issued a Notice To Proceed.  DX 29 at 1 ("[T]his letter constitutes your authority to commence work at the job site subject to the terms and conditions of the contract concerning other submittals required prior to commencing work.").  Pursuant to the October 13, 2009 Contract, RDA was to "complete [contract performance] within 555 days after receiving notice to proceed," *i.e.*, the completion date was set as June 26, 2011.  DX 1 at 1.

**F.      On November 18, 2009, The Appledore Report Was Disclosed To RDA Construction Corp.**

On November 12, 2009, RDA met with Mr. Germano, the NAVFAC's Construction Manager, at a pre-construction conference. DX 36 at 1; DX 37 at 2. Afterwards, Michael Hartman, RDA's Project Manager, and Mr. Germano toured the project site. TR at 188 (Hartman); TR at 2253 (Germano). During the tour, Mr. Hartman informed Mr. Germano that RDA planned to demolish the wharf, using two excavators that would be placed side-by-side on the wharf and gradually work backwards from one end to the other, ripping up the concrete structure and removing piles as they moved along. TR at 188 (Hartman). Mr. Hartman also stated that RDA would leave a narrow strip on the outboard side of the wharf where the soil anchoring equipment would be placed while the new bulkhead was installed. TR at 2253 (Germano). At trial, Mr. Germano testified that he was "shocked" by RDA's demolition plan, because the "wharf [was] condemned." TR 2254 (Germano).

On November 18, 2009, Mr. Germano provided RDA with the Appledore Report and restated his reservations about RDA's demolition plan: "[F]rom [a] quick review of the document and drawings, [he] would significantly question the capacity of the [marginal] wharf" and "[f]rom a safety perspective, [he did] not believe [RDA would] be allowed to place any equipment or vehicles on the wharf." PX 28 at 1.

On November 20, 2009, RDA informed Mr. Germano that it reviewed the Appledore Report and was concerned that the wharf apparently was not capable of supporting a live load—a fact not mentioned in the Solicitation. PX 29. RDA explained that

> [i]n preparation of [its] bid[,] [RDA] included means and methods to utilize portions of the existing structure as a work platform for the initial selective demolition of the wharf structure, rip rap removal, subsequent drilling of the earth anchors and final demolition of the structure. Each of these work activities included staging equipment off the existing wharf not marine access from barge mounted equipment. The instability of the wharf will cause both time and cost impacts.

PX 29.

On December 9, 2009, the NAVFAC became concerned that the conditions described in the Appledore Report would adversely affect the cost of completing the wharf and requested that RDA provide the following information:

- Please explain in some detail exactly how you intended to utilize the existing wharf in performing the contract work. For example, what portions of the wharf did you intend to demolish at various times, what equipment did you intend to stage on the remaining portions of the wharf, and how did you intend to use that equipment to advance the project?

- Please provide a plan view drawing noting the type of equipment, locating their position & reach capability. Please provide a profile view drawing for both the

rock removal work and soil anchor work locating equipment position, available angle of drilling, and reach capability.

- Please provide your best current estimate of the cost and time impacts you will incur if you are required to utilize barges and temporary structures to perform the contract work.  Please briefly explain how you arrived at your figures.

DX 54 at 1.

The NAVFAC also warned RDA that the December 9, 2009 letter should not be interpreted as accepting RDA's characterization that the Solicitation and/or contract specifications and drawings were not complete.  DX 54 at 2.

On December 20, 2009, RDA responded to the NAVFAC's December 9, 2009 letter, explaining that its "As-Bid Plan" was to use the existing wharf as a staging platform for a two-step demolition process.  DX 62 at 3.  During the first step, RDA planned to demolish the inboard side of the wharf.  DX 62 at 3.  This work would be performed from the wharf, by moving the demolition equipment backward from one end to the other.  DX 62 at 3.  Noncritical sections of the inboard wharf would be left intact to provide access to the outboard side.  DX 62 at 3.  Then, RDA would place a drill rig on the outboard portion of the wharf to complete the earth anchor installations required for the new bulkhead.  DX 62 at 3.  After installation of the earth anchors, RDA would demolish the outboard wharf.  DX 62 at 3–4.  But, in light of the Appledore Report, the wharf could no longer be used as a platform for demolition or construction staging.  DX 62 at 4.  Therefore, that work would have to be performed from barge-mounted equipment and/or platforms supported by temporary piles.  DX 62 at 4.  And, because these structural problems were not disclosed in the Solicitation or during the site visit, RDA would need to spend an additional $1,209,905.62 to complete performance.  DX 62 at 4–5; *but see* PX 35 at 1–2 (subcontractor estimate advising RDA that if the wharf demolition was performed from barges, it would cost RDA an additional $797,400).

On December 23, 2009, RDA submitted a Baseline Network Analysis Schedule ("baseline schedule") to the NAVFAC, compiled from its as-bid plan.  DX 65 at 1; TR at 229–32 (Hartman). Pursuant to the October 13, 2009 Contract, "[s]ubmittal and acceptance of the [baseline schedule] and accurate updated schedules accompanying [RDA's] pay requests [were] both conditions precedent to [the NAVFAC] processing pay request."  DX 1 at 144.

On February 2, 2010, the NAVFAC informed RDA that the December 23, 2009 baseline schedule was not acceptable, because "it [did] not accurately represent the actual 'work process logic,' that is, performing the work from barge mounted equipment, in which the project will be completed."  DX 87 at 1.  The NAVFAC also advised RDA that the February 2, 2010 letter would "serve as confirmation to our several phone conversations that all submitted baseline [schedules] to date were not approved."  DX 87 at 1.  That same day, RDA submitted a revised baseline schedule.  PX 58 at 1.

On February 5, 2010, the NAVFAC repeated that "the multiple baseline schedules previously submitted . . . [were] not acceptable" (DX 95 at 1), but conditionally approved RDA's February 2, 2010 baseline schedule for the limited purpose of allowing work to begin.  PX 58 at 1.

The NAVFAC advised RDA that "invoicing will not be permitted until [the NAVFAC] complete[d] a full review of [the] schedule and accept[ed] it." PX 58 at 1.

On February 8, 2010, the NAVFAC informed RDA that

[t]he [NAVFAC] is in the process of reviewing the information RDA . . . has provided regarding its planned method of performance of the P-469 Waterfront Improvement contract when it submitted its bid. The information consists of [RDA's December 20, 2009] letter . . . and marked up drawings CD-101 and CD-501 (which include narrative inserted by RDA discussing your proposed methods). While we have not completed our review of this information, two of our subject matter experts have expressed strong reservations regarding whether your proposed methods were feasible even if the wharf were structurally sound[.]

While the Navy hopes to complete its analysis of this issue in the near future and determine whether RDA is entitled to any adjustment to the contract price for adjusting its method of performance, our analysis does not excuse RDA from starting performance. As you are aware, your contract contains FAR Clause 52.233-1, "Disputes." [9]

DX 98 at 1.

On April 1, 2010, the NAVFAC informed RDA that the July 3, 2010 revised baseline schedule contained thirty-four deficiencies and returned it to RDA for revisions consistent with the NAVFAC's comments. DX 111 at 1.

On April 21, 2010, RDA submitted another revised schedule that the NAVFAC also rejected, listing eighteen deficiencies that RDA was required to address before the baseline schedule could be approved. DX 121 at 2.

### G.    On April 21, 2010, RDA Construction Corp. Filed A Certified Claim.

On April 21, 2010, RDA filed a certified a claim, requesting that the NAVFAC adjust the contract price by $1,948,053.86 to reflect the additional costs that RDA would incur to perform demolition of the wharf and construction of a new bulkhead from barge-mounted equipment. DX 118 at 1, 4.

### H.    On May 17, 2010, The Naval Facilities Command Approved RDA Construction Corp.'s Baseline Schedule.

On April 28, 2010, RDA submitted another baseline schedule for the NAVFAC's approval. DX 130 at 1. On May 13, 2010, the NAVFAC rejected the April 21, 2010 submission, because it did not include work that the October 13, 2009 Contract required. DX 130 at 1–3. The next day,

---

[9] FAR 52.233-1(i) states that "[t]he Contractor shall proceed diligently with performance of [the relevant] contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the [CO]." 48 C.F.R. 52.233-1(i).

RDA submitted a new revised baseline schedule, addressing the deficiencies listed in the NAVFAC's May 13, 2010 rejection.  DX 134 at 1.  On May 17, 2010, the NAVFAC finally approved RDA's baseline schedule.  DX 134 at 1.

## I.     On August 31, 2010, RDA Construction Corp.'s April 21, 2010 Certified Claim Was Denied.

On June 17, 2010, the NAVFAC advised RDA that the Defense Contract Audit Agency ("DCAA") was performing an audit of RDA's April 21, 2010 Certified Claim and a final decision would be issued on, or before, August 31, 2010.  DX 151.  On August 11, 2010, RDA was warned that the NAVFAC would deny RDA's certified claim, if RDA continued to fail to provide the information requested by DCAA to complete the audit.  DX 170 at 2.  RDA, however, still did not provide the requested documents.  TR at 522 (Hartman).

On August 31, 2010, the NAVFAC CO issued a decision recognizing that the NAVFAC failed to disclose the Appledore Report during the bidding process, but nevertheless denied RDA's certified claim, because a "reasonable contractor" who attended the June 4, 2009 and/or June 11, 2009 site visits should have concluded that the wharf was in such poor condition that it could not be used as a platform for demolition and construction:  "[I]t was also unreasonable for RDA to assume that the wharf was structurally sound in light of the fact that the entire purpose of the contract was to demolish the structure and build a new one."  DX 193 at 3.

The NAVFAC CO added that

> RDA has not demonstrated its claimed damages with sufficient specificity to justify any payment.  The Government has made several requests that RDA provide calculations showing that the wharf could have accommodated RDA's proposed methods, such as supporting the weight and lateral forces of construction equipment, if it were in good condition, but RDA has never provided any such information.

DX 193 at 3–4.

## J.     On September 20, 2010, RDA Construction Corp. Informed The Naval Facilities Command That Underground Obstructions Were Encountered, So Work Stopped.

The October 13, 2009 Contract required RDA to replace the bulkhead between Pier 1 and Pier 2 of the Newport Naval Station.  DX 1 at 9.  The bulkhead was composed of king piles (*i.e.*, support beams installed intermittently along the structure) and sheet piles (*i.e.*, a wall of interlocking metal sheets that mount onto the king piles).  DX 1 at 100; PX 12 at 3.  To replace the bulkhead at Newport Naval Station, RDA was required to extract the existing king and sheet piles and install new ones.  DX 729 at 6 (Helmes Direct).

RDA began to renovate the bulkhead from the south-end.  TR at 298–99 (Hartman).  On August 23, 2010, however, RDA informed the NAVFAC that an underground obstruction prevented RDA from installing additional sheet piles at the south bulkhead and requested direction

on how to proceed.  DX 206 at 1.  On September 20, 2010, RDA requested an equitable adjustment stating that the obstruction encountered was a differing site condition.[10]

The NAVFAC did not immediately respond to RDA's September 20, 2010 letter.  As a result, RDA stopped working on the southern bulkhead and began to remove the sheet piles in the center bulkhead.  TR at 302 (Hartman).  But, it was not long before RDA encountered other difficulties at that location.  On December 14, 2010, RDA notified the NAVFAC that "[t]he sheets [at the center bulkhead were] in such a deteriorated condition [that] they [could not] withstand the extraction process and pull[ed] apart."  DX 237 at 2.  RDA also reported that it would "track all associated costs to perform this changed condition, and forward same to [the NAVFAC] for review."  DX 237 at 2.

On January 7, 2011, RDA complained that the NAVFAC failed to acknowledge its December 14, 2010 letter and warned that "[a]ll work associated with the Center Bulkhead will be shutdown until the [NAVFAC] responds in writing as required by the [October 13, 2009 Contract]."  DX 244 at 1.  Nevertheless, RDA proceeded to work on the north bulkhead.  TR at 339 (Hartman).  On March 9, 2011, RDA informed the NAVFAC that it hit a second obstruction while installing sheet pile at the north bulkhead and requested to meet with the NAVFAC to discuss possible solutions.  DX 283 at 2.  RDA also advised the NAVFAC that "[w]e are now at a position where no work can proceed on either the South, Center or North Bulkheads without direction.  We laid off all of the workers on site today and will return once we come to a mutual understanding on how to proceed."  DX 283 at 2.

---

[10] The October 13, 2009 Contract incorporated a "differing site conditions" clause, that stated:

> (a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of—
>> (1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or
>> (2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.
> (b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice.  If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

48 C.F.R. § 52.236-2(a)–(b).

**K.    On March 10, 2011, The Naval Facilities Command Instructed RDA To Submit A Cost Proposal To Remove The Obstructions And Continue Work.**

On March 10, 2011, RDA was advised that

[t]he [NAVFAC] received [RDA's] cost proposal on 17 February 2011 regarding removal of the obstructions.  Additional back-up information was requested from RDA on 4 March 2011[.] . . . [RDA's] proposal cannot be analyzed until this information is received.

RDA is claiming that they are unable to remove the existing sheet piles . . . [.]  As stated on drawing CD-501, Note 1, 'if sheets cannot be extracted, cut sheet along knuckle from top of sheet to ground line, then continue to extract using a vibratory hammer.'  During a site visit on 8 March, the [NAVFAC] observed that while trying to remove the existing sheets, RDA did not cut to the ground line but rather to the waterline.  For this reason, the [NAVFAC] disagrees that RDA has encountered a differing site condition.

Please be advised that RDA is currently in default of the contract.  If RDA disagrees with the [NAVFAC's] response to these issues, RDA's remedy is to utilize the [CDA], which is incorporated into the contract via FAR 52.233-1.  Pursuant to that clause, 'the contractor shall proceed diligently with performance of this contract . . . and comply with any decision of the [CO],' even though it is pursuing claims under the [CDA]. . . . Any future abandonment of the project by RDA will be considered a material breach[.]

DX 274 at 1–2.

On March 11, 2011, RDA responded that its work force would return to the site on March 14, 2011, but the decision to stop work "should not be construed as Project abandonment[,] but rather a short period of time to coordinate and plan for the most recent developments experience on the Project."  DX 276 at 1.

On March 16, 2011, RDA informed the NAVFAC of another obstruction at the north bulkhead that was encountered, renewed complaints that obstructions at the bulkhead were differing site conditions, and requested a meeting to discuss "various options and hopefully come to terms with a solution."  DX 283 at 3.

**L.    In Late March 2011, RDA Construction Corp.'s Quality Control Manager And Site Safety Health Officer Quit.**

In late March 2011, RDA's Site Safety Health Officer ("SSHO") and Quality Control Manager ("QC") quit after RDA experienced two accidents on site.  DX 174; DX 262; TR at 1180–81 (Mr. Rachupka), 1368 (Kelley).  Thereafter, from March 31–May 5, 2011, RDA sent numerous letters to the NAVFAC requesting that Ray Morisette, Peter Meomartino, Lynda Amarantes, Michael Rand, and Richard DiRamio be approved as QCs and SSHOs.  DX 307–13, 316, 319–20, 322–26.  On May 9, 2011, the NAVFAC approved Mr. Morrissette to serve both as the QC and

SSHO, but denied RDA's other proposed personnel, because their "resumes and certificates" did not meet contract requirements.  DX 327 at 1.

**M.      On June 7, 2011 And August 19, 2011, The Naval Facilities Command Issued Contract Modifications 4 and 5 To The October 13, 2009 Contract.**

On April 4, 2011, the NAVFAC requested that RDA submit a cost proposal for "a pneumatic percussive air-track drill rig to penetrate through the reported obstructions [at the south bulkhead and north bulkhead]," but cautioned that "this is an inquiry only and is not to be construed as authority to proceed with the work."  DX 293 at 1.  On April 12, 2011, RDA provided the NAVFAC with that proposal.  DX 298 at 1.  On April 14, 2011, the NAVFAC asked for more information and "to provide an approximate number of days [RDA] thought it might take to drill through the obstructions so [the NAVFAC could] put an estimated number of days in the modification[.]"  DX 299 at 1.  On April 22, 2011, RDA provided that information.  DX 304 at 1.

On June 7, 2011, the NAVFAC executed Modification 4[11] as an equitable adjustment to the October 13, 2009 Contract, "to incorporate changes required by obstructions encountered during installation of sheet piles."  DX 1 at 587.  Modification 4 required RDA to drill through the obstructions at the south and north bulkheads, extended the contract completion date by forty-four days, *i.e.*, from June 26 to August 9, 2011, and increased the contract price by $290,180.  DX 1 at 588.  Modification 4 also required that "[a]cceptance of this modification by the Contractor *constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs*, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised."  DX 1 at 588 (emphasis added).[12]

On June 28, 2011, Ray Morrissette had a heart attack.  DX 347 at 1; PX 138 at 1; TR at 659 (Wallis), 1157–58 (Rachupka), 1373 (Kelley).  Because the October 13, 2009 Contract required RDA to "[p]rovide a Site Safety and Health Officer (SSHO) at the work site at all times," RDA had to stop work, pending Ray Morrissette's recovery or the appointment of another SSHO. DX 1 at 192; DX 347 at 1; DX 350 at 1.  On June 29, 2011, RDA re-proposed Lynda Amarantes

---

[11] Modifications 1–3 made administrative changes to the October 13, 2009 Contract.  On November 4, 2009, the NAVFAC executed Modification 1 designating the Facilities Engineering Acquisition Division team at Newport Naval Station as the Administrative Contracting Officer and set the liquidated damages amount at $3,531.56 for each calendar day of delay until the work is completed.  DX 1 at 581.  On January 27, 2010, the NAVFAC executed Modification 2 providing that payment to RDA would be made by the Defense Finance and Accounting Service. DX 1 at 583.  On April 15, 2010, Modification 3 changed the contract completion date from April 11, 2011 to June 26, 2011, "due to [an] Option exercised at time of award (which allowed for an additional 65 days for contract completion if exercised)."  DX 1 at 586.

[12] The effect of the accord and satisfaction clause was to absolve the NAVFAC from any liability relating to the non-disclosure of the Appledore Report and the FST Report prior to executing the October 13,2 009 Contract, including RDA's April 21, 2010 Certified Claim.

for the QC and SSHO positions.  DX 345 at 1; DX 346 at 1.  On June 30, 2011, RDA also re-proposed Michael Rand for the QC position.  DX 348 at 1.

On July 13, 2011, the NAVFAC responded that Lynda Amarantes was not qualified to serve as a QC or SSHO.  DX 356 at 1.  On July 27, 2011, RDA advised the NAVFAC that Ray Morrissette was "cleared by his cardiologist to return to work," but was required to "attend [a cardiac rehabilitation program] on Mondays, Wednesdays, [and] Fridays."  DX 366 at 1.  RDA proposed that Michael Rand act as QC and SSHO, when Ray Morrissette was absent.  DX 366 at 1.

On August 9, 2011, RDA informed the NAVFAC that it began drilling through the obstructions on July 17, 2011, but work was still in progress.  DX 372 at 1.  The August 9, 2011 letter also advised that

> [t]o date [RDA has] experienced conditions which were not anticipated in the scope of additional work.  Several iterations of obstruction drilling, attempted driving of permanent sheets and then more drilling has occurred several times.  Unanticipated additional obstruction drilling at the Center Bulkhead . . . , extraction of existing sheet pile at the North Bulkhead . . . causing adjacent King Piles to move outboard. In general RDA has worked out of planned sequence causing our Obstruction Drill Crew and Pile Driving Crew to experience inefficiencies in production.

DX 372 at 1.

On August 19, 2011, the NAVFAC issued Modification 5 to the October 13, 2009 Contract, extending the contract end-date from August 9 to August 16, 2011, and increased the contract price by $41,055.  DX 1 at 592.  Modification 5 also included an accord and satisfaction clause.  DX 1 at 592.

### N. On August 31, 2011, RDA Construction Corp. Filed A Complaint In The United States Court Of Federal Claims.

On August 31, 2011, RDA filed a Complaint in the United States Court of Federal Claims, alleging that: (1) the Government violated its duty to disclose material information regarding the nature of the work required by the October 13, 2009 Contract; (2) under the differing site conditions clause of the October 13, 2009 Contract, RDA is entitled to recover costs attributable to site conditions that differed materially from the conditions disclosed in the contract documents; and (3) the NAVFAC affirmatively and intentionally misrepresented the conditions of the wharf. ECF No. 1, 8/31/11 Compl. at ¶¶ 49–50, 52–53, 55–56 ("8/31/11 Compl.").  On that same day, *RDA Construction Corp. v. United States*, No. 11-555, was assigned to the Honorable Francis M. Allegra.  ECF No. 3.

### O. On September 14, 2011, RDA Construction Corp. Experienced A Third Accident At The Project Site.

On September 14, 2011, RDA had an accident at the Newport Naval Station involving a Manitowoc 4100W crane, but no one was injured.  DX 398 at 1.  On September 27, 2011, RDA was informed that its safety record was unacceptable, because "neither the SSHO/QC Manager

nor the Superintendent [was] on site when the accident occurred." DX 413 at 1. The NAVFAC also warned RDA that

> [i]f the Government observes any unsafe conditions at the project site in the future, or if any future incidents occur, we plan to vigorously enforce the contract's remedies for such matters. Specifically, the contract permits the Government to stop all work on the project until all safety concerns have been remedied. Under the contract, such a stoppage would not entitle RDA to any type of monetary adjustment nor any extension of the contract's completion date. The contract specifications also permit the Government to demand the removal of your superintendent and/or SSHO due to their failure to enforce safety requirements and stop all work until suitable replacements are identified and onsite. And, if such stoppages result in RDA failing to make sufficient progress on the contract, the Government will be entitled to terminate the contract for default.

DX 413 at 1–2.

On September 28, 2011, RDA responded that it did not "take the events surrounding the incident on September 14, 2011 lightly and intend[ed] to address the situation . . . to the [NAVFAC's] satisfaction." DX 415 at 1. To that end, RDA proposed "an internal review of the contract requirements regarding the SSHO" and promised that "[t]he approved SSHO or his approved designee will be on site during all work activities," "[p]rior to a scheduled absence by the SSHO upcoming safety and QC inspections will be completed," and "[i]f there are any QC and/or safety requirements that have to be addressed or if there are multiple work activities being performed during the SSHO's absence then RDA's President, Gene Kelley will provide the additional oversight." DX 415 at 2.

On October 11, 2011, RDA proposed that Mark Wallis be approved as the alternate SSHO so that he could serve as SSHO, when Ray Morrissette was not present at the project site. DX 426 at 1. On October 19, 2011, RDA also submitted Mark Wallis as an alternate QC. DX 436 at 1. On January 19, 2012, the NAVFAC rejected RDA's proposal to use Mark Wallis as a QC, because of

> certain prior actions he has taken that have demonstrated a total disregard for necessary safety and environmental concerns. For example, Wallis recently ignored Navy guidance by failing to use any preventive measures to prevent or mitigate a release of fuel during the recovery operation of the sunken push boat [on January 12, 2012]. Although the need for such measures was explicitly discussed during the critical lift meeting on [January 11, 2012] and mentioned again prior to the critical lift on [January 12, 2012], RDA did not exercise necessary steps to prevent or contain a spill.
>
> As a result of RDA's failure, a fuel spill occurred during the lift and Naval Station Newport had to report a second release of fuel from RDA's boat into Narragansett Bay to the RI Department of Environmental Management and US Coast Guard. This recent spill was the second release of fuel into Narragansett Bay by RDA in the past month (first release occurred on [December 29, 2011] when attempting to

recover the sunken push boat). Despite having experienced the prior spill, and despite the Navy's guidance to RDA to have spill kits available to respond if additional fuel was released into the water, RDA did not utilize any preventive measures prior to lifting the boat from the water. The Navy finds this lack of care on the part of RDA and Wallis to be completely unacceptable.

DX 485 at 1–2. The NAVFAC also denied RDA's request to use Mark Wallis as an SSHO. DX 486 at 1.

On January 20, 2012, RDA proposed Peter Brewer to replace Ray Morrissette as the SSHO. DX 487 at 1. On January 24, 2012, RDA requested that the NAVFAC reconsider Mark Wallis as RDA's QC. DX 489 at 1. On January 27, 2012, the NAVFAC approved Peter Brewer as RDA's SSHO, but again rejected Mark Wallis, insisting that "a different, qualified individual [] fill the QC position before [RDA could] resume work on the project." DX 491 at 1. On the same day, RDA requested approval of Gerald Smith as QC. DX 493 at 1. On February 13, 2012, the NAVFAC approved Gerald Smith as RDA's QC. PX 156 at 2.

**P.      From March 20, 2012 To November 8, 2012, The Naval Facilities Command Issued Contract Modifications 6–12.**

On March 20, 2012, the NAVFAC executed Modification 6, granting RDA a $34,401 equitable adjustment to remove the H-piles, sheet piles, and creosoted timber that were not shown on the contract drawings and extended the contract completion date from August 16, 2011 to August 17, 2011. DX 1 at 594. Modification 6 also contained an accord and satisfaction clause. DX 1 at 594.

On April 13, 2012, the NAVFAC issued Modification 7, requiring RDA to perform additional drilling through the obstructions at the south bulkhead with a construction monitor onsite to observe the drilling operations. DX 1 at 597. The contract completion date also was extended by seventy-one days, *i.e.*, from August 17, 2011 to October 27, 2011, and the total cost of the contract was increased by $63,959.23. DX 1 at 597.

On June 6, 2012, the NAVFAC executed Modification 8, extending the contract completion date to November 13, 2011 and the total cost by $95,314, to add a corrosion protection system on the tie rods for the deck fitting bases and attach all landside anodes to new sheet piles. Modification 8 also included an accord and satisfaction clause. DX 1 at 601.

On August 17, 2012, the NAVFAC issued Modification 9, extending the contract completion date to February 14, 2012 and increasing the contract price by $351,423, for additional drilling through the obstructions at the south and north bulkheads. DX 1 at 604.

On September 4, 2012, the NAVFAC published Modification 10, granting RDA a $69,280 equitable adjustment for the time, labor, material and equipment costs that RDA incurred to drill through the obstructions at the south bulkhead. DX 1 at 607–08. Modification 10 also extended the contract completion date to June 15, 2012 for delays when RDA did not have an approved SSHO and QC. DX 1 at 608.

On September 19, 2012, the NAVFAC executed Modification 11, decreasing the contract completion date to June 12, 2012 and deducting $2,504 from the contract price, because RDA used a method to drill through the obstructions at the north bulkhead that was less expensive than originally anticipated.  DX 1 at 611–12.

On November 8, 2012, the NAVFAC executed Modification 12, extending the contract completion day to October 5, 2012, and increasing the contract price by $299,165, for additional work required to drill through obstructions at the north bulkhead.  DX 1 at 614–15.

**Q.    On February 21, 2013, The Naval Facility Command Terminated The October 13, 2009 Contract.**

On November 7, 2012, the NAVFAC directed RDA to remove several piles from the bay floor that broke below the mud-line.  DX 626 at 1.  On January 18, 2013, RDA complained that the NAVFAC's repeated failure to adjust the October 13, 2009 Contract for unforeseen conditions and November 7, 2012 directive constituted a cardinal change.  DX 626 at 2.  Therefore, RDA refused to comply with the NAVFAC's instructions.  DX 626 at 2.

On November 28, 2012, J. P. Riley Crane Consultants ("J.P. Riley"), an independent crane inspector, conducted an annual inspection of the Manitowoc 4100W crane and presented RDA with a Crane Inspection Certificate, but also issued a Deficiency Report citing five items that needed repair.  DX 677 at 3, 6.  RDA was instructed to sign the Deficiency Report and return it to J.P. Riley, ten days after the repairs were made.  DX 677 at 6.  On December 13, 2012, an RDA employee signed the Report.  DX 677 at 6.

On January 9, 2013, RDA provided the NAVFAC with the November 28, 2012 Crane Inspection Certificate and signed Deficiency Report.  DX 677 at 17.  But, on January 10, 2013, a NAVFAC official sent an e-mail to RDA stating there was no "mention when the crane was re-inspected by J[.]P[.] Riley confirming the adequacy of repairs so that it could be placed back into service."  DX 677 at 18.  The email also stated that, according to the United States Army Corps of Engineer Safety And Health Requirements Manual EM 385-1-1 (2008) (the "EM 385-1-1"): "a written report is required confirming the adequacy of repairs."  DX 677 at 18.  Subsequently, the NAVFAC and RDA argued about whether the EM 385-1-1 required J.P. Riley to re-inspect the crane after the repairs were completed, or if an RDA mechanic could perform the re-inspection.  DX 677 at 17–27.

On January 14, 2013, the NAVFAC issued a letter, pursuant to FAR 52.236–13,[13] directing RDA "to have the Manitowoc 4100 crane inspected by an independent, third-party that

---

[13] In demolition contracts, FAR 52.236–13 provides that  "the Contractor shall comply with all pertinent provisions of the latest version of U.S. Army Corps of Engineers Safety and Health Requirements Manual, EM 385–1–1, in effect on the date of the solicitation," and

> [if the] Contracting Officer becomes aware of any noncompliance with these requirements or any condition which poses a serious or imminent danger to the health or safety of the public or Government personnel, the Contracting Officer shall notify the Contractor orally, with written confirmation, and request

specializes in performing crane inspection" and stating that "RDA is not permitted to use the Manitowoc 4100 crane . . . until such an independent inspection has been completed." DX 677 at 28.  The letter also instructed that the NAVFAC personnel were to be present for the re-inspection. DX 677 at 28.

On January 16, 2013, J.P. Riley re-inspected the crane in the presence of Craig Rachupka, NAVFAC's Construction/Project Manager.  DX 625 at 1.  At the re-inspection, RDA agreed to make the necessary repairs and submit to a third re-inspection.  DX 625 at 2.  The NAVFAC also instructed RDA to keep the crane out of service until that time.  DX 677 at 60.  Afterward, RDA sent the NAVFAC additional letters about whether FAR 52.236–13 and the EM 385-1-1 gave the NAVFAC authority to keep RDA's Manitowoc 4100 crane out of service.  DX 677 at 60, 104, 106, 118–121.

On January 31, 2013, the NAVFAC instructed RDA to show cause why the October 13, 2009 Contract should not be terminated for default, pursuant to FAR 52.249-10,[14] because

---

immediate initiation of corrective action . . . .  If the Contractor fails or refuses to promptly take corrective action, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken. The Contractor shall not be entitled to any equitable adjustment of the contract price or extension of the performance schedule on any stop work order issued under this clause.

48 C.F.R. § 52.236–13 (c), (d).

[14] FAR 52.249-10 states, in relevant part,

(a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed.  In this event, the Government may take over the work and complete it by contract or otherwise, and may take possession of and use any materials, appliances, and plant on the work site necessary for completing the work.  The Contractor and its sureties shall be liable for any damage to the Government resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated.  This liability includes any increased costs incurred by the Government in completing the work.

(b) The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if—
        (1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor.

48 C.F.R. 52.249-10.

> the contract's [amended] completion date passed almost four months ago, on 5
> October 2012. Since that date, the Navy ha[d] refrained from terminating RDA . . .
> under the default clause in hopes that RDA would make significant progress
> towards completion, thereby mitigating its potential damages.
>
> RDA's continued failure to make progress towards completion of this project,
> however, require[d] the Navy to reconsider its position regarding termination.
> RDA . . . made only limited progress on any contract work for over a month and at
> least two of its major pieces of equipment . . . [were] currently broken, [creating]
> significant concerns regarding RDA's ability, and desire, to achieve progress in the
> future. RDA . . . also . . . repudiated its duty to perform . . . the extraction of H-
> piles broken during earlier removal attempts.

DX 636 at 1.

On February 1, 2013, RDA insisted that "progress ha[d] been limited due to obstructions,
and the [G]overnment's failure to act in good faith and to utilize the partnering agreement to get
this project done." DX 637 at 1.

On February 21, 2013, a NAVFAC CO terminated the October 13, 2009 Contract for
default, citing RDA's failure to perform the necessary contract work and complete the project in a
timely manner. DX 650 at 1. In addition, RDA was advised that the NAVFAC intended to issue
a contract modification assessing liquidated damages against RDA. DX 650 at 3. On that date,
the NAVFAC also contacted RDA's surety, Great American Insurance Company ("GAIC"),
demanding that GAIC complete the October 13, 2009 Contract. DX 653 at 1, 11. Subsequently,
GAIC conducted two underwater surveys of the project site. DX 689; DX 698. Both surveys
showed that RDA left substantial amounts of debris around the footprint of the demolished wharf.
DX 689 at 1; DX 698 at 4.

As a result, on March 18, 2013, RDA filed a Certified Claim stating:

> [p]lease find attached our costs associated with your direction to re-inspect the
> Manitowoc 4100W crane . . . . As RDA believes that NAVFAC direction to re-
> inspect the crane to be unreasonable and exceed contract requirements we are
> hereby filing our Notification of Claim.

DX 677 at 114–15.

### R.     On July 3, 2013, RDA Construction Corp. Filed A Second Certified Claim.

On July 3, 2013, RDA filed a second certified claim alleging that the NAVFAC: delayed
contract performance (DX 691 at 19–29); failed to award RDA time extensions for delays caused
by the NAVFAC (DX 691 at 21); unilaterally modified the October 13, 2009 Contract (DX 691 at
21–25); and wrongfully terminated the October 13, 2009 Contract (DX 691 at 30). This conduct
breached the October 13, 2009 Contract and entitled RDA to recover $1,625,258 in unanticipated
costs and $718,059 in lost profits. DX 691 at 9, 30–31. The July 3, 2013 Certified Claim also
alleged that RDA was not liable for liquidated damages, but entitled to recover $294,705 that the
NAVFAC wrongfully withheld from RDA. DX 691 at 13, 31.

On September 26, 2013, the NAVFAC CO determined that RDA's July 3, 2013 Certified Claim failed to identify a specific basis for each of the claimed items and was invalid.  DX 695 at 2.  The CO also determined that, even if the July 3, 2013 Certified Claim was valid, the NAVFAC was only liable for PCO 46, "Revised Base Access Requirements."  DX 695 at 2.  In a separate letter, also dated September 26, 2013, the NAVFAC CO decided that RDA was entitled to $11,162.99, because the NAVFAC changed policies regarding base access, causing RDA to incur the cost of "new access badges for its employees[.]"  DX 696 at 1.

On December 20, 2013, the NAVFAC entered into a Tender Agreement with RDA's surety, GAIC.  DX 700.  Under the Agreement, GAIC tendered Haskell Company ("Haskell") to complete the October 13, 2009 Contract for $4,707,353.  DX 700 at 4.  The NAVFAC would pay Haskell the remaining contract balance of $1,932,415.76 and GAIC would cover the remaining $2,774,937.24.  DX 700 at 4.

On March 4, 2014, Haskell and the NAVFAC executed a contract for completion of the remaining work under RDA's October 13, 2009 Contract.  DX 702 at 2.  Haskell's March 4, 2014 Contract had a completion date of November 30, 2014.  DX 702 at 6.

### S.     On April 15, 2015, The Naval Facility Command's Contracting Officer Determined That RDA Construction Corp. Was Liable For Liquidated Damages.

On April 15, 2015, the NAVFAC CO also determined that RDA was liable for $2,581,161 in liquidated damages.  DX 711 at 1.  The CO, however, credited RDA $11,162.99 for PCO 46 and $294,705 for outstanding compensation that the NAVFAC withheld from RDA as partial payment of the assessed liquidated damages.  DX 711 at 1.  As a result, the CO determined that RDA owed the NAVFAC $2,275,293.01 in liquidated damages.  DX 711 at 1.

## II.   PROCEDURAL HISTORY.

After three years of discovery before Judge Allegra, on May 7, 2015, RDA filed a Second Amended Complaint ("5/7/15 Sec. Am. Compl. at ¶¶ 1–134"), alleging that:

(1)     the NAVFAC breached its duty to disclose material information regarding the extreme deterioration of the Wharf, that was known by the NAVFAC and unavailable to RDA ("Count I");

(2)     RDA encountered latent site conditions that materially differed from the conditions described in the Contract ("Count II");

(3)     the NAVFAC knew that the site conditions materially differed from the condition described in the Contract, but negligently and/or intentionally withheld that information ("Count III");

(4)     the NAVFAC affirmatively misrepresented the purpose of the Contract and the actual conditions of the Wharf ("Count IV");

(5)     the NAVFAC breached the Contract ("Count V");

(6)     the CO's administration of contract work was arbitrary and capricious ("Count VI");

(7)     the NAVFAC acted "willfully, intentionally, and in bad faith," when it withheld decisions, created obstructions, failed to timely approve requests for information and changes, and wrongfully terminated the Contract ("Count VII");

(8)     the NAVFAC breached the Covenant of Good Faith and Fair Dealing ("Count VIII"); and

(9)     the CO's determination that the NAVFAC was entitled to liquidated damages for delays caused by RDA and to retain $294,705 in partial payment thereof, was "improper, unjustifiable, unsupported by the contract documents, and in bad faith" ("Count IX").

ECF No. 44, 5/7/15 Sec. Am. Compl. at ¶¶ 95–96, 98–99, 101–04, 106–07, 109–14, 116–18, 120–22, 124–27, 129–34.

On June 12, 2015, the Government filed an Answer to RDA's May 7, 2015 Second Amended Complaint ("6/12/15 Gov't Answer") asserting three affirmative defenses:  (1) part, or all, of RDA's claims are barred by release, waiver, accord and satisfaction, or estoppel; (2) RDA assumed the risk that its site investigation, as well as its chosen means and methods during performance, would be inadequate; and (3) to the extent RDA is entitled to any recovery, it must be offset by amounts that RDA owes the NAVFAC.  ECF No. 46, 6/12/15 Gov't Answer at ¶¶ 136–38.

In addition, the June 12, 2015 Answer contained four counterclaims, alleging that the Government is entitled to:

(1)     $2,275,293.01 in liquidated damages, because RDA failed to finish performance of the October 13, 2009 Contract by the completion date ("Counterclaim I");

(2)     $82,974.70, under the CDA's anti-fraud provision, 41 U.S.C. § 7103(c)(2), because RDA misrepresented facts related to items claimed in the July 3, 2013 Certified Claim ("Counterclaim II");

(3)     forfeiture of RDA's July 3, 2013 Certified Claim, pursuant to 28 U.S.C. § 2514, because that claim contained false statements ("Counterclaim III"); and

(4)     $231,000, under the False Claims Act, 31 U.S.C. §§ 3729–3733, because RDA knowingly submitted twenty invoices to the NAVFAC that contained false representations (Counterclaim IV").

6/12/15 Gov't Answer ¶¶ 174–90.

*     *     *

On June 23, 2015, this case was reassigned to the undersigned judge. ECF Nos. 47–48. On July 14, 2015, the court issued an Order, setting the deadline for RDA's Answer to the Government's June 2, 2015 Counterclaims for July 24, 2015. ECF No. 50. In addition, the court set a trial date to be held in Boston, Massachusetts commencing on November 16, 2015. ECF No. 50.

On July 24, 2015, RDA filed an Answer to the counterclaims alleged in the Government's June 12, 2015 Answer ("7/24/15 Pl. Answer"), asserting ten affirmative defenses:

(1)     The Government's counterclaims fail to state a claim upon which relief can be granted ("Affirmative Defense I");

(2)     the Government is estopped from recovering damages from RDA ("Affirmative Defense II");

(3)     the Government's counterclaims are barred by the principle of waiver ("Affirmative Defense III");

(4)     the Government's counterclaims are barred by the doctrine of unclean hands ("Affirmative Defense IV");

(5)     the Government's counterclaims are based on statements or conduct that the NAVFAC approved or ratified ("Affirmative Defense V");

(6)     to the extent that any of the circumstances alleged by the Government occurred, the Government is barred from recovery, because these facts were caused by the NAVFAC ("Affirmative Defense VI");

(7)     the NAVFAC did not rely upon the misrepresentations alleged in the Government's counterclaims ("Affirmative Defense VII");

(8)     the Government did not plead any fraud counterclaim with specificity, as required by law ("Affirmative Defense VIII");

(9)     the Government's counterclaims are barred, because RDA did not knowingly submit any false claims to the NAVFAC for payment or approval ("Affirmative Defense IX"); and

(10)     the Government's counterclaims are barred, because RDA never made an actionable misrepresentation, nor did it knowingly make any false statement, record or other representation material to any claim ("Affirmative Defense X").

ECF No. 51, 7/24/15 Pl. Answer at 6–8.

In addition, RDA "reserve[d] the right to prove such other and further affirmative defenses as are disclosed in discovery . . . and through evidence offered at the trial of this action." 7/24/15 Pl. Answer at 8.

On September 21, 2015, the parties filed a Joint Status Report requesting a pretrial schedule.  ECF No. 53.  On September 29, 2015, the parties filed their respective Preliminary Witness Lists.  ECF Nos. 54–55.  On October 7, 2015, the court issued a Scheduling Order, setting an Initial Pretrial Conference for October 21, 2015.  ECF No. 58.

On October 16, 2015, the Government filed a Motion To Dismiss ("Gov't Mot."), pursuant to Rule of the United States Court of Federal Claims ("RCFC") 12(b)(1), arguing that, under the Contract Disputes Act, 41 U.S.C. §§ 7101–09, the court does not have jurisdiction to adjudicate claims alleged in the May 7, 2015 Second Amended Complaint, because it did not identify the relief sought by RDA.  ECF No. 59.  Specifically, paragraph ninety-two of the Second Amended Complaint (ECF No. 59 at 6–7) includes six items that RDA failed to submit to the NAVFAC CO in a certified claim or that contradicted the RDA's certified claim.  ECF No. 59 at 7–9.

On November 3, 2015, the Government filed a Witness List.  ECF No. 60.  On November 4, 2015, RDA filed a Witness List.  ECF No. 61.  That same day, the court issued a Pre-Trial Scheduling Order, stating that the court would resume trial from November 16, 2015 to November 19, 2015.  ECF No. 62.  On November 10, 2015, the parties filed their respective Exhibit Lists.  ECF Nos. 63–67.  On November 11, 2015, RDA filed a Response to the Government's October 16, 2015 Motion To Dismiss ("Pl. Resp."), arguing that the court has jurisdiction to adjudicate all the claims alleged in the May 7, 2015 Second Amended Complaint, because RDA submitted each of these claims to the NAVFAC CO prior to filing the May 7, 2015 Second Amended Complaint in the United States Court of Federal Claims.  ECF No. 68, Pl. Resp. at 1.  On November 12, 2015, the court issued an Order denying the October 16, 2015 Motion To Dismiss, pending trial.  ECF No. 69.  The same day, the Government filed a Pre-Trial Brief.  ECF No. 70.  On November 15, 2015, RDA filed a Revised Exhibit List.  ECF No. 71.

On November 16–19, 2015, the court presided over trial in Boston, Massachusetts (TR at 1–1141).  ECF Nos. 73, 75, 77, 79.  On December 4, 2015, RDA filed a Consent Motion For Leave To File Deposition Transcripts Of Jonathan Peters And Marc Nicolazzo that the court granted.  ECF Nos. 80.  On December 5, 2015, RDA filed the deposition testimony of Jonathan Peters and Marc Nicolazzo.  ECF Nos. 81–84.  On December 7–10, 2015 the court resumed trial in Boston, Massachusetts (TR at 1142–2470).  ECF Nos. 87, 89, 91, 93.  The court also instructed the Government to produce several documents for which the Government claimed privilege for *in camera* review.  TR at 1257.  On December 17, 2015, the Government filed a Notice Of *In Camera* Submission.  ECF No. 85.  On January 4–6, 2016, the court resumed trial in Washington, D.C.  ECF Nos. 97, 99, 101; TR at 2471–2759.

On March 4, 2016, the parties filed a Joint Status Report.  ECF No. 102.  Therein, RDA explained that, during trial, the Government raised concerns that some of RDA's damages claims were not supported by financial records.  ECF No. 102 at 1.  In response, RDA engaged an accountant to analyze company records and prepare an expert report on RDA's damages.  ECF No. 102 at 1.  RDA requested that the court schedule a hearing to conclude the trial and allow RDA leave to file a Third Amended Complaint.  ECF No. 102 at 2–3.  The Government agreed that the court should schedule a date to conclude the trial, but opposed RDA's motion.  ECF No. 102 at 3–4.  On March 16, 2016, the court issued an Order, instructing the parties that trial would resume on July 11–12, 2016.  ECF No. 103.  On July 8, 2016, RDA filed a Motion To Bifurcate.  ECF No. 104.  On July 11, 2016, trial resumed in Washington D.C.  ECF No. 108, (TR at 2760–

854).  At that time, the court instructed the parties to draft a proposed scheduling order to conclude the case.  TR at 2852.  On July 12, 2016, the court denied RDA's July 8, 2016 Motion To Bifurcate.

On July 18, 2016, the court issued a Scheduling Order, instructing RDA to provide the Government with an expert report from RDA's accountant, Michael Brander, by July 30, 2016. ECF No. 106.  In addition, the court instructed the parties to file a Joint Status Report, proposing a schedule for further proceedings, by August 12, 2016.  ECF No. 106.

On August 12, 2016, the parties filed a Joint Status Report, in which they proposed different schedules.  ECF No. 109.  RDA proposed that the court re-open discovery on damages; the Government requested that the court conclude the trial and issue a post-trial briefing schedule. ECF No. 109 at 1–2, 4.

On August 16, 2016, the court convened a Status Conference, wherein the court stated that, "in light of the parties' disputed issues [over damages,] . . . the Court has decided to . . . bifurcate [this case] and [first] issue a liability decision."  ECF No. 113, 8/16/2016 TR at 11.  On August 19, 2016, the parties filed a Joint Status Report, representing that

> the parties agree that the most efficient way to proceed at this point will be to bifurcate plaintiff's damages case and proceed with briefing as to liability regarding plaintiff's claims.  This briefing would also include post-trial briefing on defendant's counterclaims, for which there is no need for bifurcation, such that briefing on defendant's counterclaims would address both liability and quantum.

ECF No. 110.  That same day, the court issued a Briefing Schedule, instructing the parties to submit Post-Trial Briefs by October 5, 2016; any Post-Trial Response Briefs were due by November 4, 2016.  ECF No. 111.

On October 18, 2016, RDA filed an Unopposed Motion To Modify The Briefing Schedule. ECF No. 118.  On October 19, 2016, the court granted the October 18, 2016 Motion.  ECF No. 119.  Pursuant to the modified briefing schedule, on November 8, 2016, the parties filed Post-Trial Briefs ("Pl. PT Br." and "Gov't PT Br.").  ECF Nos. 120–21.  On January 23, 2017, the parties filed Post-Trial Response Briefs ("Pl. PT Resp." and "Gov't PT Resp.").  ECF Nos. 129–30.

On April 18, 2017, the court instructed the parties to file a Draft Order, identifying all of the Exhibits and Demonstratives admitted into evidence in this case.  On May 17, 2017, the parties submitted the Draft Order, attached hereto as Court Exhibit A.

## III.   DISCUSSION.

### A.   Jurisdiction.

The Tucker Act authorizes the United States Court of Federal Claims with jurisdiction to adjudicate any claim that: (1) arises under the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101– 7109; and (2) has been submitted to the relevant CO for a final decision.  *See* 28 U.S.C. 1491(a)(2) ("The [United States] Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 . . . on which a decision of the [CO] has been issued[.]").

1.     **Whether The Claims Alleged In The May 7, 2015 Second Amended Complaint Arise Under The Contract Disputes Act.**

A claim "arises under" the CDA if it is based on

> any express or implied contract . . . made by an executive agency for-- (1) the procurement of services, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair, or maintenance of real property; or (4) the disposal of personal property.

41 U.S.C. § 7102(a).

The May 7, 2015 Second Amended Complaint alleges nine claims that are based on the October 13, 2009 Contract between the NAVFAC and RDA to improve a wharf at Newport Naval Station.  Sec. Am. Compl. at ¶¶ 1–134.  For this reason, the court has determined that the claims alleged in the May 7, 2015 Second Amended Complaint arise under the CDA.

2.     **Whether The Claims Alleged In The May 7, 2015 Second Amended Complaint Were Submitted To The Contracting Officer For A Final Decision.**

The CDA provides that "[e]ach claim by a contractor against the Federal Government relating to a contract *shall be submitted* to the [CO] *for a decision*."  41 U.S.C § 7103(a)(1) (emphasis added).  For this reason, the United States Court of Appeals for the Federal Circuit has held that CDA "jurisdiction . . . requires both a valid claim and a [CO's] final decision on that claim."  *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010).

The CDA, however, does not define the term "claim."  *Id* at 1327.  Therefore, the court "look[s] to the FAR implementing the CDA for the definition [of that term]."  *Id*. (citing *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (*en banc*)).  According to the FAR, a "claim" is "a [non-routine,] written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract."  48 C.F.R. § 52.233-1.

A claim under the CDA also must contain "a clear and unequivocal statement that gives the [CO] adequate notice of the basis and amount of the claim."  *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1997).  A claim also must "indicate to the [CO] that the [plaintiff] is requesting a final decision."  *See M. Maropakis Carpentry*, 609 F.3d at 1327.  In addition,

> [f]or claims of more than $100,000 made by a contractor, the contractor shall certify that--
>
> (A) the claim is made in good faith;
>
> (B) the supporting data are accurate and complete to the best of the contractor's knowledge and belief;

(C) the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable; and

(D) the certifier is authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 7103(b)(1).

If the plaintiff submits a valid CDA claim, the CO has sixty days to issue a decision or notify the plaintiff of the time within which a decision will be issued. *See* 41 U.S.C. §§ 7103(f)(1)–(2). The CO's failure "to issue a decision on a claim within the required time period is deemed to be a decision by the [CO] denying the claim and authoriz[ing] an appeal or action on the claim[.]" 41 U.S.C. § 7103(f)(5).

In addition, "[a]n action brought before the [United States] Court of Federal Claims under the CDA must be 'based on the same claim previously presented to and denied by the [CO].'" *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003) (quoting *Cerberonics, Inc. v. United States,* 13 Cl. Ct. 415, 417 (1987)). "This standard, however, does not require rigid adherence to the exact language or structure of the original administrative CDA claim [when different claims] arise from the same operative facts, [and] claim essentially the same relief, and merely assert differing legal theories for that recovery." *Scott Timber*, 333 F.3d at 1365.

### a.      Regarding Counts I–IV.

On April 21, 2010, prior to filing this lawsuit, RDA submitted a certified claim to the NAVFAC CO requesting an equitable adjustment for costs that RDA did not anticipate, because the NAVFAC failed to disclose the Appledore Report and FST Report. DX 118 at 1–3. The April 21, 2010 Certified Claim specified that the equitable adjustment was related to "the 2005 Marginal Wharf Inspection Report," *i.e.*, the Appledore Report (DX 118 at 1), and provided a detailed breakdown of the costs RDA sought to recover (DX 118 at 4–5), providing the NAVFAC CO "adequate notice of the basis and amount of the claim." *Contract Cleaning*, 811 F.2d at 592. On August 31, 2010, the NAVFAC CO denied RDA's April 21, 2010 Certified Claim.

Counts I–IV of the May 7, 2015 Second Amended Complaint allege that RDA is entitled to damages for the NAVFAC's failure to disclose that the Newport Naval Station wharf could not support the weight of construction equipment under four different legal theories: (1) the NAVFAC violated its duty to disclose "superior knowledge" regarding the wharf's deteriorated condition; (2) the October 13, 2009 Contract's differing site conditions clause entitles RDA to an equitable adjustment; (3) the NAVFAC affirmatively misrepresented the condition of the Newport Naval Station wharf; and (4) the NAVFAC misrepresented the purpose of the project. 5/7/15 Sec. Am. Compl. at ¶¶ 94–107.

The April 21, 2010 Certified Claim and Counts I–IV of the May 7, 2015 Second Amended Complaint "assert differing legal theories for . . . recovery." *Scott Timber*, 333 F.3d at 1365. But, they "arise from the same operative facts, [and] claim essentially the same relief." *Id*. Therefore, Counts I–IV of the May 7, 2015 Second Amended Complaint are "based on the same claim previously presented to and denied by the [CO]." *Id*.

For these reasons, the court has determined that it has jurisdiction to adjudicate Counts I–IV of the May 7, 2015 Second Amended Complaint.

### b.   Regarding Counts V–IX.

On July 3, 2013, RDA submitted a second Certified Claim to the NAVFAC CO alleging that the NAVFAC: delayed contract performance (DX 691 at 19–29); failed to award RDA time extensions for delays caused by the NAVFAC (DX 691 at 21); unilaterally modified the October 13, 2009 Contract (DX 691 at 21–25); and wrongfully terminated the October 13, 2009 Contract (DX 691 at 30). This conduct breached the October 13, 2009 Contract and entitled RDA to recover $1,625,258 in unanticipated costs and $718,059 in lost profits. DX 691 at 9, 30–31. The July 3, 2013 Certified Claim also alleged that RDA was not liable for liquidated damages and owed $294,705 that the NAVFAC withheld in partial payment of those liquidated damages. DX 691 at 13, 31. The court has determined that the July 3, 2013 Certified Claim properly was submitted to the CO for a final decision and provided notice of the basis and amount of the claim alleged. *See Contract Cleaning*, 811 F.2d at 592. On September 26, 2013, the CO denied the July 3, 2013 Certified Claim. DX 695.

Count V of the May 7, 2015 Second Amended Complaint alleges that the NAVFAC breached the October 13, 2009 Contract by: causing unnecessary delays, imposing requirements on RDA beyond the terms of the contract; failing to compensate RDA for the time and cost of changes to the project; failing to conduct "partnering sessions," and wrongfully terminating the October 13, 2009 Contract. 5/7/15 Sec. Am. Compl. at ¶¶ 111–14. Based on the same operative facts as Count V, Counts VI–IX allege that the NAVFAC's administration and ultimate termination of the October 13, 2009 Contract was arbitrary and capricious and violated the NAVFAC's duty of good faith and fair dealing. 5/7/15 Sec. Am. Compl. at ¶¶ 115–27.

The July 3, 2013 Certified Claim and Counts V–IX of the May 7, 2015 Second Amended Complaint arise from the same operative facts and seek essentially the same relief. Therefore, Counts V–IX are "based on the same claim[s] previously presented to and denied by the [CO]." *Scott Timber*, 333 F.3d at 1365.

For these reasons, the court has determined that it has jurisdiction to adjudicate Counts V–IX of the May 7, 2015 Second Amended Complaint.

### c.   Regarding Damages.

On October 16, 2015, the Government filed a Motion To Dismiss for lack of subject matter jurisdiction, pursuant to RCFC 12(b)(1). Gov't Mot. at 1. Therein, the Government argued that paragraph ninety-two of the May 7, 2015 Second Amended Complaint contained a table, identifying the components of RDA's total damages, but RDA did not properly submit some of those components to the NAVFAC CO. Gov't Mot. at 7–9. On November 12, 2015, the court denied the October 16, 2015 Motion To Dismiss, pending trial in this case. ECF No. 69.

On November 8, 2016, after trial concluded, the Government filed a Post Trial Brief arguing that "[a]t trial, it remained RDA's burden to prove that the [c]ourt ha[d] jurisdiction to grant the relief [RDA] seeks in its [May 7, 2015] second amended complaint." Gov't PT Br. at 74; *see also Fanning, Phillips, Molnar v. West*, 160 F.3d 717, 720 (Fed. Cir. 1998) ("Federal courts

are not courts of general jurisdiction[.] We therefore have a special obligation to satisfy ourselves of our own jurisdiction." (internal citations omitted)).

The components listed in paragraph ninety-two of the May 7, 2015 Second Amended Complaint are not separate claims; instead, they specify the amount of damages requested under Counts I–VIII. Because the court has jurisdiction to adjudicate the subject matter of Counts I–VIII, the court has determined that it also has jurisdiction to determine any damages arising from those claims.

### B. Standing.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit[.]" *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992)). "The party invoking federal jurisdiction bears the burden of establishing [standing]." *Lujan*, 504 U.S. at 560. The United States Supreme Court held in *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167 (2000), that to establish standing

> a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* 180–81.

In addition, "[t]o have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States." *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003). In other words, the contract in question must be between the plaintiff and the Government. *See Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990) ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the [G]overnment.").

The May 7, 2015 Second Amended Complaint alleges that RDA suffered monetary injury that is concrete, particularized, and fairly traceable to the NAVFAC's actions. And, any financial injury established by RDA can be redressed by a monetary award. Moreover, it is undisputed that RDA was a signatory and intended beneficiary of the October 13, 2009 Contract. 5/7/15 Sec. Am. Compl. at ¶ 5 ("On or about September 14, 2009, RDA entered contract No. N40085-09-C-7002 P469 . . . with the Government[.]"); 6/12/15 Gov't Answer at ¶ 5 ("Admits the allegations contained in paragraph 5[.]"). Therefore, RDA is in privity of contract with the Government.

For these reasons, the court has determined that RDA has standing to seek an adjudication of the claims alleged in the May 7, 2015 Second Amended Complaint.

**C.     The Claims Alleged In RDA Construction Corp.'s May 7, 2015 Second Amended Complaint.**

**1.     Count I: Whether The Naval Facilities Command Had A Duty To Disclose The Appledore Report And The Fay, Spofford & Thorndike Report.**

**a.     Plaintiff's Argument.**

RDA argues that, under the "superior knowledge doctrine," a contracting agency has an "implied duty" to advise contractors of "otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance." Pl. PT Br. at 47 (*quoting Scott Timber Co.*, 692 F.3d at 1373). In this case, the NAVFAC violated the duty to disclose, because:

(1)     the Appledore Report concluded that the wharf could not support the weight of demolition equipment, a fact that would and did affect the cost and duration of performance (Pl. PT Br. at 48);

(2)     the NAVFAC was aware of the wharf's deterioration and knew that this condition could only be observed during an underwater inspection (Pl. PT Br. at 48–49);

(3)     the Solicitation did not mention that the wharf, supporting H-piles and bulkhead were in poor condition; instead the specification stated that RDA could locate demolition equipment throughout the wharf (Pl. PT Br. at 49); and

(4)     the NAVFAC did not advise RDA about the existence of the Appledore Report or the FST Report or conclusions therein until after the parties had signed the October 13, 2009 Contract (Pl. PT Br. at 48).

In sum, the NAVFAC's violation of the implied duty to disclose the Appledore Report and FST Report was a material breach of the October 13, 2009 Contract that adversely affected RDA's ability to perform. Pl. PT Br. at 50. Therefore, the court should convert the NAVFAC's February 21, 2013 decision to terminate the October 13, 2009 Contract for default to a termination for convenience.

**b.     The Government's Response.**

The Government responds that it had no duty to disclose either the Appledore Report or FST Report, nor did the Solicitation mislead RDA about the conditions of the Newport Naval Station wharf and, in any event, RDA was on notice to inquire about those conditions. Gov't PT Br. at 76. The Solicitation informed RDA that, since the wharf was constructed in the 1950s RDA was on notice that the wharf, "was likely not in good condition." Gov't PT Br. at 77. In addition, structural problems were identified in Solicitation documents and apparent during the June 4, 2009 and June 11, 2009 site visits. Gov't PT Br. at 77 (citing DX 729 at 5 (Helmes Direct) ("Contract Drawings showing the existing bulkhead identify a number of sinkholes which clearly indicate an unstable condition[.]")). Moreover, during the bidding process, RDA did not ask the NAVFAC any questions about the condition of the wharf. Gov't PT Br. at 77 (citing TR at 1474 (Kelley)).

Nor did RDA perform an independent analysis of the wharf's load capacity by a professional engineer that would have revealed

> (1) that the wharf deck slab would have been unable to safely accommodate the loads of even a very lightweight excavator, (2) that the wharf structure would have collapsed under its own weight once the restraint provided by the connection to the landside was removed, and (3) that the existing steel sheet pile wall would have failed as the rip rap was removed, which had to occur before the king piles for the new bulkhead wall could be installed.

Gov't PT Br. at 77–78 (citing DX 728 (Cohen Direct)).

More importantly, RDA's plan to perform parts of the bulkhead construction from the wharf was inconsistent with the Solicitation's instruction that the wharf must be completely demolished before work could commence on the bulkhead. Gov't PT Br. at 78 (citing DX 1 at 83 ("CONCRETE APRON & PILES TO BE DEMOLISHED PRIOR TO REMOVAL OF ROCK FILL."); and DX 1 at 414 ("Any excavation [of rock fill] required within the area where sheet pilings are to be installed shall be completed prior to placing sheet pilings.")).

### c.    Plaintiff's Reply.

RDA replies that the severe structural deterioration of the wharf and bulkhead were not apparent during the June 4 and June 11, 2009 site visits. Pl. PT Resp. at 3–4. The wharf showed some signs of wear-and-tear, but was well-preserved for its age. Pl. PT Resp. at 3.

In addition, RDA's demolition plan was consistent with the Solicitation. Pl. PT Br. at 8. Although the Solicitation required RDA to demolish sections of the wharf, before removing the rip rap beneath, it did not necessarily require RDA to demolish the entire wharf before commencing any rip rap removal. Pl. PT Resp. at 9. Moreover, the Solicitation did not expressly prohibit RDA from placing equipment on the wharf. Pl. PT Resp. at 9. Therefore, RDA's plan to demolish the inboard portion of the wharf using equipment located on the wharf, did not conflict with the Solicitation. Pl. PT Resp. at 9.

Furthermore, it is undisputed that the NAVFAC knew about the Appledore Report and FST Report before issuing the Solicitation and understood their importance to the cost of the project. Pl. PT Resp. at 8. But, the NAVFAC did not include or refer to either report or their findings in the Solicitation. Pl. PT Resp. at 8. This was a conscious attempt to mislead prospective bidders. Pl. PT Resp. at 10.

### d.    The Court's Resolution.

It is well established that "the contractor in a fixed-price contract assumes the risk of unexpected costs." *ITT Arctic Servs., Inc. v. United States*, 524 F.2d 680, 691 (Ct. Cl. 1975); *see also Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 778 (Ct. Cl. 1963) ("Where the Government . . . has no duty to disclose information, and does not improperly interfere with performance, the fixed-price contractor of course bears the burden of unanticipated increases in cost[.]"). Under the superior knowledge doctrine, however, the Government has "an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter

affecting the contract that is vital to its performance." *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000).

> A contracting agency violates the implied duty to disclose "superior knowledge" if:
>
> (1) a contractor undertakes to perform [the contract] without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*Hercules Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994). The plaintiff bears the burden of establishing each element by "specific evidence." *See GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991).

Regarding the first and fourth elements, Mr. Hartman, RDA's Project Manager, and Mr. Wood, RDA's Estimator, testified that RDA was unaware of any load restrictions on the wharf until November 2009, approximately one month after the parties executed the October 13, 2009 Contract. TR at 106–07 (Wood); TR at 188–89 (Hartman). Mr. Germano, the NAVFAC Construction Manager, confirmed that the NAVFAC did not disclose that the wharf was subject to severe load restrictions until November 18, 2009. TR at 2256–60 (Germano). Therefore, the court finds that RDA undertook to perform the October 13, 2009 Contract without "vital knowledge" of a fact that affected performance costs and duration. *See Hercules*, 24 F.3d at 196 (element one). And, the NAVFAC failed to provide that information before contract formation. *See Hercules*, 24 F.3d at 196 (element four).

Regarding the second element, RDA argues that bidders only could have learned of the wharf's load restriction from: (1) the Solicitation; or (2) the June 4 and June 11, 2009 site visits. Pl. PT Resp. at 8. The NAVFAC knew that the Solicitation did not provide a load restriction for the wharf. Pl. PT Br. at 48. The NAVFAC also knew that the deterioration jeopardizing the wharf's structural integrity "could only be observed during [an] underwater investigation." Pl. PT Br. at 48 (quoting PX 12 at 21 (Appledore Report)).

RDA's argument assumes that bidders could only ascertain that the wharf was subject to a load restriction by directly observing the wharf's subsurface deterioration. But, this assumption is rebutted by evidence showing that there were other indicia of the wharf's limited load capacity visible during the June 4 and June 11, 2009 site visits. For example, orange sawhorses and concrete barriers lining the perimeter of the wharf indicated that vehicles could not drive there. In addition, large sinkholes running along most of the wharf and bulkhead suggested that the land around the wharf was not stable. DX 729 at 5, 8 (Helmes Direct).



DX 742.10 (photograph of the wharf taken on May 19, 2008, prior to the June 4 and June 11, 2009 site visits);



DX 742.15 (photograph of the wharf taken on June 20, 2008, prior to the June 4 and June 11, 2009 site visits);



DX 742.14 (photograph of sinkhole taken on May 30, 2008, prior to the June 4 and June 11, 2009 site visits); DX 742.6 (photograph of sinkhole taken on May 19, 2008).

Therefore, although the NAVFAC was aware that RDA had no knowledge of the Appledore Report or the FST Reports prior to submitting a bid, the court finds that, from the physical condition of the wharf visible on inspection, a contractor would have "reason to obtain [additional] information," such as an independent engineer report or an underwater investigation. *See Hercules*, 24 F.3d at 196 (element two).  Accordingly, RDA's superior knowledge claim fails under the second element.

Regarding the third element, RDA argues that the Solicitation affirmatively misrepresented that the wharf could support the weight of cranes and excavators by instructing prospective contractors to "[l]ocate demolition equipment throughout the structure and remove materials so as to not impose excessive loads to framing."  DX 1 at 291.  RDA interprets "demolition equipment" to include heavy machines like cranes and excavators.  Pl. PT Br. at 49.  The Solicitation, however, does not define that term.  Instead, the Solicitation incorporates the American Society of Safety Engineer's 2006 Safety and Health Program Requirements for Demolition Operations ("ASSE A10.6") (DX 1 at 288), which states that the type of demolition equipment that each structure can withstand should be determined by the contractor (ASSE A10.6 at §§ 4.1, 5.8).

The United States Court of Appeals for the Federal Circuit has held that "various contract provisions must be read as part of an organic whole, according reasonable meaning to all of the contract terms.  Such interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant."  *See Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322

(Fed. Cir. 1997) (internal citations omitted).  In this case, Section 4.1 of the ASSE A10.6, which was part of the Solicitation, provides that "[p]rior to starting demolition operations, a written engineering survey of the structure shall be made by a qualified person *to determine the type and condition of the framing, floors and walls so that action can be taken, if needed, to prevent premature collapse of any portion of the structure*."  ASSE A10.6 at § 4.1 (emphasis added). Similarly, Section 5.8 of the ASSE A10.6 cautions that "[t]he use of equipment and storage of materials and debris on any floor *shall not exceed the allowable floor loads*."  ASSE A10.6 at § 5.8 (emphasis added).  Both of these industry standards require that bidders conduct engineering due diligence to ensure the load capacity of the relevant structure before placing equipment there.

RDA also argues that the Solicitation's failure to provide load restrictions for the wharf misled prospective bidders to assume that the wharf was not subject to any significant restrictions and could support the weight of heavy construction equipment. Pl. PT Br. at 48–49.  Mr. Wood testified that, if the Solicitation does not specify the load capacity of a certain structure, it is safe to "use [that structure] for its intended purpose."  TR at 106 (Wood).  Mr. Wood's view, however, was rebutted by the expert testimony of Philip Helmes, P.E., who observed that, when "[t]he Contract Documents do not indicate or provide any safe load limits for the existing structure, . . . a responsible contractor would be expected to seek additional information . . . prior to developing a work method based on imposing significant loads on the wharf."  DX 729 at 6 (Helmes Direct). Mr. Helmes also testified that without "a pre-bid engineer's assessment . . ., the alleged assumption that the bulkhead could support the load from RDA's intended equipment had no basis and was a poor assumption."  DX 729 at 6 (Helmes Direct).  There is no evidence that any of the contractors were precluded from having an independent professional engineer present during the site visits or from conducting an underwater investigation.  Therefore, the Solicitation's instruction to "[l]ocate demolition equipment throughout the structure" and the Solicitation's failure to provide an express load restriction for the wharf did not represent that the wharf could withstand heavy construction equipment.  *See Hercules*, 24 F.3d at 196 (element three).

But, even if the Solicitation could be construed as misleading bidders about the wharf's load capacity, RDA's superior knowledge claim still fails under the third factor, because the Solicitation provided bidders with specific notice to inquire about the wharf's condition.  DX 1 at 34 (incorporating 48 C.F.R. § 52.236-3(a)).[15]  RDA justifies the failure to conduct an independent inspection, explaining that most of the deterioration affecting the wharf could not be observed from the deck's surface.  TR at 189–90 (Hartman).  FAR 52.236-3(a), however, requires bidders to verify *both the surface and subsurface* condition of the wharf, relying on: "an inspection of the site;" "all exploratory work done by the Government;" and "the drawings and specification made

---

[15] FAR 52.236-3(a) requires that:

The Contractor . . . acknowledges that *it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials* . . . insofar as this information is reasonably ascertainable from an inspection of the site, *including all exploratory work done by the Government*, as well as from the drawings and specifications made a part of this contract.

48 C.F.R. § 52.236-3(a) (emphases added).

a part of this contract." 48 C.F.R. § 52.236-3(a). Therefore, RDA was on notice to inquire about the subsurface conditions of the wharf that were not visible during its site visit. *See Hercules*, 24 F.3d at 196 (element three).

For these reasons, the court has determined that the NAVFAC did not have a duty to disclose the Appledore Report and FST Report prior to accepting RDA's bid and entering into the October 13, 2009 Contract. Accordingly, Count I of the May 7, 2015 Second Amended Complaint is dismissed.

> **2.      Count II: Whether RDA Construction Corp. Is Entitled To An Equitable Adjustment Under The October 13, 2009 Contract's Differing Site Conditions Clause.**

> **a.      Plaintiff's Argument.**

RDA argues that the actual deteriorating condition of the wharf and bulkhead was a "type 1" differing site condition,[16] for which RDA is entitled to an equitable adjustment. RDA adds that a reasonable person would interpret the Solicitation to allow a contractor to perform work from the wharf and the land parallel to the wharf. Pl. PT Br. at 55. RDA's Estimator testified that, if there was a restriction on the wharf's capacity there would be a corresponding note; if there was no note, the structure was usable for its intended purpose. TR at 106 (Mr. Wood). RDA's Construction Manager also testified that, in his experience, load restrictions always are provided to bidders. TR at 191–92, 209 (Hartman). In this case, the Solicitation expressly allowed bidders to place demolition equipment on the wharf, but to "[l]ocate demolition equipment throughout the structure." DX 1 at 291. In addition, the Solicitation instructed bidders to assume that thirty holes in the bulkhead would need repair. Pl. PT Br. at 55 (citing DX 1 at 107). But, RDA's Engineering Consultant testified that this amount of deterioration ordinarily would not prohibit a contractor from demolishing the wharf from the landside of the bulkhead or from the wharf deck. TR at 827–28 (Martel).

RDA adds that the actual condition of the existing bulkhead and wharf were not reasonably foreseeable, based on the Solicitation and site visits. Pl. PT Br. at 55. RDA's President, RDA's Estimator, and RDA's Project Manager "testified credibly that the observable condition of the wharf provided no indication that RDA would be unable to employ conventional means to demolish and construct this project from the existing structure and from the landside of the bulkhead." Pl. PT Br. at 55.

In sum, RDA reasonably relied on the Solicitation's representation about the wharf's condition. Pl. PT Br. at 55 ("RDA's cost estimate, including its estimate as to the duration of the work on this Project, were based on its thorough review of the contract documents and its visual inspection of the facility."). But, the actual conditions of the wharf and bulkhead differed

---

[16] The October 13, 2009 Contract includes a "differing site conditions" clause. DX 1 at 545 (incorporating 48 C.F.R. § 52.236-2). "Type 1" differing site conditions are "[s]ubsurface or latent physical conditions at the site which differ materially *from those indicated in this contract*[.]" 48 C.F.R. § 52.236-2(a)(1) (emphasis added).

materially from the conditions represented in the Solicitation requiring RDA to shift operations to the water and incur the cost of deploying a barge for the duration of the project.  Pl. PT Br. at 56.

### b.    The Government's Response.

The Government responds that RDA did not establish each element of its differing site conditions claim.  Gov't PT Resp. at 17.

### c.    The Court's Resolution.

To receive an equitable adjustment for a "type 1" differing site condition, a contractor must establish that: (1) "a reasonable contractor reading the contract documents as a whole would interpret them as making a representation about the site conditions;" (2) "the actual site conditions were not reasonably foreseeable to the contractor, with the information available to the particular contractor outside the contract documents;" (3) "the particular contractor in fact relied on the contract representation;" and (4) "the conditions differed materially from those represented, and the contractor suffered damages as a result." *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1348–49 (Fed. Cir. 2008).

As to the first element, the United States Court of Appeals for the Federal Circuit has held that there cannot be a differing site condition, "unless the contract [affirmatively] indicated what that condition would be." *Comtrol, Inc. v. United States*, 294 F.3d 1357, 1363 (Fed. Cir. 2002). Whether the contract indicates a particular site condition is a question of contract interpretation, requiring the court to "place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents." *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998).

In this case, the Solicitation instructed the contractor to "[l]ocate demolition equipment throughout the structure and remove materials so as to not impose excessive loads to framing." DX 1 at 291.  RDA argues that this clause affirmatively represented that the wharf could support the weight of heavy demolition equipment, such as cranes and excavators.  But, other provisions of the Solicitation clarified that the contractor was responsible for evaluating each structure to determine what type of demolition equipment it could safely withstand.  DX 1 at 288 (citing ASSE A10.6 § 4.1 ("Prior to starting demolition operations, a written engineering survey of the structure shall be made by a qualified person to determine the type and condition of the framing, floors and walls so that action can be taken, if needed, to prevent premature collapse of any portion of the structure.") and ASSE A10.6 § 5.8 ("The use of equipment and storage of materials and debris on any floor shall not exceed the allowable floor loads.")).  Therefore, the Solicitation did not represent that the wharf could support the weight of any demolition equipment, only that the weight needed to be balanced throughout the surface of the relevant structure and the concentration of heavy equipment on one area of a particular structure could cause it to collapse.

Moreover, RDA argues that the Solicitation's failure to provide a load restriction for the wharf would lead a reasonable contractor to conclude that the wharf could bear the weight of heavy construction equipment.  Pl. PT Br. at 54–55.  RDA's Estimator testified that, in his experience, "if there is a [load] restriction [associated with a structure], there would be a note [in the Solicitation]."  TR at 106 (Wood).  The absence of a note led him to conclude that "[RDA] could

utilize the [wharf] to work off of." TR at 107 (Wood). But, Mr. Wood's testimony was contradicted by RDA's Project Manager, who testified that he did not draw any conclusion about the absence of load restrictions on the wharf, until he read the Appledore Report. TR at 191 (Hartman). The Government also rebutted Mr. Wood with expert testimony that advised: "a prudent contractor would have requested more information regarding the [wharf's] Safe Load Limit" and "[i]t was not reasonable for RDA to assume that the existing structure could support heavy construction equipment." DX 729 at 5 (Helmes Direct). DX 742.6 (photograph of sinkhole taken on May 19, 2008, prior to the June 4 and June 11, 2009 site visits.)

In addition, the Solicitation required prospective bidders to satisfy themselves of "the character, quality, and quantity of surface and subsurface materials . . . insofar as this information was reasonably ascertainable from an inspection of the site[.]" DX 1 at 34 (incorporating 48 C.F.R. § 52.236-3(a)). Photographs of the wharf taken prior to RDA's June 4 and June 11, 2009 site visits show orange sawhorses and concrete barriers, cordoning off the wharf. DX 742.14 (photograph of wharf taken on May 20, 2008, prior to the June 4 and June 11, 2009 site visits); DX 742.15 (photograph of wharf taken on June 20, 2008, prior to the June 4 and June 11, 2009 site visits). A reasonable and prudent contractor could see that the wharf could not safely bear the weight of vehicular traffic, much less heavy construction equipment, regardless of the Solicitation's silence about that issue. Therefore, a reasonable contractor would read the Solicitation, including accompanying drawings, the ASSE A10.6 industry standards and observation of the wharf's condition during two site visits, to warrant further investigation into whether the wharf and bulkhead could safely bear the weight of demolition equipment.

RDA counters that a reasonable contractor would interpret the Solicitation's disclosure of thirty holes in the bulkhead as a representation that the bulkhead and wharf had no other significant deterioration. But, a statement that the bulkhead contained *some deterioration* did not affirmatively represent that the bulkhead contained *only* that amount of deterioration. *See, Int'l Tech. Corp.*, 523 F.3d at 1350 ("[T]his court [has] held that contract documents stating '[h]ard material . . . may be encountered' did not represent that only hard material would be encountered." (quoting *Comtrol*, 294 F.3d at 1362)). Moreover, the Government's construction project development practices expert testified that the contract drawings "showing the existing bulkhead[,] identify a number of sinkholes which clearly indicate an unstable condition[.]" DX 729 at 6 (Helmes Direct).

For these reasons, the court has determined that, as a matter of law, RDA is not entitled to an equitable adjustment under the October 13, 2009 Contract's differing site conditions clause. *See Comtrol*, 294 F.3d at 1363 ("A contractor is not eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be.").

In the alternative, RDA raises a "defective specification claim" under Count II. Pl PT Br. at 56. But, the United States Court of Appeals for the Federal Circuit has held that:

Although differing site conditions and defective specifications claims are distinct in theory, they collapse into a single claim . . . *where the alleged defect in the specification is the failure to disclose the alleged differing site condition*. Where the differing site conditions claim and the defective specifications claim are so

intertwined as to constitute a single claim, *that claim will be governed by the specific differing site conditions clause and the cases under that clause*.

*Comtrol*, 294 F.3d at 1362 (emphases added).

In this case, RDA's defective specification claim arises from the NAVFAC's alleged failure to disclose that the wharf could not support the weight of demolition equipment, *i.e.*, the same condition that RDA argues entitles it to an equitable adjustment under the October 13, 2009 Contract's differing site conditions clause.   Pl. PT Br. at 56–57.   Therefore, RDA's defective specification and differing site conditions allegations constitute a single claim governed by the October 13, 2009 Contract's differing site conditions clause and precedent regarding the same. Since the court has determined that RDA is not entitled to relief under the differing site conditions theory, RDA also is not entitled to relief under a defective specification theory.   Accordingly, Count II of the May 7, 2015 Second Amended Complaint is dismissed.

### 3. Counts III And IV: Whether The Naval Facilities Command Misrepresented The Condition Of The Wharf And The Purpose Of The October 13, 2009 Contract.

#### a. Plaintiff's Argument.

Counts III and IV are a variation of Count II, the gravamen of which is that the Solicitation affirmatively represented that the contractor could locate demolition equipment on the wharf.   Pl. PT Resp. at 11 (citing DX 1 at 291).   In addition, the absence of a load restriction in the Solicitation, indicated that the relevant structure could be used for its intended purpose.   Pl. PT Resp. at 11 (citing TR at 104–07 (Mr. Wood)); TR at 191–92 (Hartman).   Accordingly, RDA reasoned that "[t]hese express representations, together with the NAVFAC's failure to provide the Appledore Report and the [FST Report], constitute clear misrepresentations of material fact regarding the manner in which the work [was] to be performed and the condition of the wharf that RDA reasonably relied upon in submitting its bid for this project."   Pl. PT Resp. at 11–12.

#### b. The Government's Response.

The Government responds that the Solicitation did not misrepresent that the wharf could bear the weight of demolition equipment.   Gov't PT Br. at 77.   Nor has RDA proffered any pre-award evidence to show that it intended to work from the wharf.   Gov't PT Br. at 76.   Therefore, even if the Solicitation misrepresented that the wharf could support demolition equipment, RDA failed to demonstrate that it relied on any such misrepresentation.   Gov't PT Br. at 76.   In fact, a reasonable contractor would not have relied on a representation that a seventy year-old wharf, with obvious signs of deterioration, could support the weight of heavy construction equipment, without further investigation.   Gov't PT Br. at 77–79.

#### c. The Court's Resolution.

The United States Court of Appeals for the Federal Circuit has held that, "for a contractor to prevail on a claim of misrepresentation, the contractor must show that the Government made an erroneous representation of a material fact that the contractor honestly and reasonably relied on to the contractor's detriment."   *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 729 (Fed. Cir.

1997).  This is the same legal standard that applies to type 1 differing site conditions claims.  *See Int'l Tech.*, 523 F.3d at 1348 ("A misstatement as to site conditions in a government contract can support a claim for breach of contract.  The same requirements apply whether the contractor asserts such a common law breach claim or a Type I claim under the Differing Site Conditions clause[.]").  Again, whether a Solicitation makes an erroneous representation is a question of contract interpretation, requiring the court to "place itself into the shoes of a reasonable and prudent contractor[.]"  *H.B. Mac*, 153 F.3d at 1345.

In this case, RDA argues that the Solicitation misrepresented that the wharf could safely bear the weight of demolition equipment, because it: (1) failed to disclose the Appledore Report and FST Report prior to the contract award (Pl. PT Resp. at 11); (2) did not provide a load restriction for the wharf or bulkhead (Pl. PT Resp. at 11); and (3) instructed contractors to "[l]ocate demolition equipment throughout the structure" (Pl. PT Resp. at 11 (quoting DX 1 at 291)).  As discussed previously, the court finds that a reasonable and prudent contractor would not interpret the Solicitation as a whole to affirmatively represent that the conditions of the wharf could support demolition equipment.

For these reasons, the court has determined that RDA did not satisfy the requisite elements of misrepresentation.  Accordingly, Count III and Count IV of the May 7, 2015 Second Amended Complaint are dismissed.

### 4. Count V: Whether The Naval Facilities Command's November 7, 2012 Directive Was A Cardinal Change To The October 13, 2009 Contract.

#### a. Plaintiff's Argument.

Count V alleges that the NAVFAC's November 7, 2012 "directive" to extract broken H-piles from beneath the sea floor was a cardinal change, because it substantially altered the magnitude, cost, and type of work required by the October 13, 2009 Contract.  Pl. PT Br. at 40–41.

At the time of RDA's bid, without the benefit of the Appledore Report, RDA planned to use a vibratory hammer to shake and remove the H-piles in one piece from the sea floor.  Pl. PT Br. at 40.  Because the H-piles were deteriorated beyond what was expected, all of the piles that RDA attempted to remove broke.  Pl. PT Br. at 41.  After trial and error, RDA discovered a method to extract the broken piles, but it was costlier than RDA originally anticipated for pile-removal.  Pl. PT Br. at 41.  In fact, the company that assumed completion of the project estimated that removing all of the broken H-piles would cost over $5 million.  Pl. PT Br. at 41 (citing 11/05/15 Dep. of Jonathan Peters at 321, 323).  In addition, the NAVFAC's November 7, 2012 "directive" would have extended the October 13, 2009 Contract's duration by months, as established, since Haskell worked to remove all of the H-piles "throughout 2014 and [October] 2015."  Pl. PT Br. at 42.

#### b. The Government's Response.

The Government responds that the October 13, 2009 Contract required RDA to "remove piles in their entirety."  DX 1 at 82.  Although it became very expensive to remove the H-piles, the added expense was RDA's fault, because "RDA *intentionally broke* the piles off, having proposed

and obtained approval for this . . . method in its demolition plan." Gov't PT Br. at 65 (citing DX 108 at 5) (emphasis added).  Therefore, the NAVFAC's November 7, 2012 directive did not significantly change: (1) the magnitude of work to be performed; (2) the nature of the work contemplated in the October 13, 2009 Contract; or (3) the cost of performance.  And, the November 7, 2012 directive did not constitute a cardinal change.  Gov't PT Br. at 66.

### c.     The Court's Resolution.

As a matter of law, the cardinal change doctrine may be invoked where,

> the [contracting agency] effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for.  By definition, then a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach.

*Allied Materials & Equip. Co. v. United States*, 569 F.2d 562, 563–64 (Ct. Cl. 1978) (emphasis added).

As with other breach of contract claims, the cardinal change doctrine has a causation requirement.  *See Rolin v. United States*, 160 F. Supp. 264, 268 (Ct. Cl. 1958) ("[T]he Government's financial obligation to anyone who has furnished materials or services to the Government under a contract is to be found within the four walls of the contract, *unless the Government has caused its contractor to incur unforeseen expenses in performing the contract*." (emphasis added)).  In other words, a plaintiff cannot prevail on a breach of contract claim, simply because unforeseen circumstances changed the amount, or difficulty, of the contract work.  *See United States v. Spearin*, 248 U.S. 132, 135–36 (1918) ("Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." (internal citations omitted)).  Instead, the plaintiff must demonstrate that the Government caused the underlying change.

"[A] cardinal change is principally a question of fact[.]"  *Allied Materials*, 569 F.2d at 565.  "Each case must be analyzed on its own facts and circumstances giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole."  *Gen. Dynamics Corp. v. United States*, 585 F.2d 457, 462 (Ct. Cl. 1978).  Since a cardinal change constitutes a breach of contract, the plaintiff bears the burden of proof.  *See Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1360 (Fed. Cir. 2009).

The October 13, 2009 Contract expressly required RDA to "remove piles in their entirety."  DX 1 at 82.  The November 7, 2012 instruction did not change this requirement in any way, stating, "[all] remaining H-piles . . . will have to be removed in their entirety[.]"  PX 96 at 1.  In other words, the NAVFAC did not cause any change to the contract requirements.  Nevertheless, RDA insists that the NAVFAC's November 7, 2012 directive constituted a cardinal change, because RDA did not expect the piles to break during the extraction process.  But, due to latent deterioration, virtually all of the piles snapped below the sea floor.  Pl. PT Br. 40–41.  Removal of the broken pile stubs required RDA to use extraction methods that were far more expensive than it originally anticipated.  Pl. PT Br. 41.  Under these circumstances, the NAVFAC's enforcement

of the contractual requirement that all piles must be removed in their entirety was a cardinal change.  Pl. PT Br. at 40–42.

RDA's cardinal change claim fails, because the record contradicts RDA's assertion that it did not expect the piles to break during the extraction process.  On March 29, 2010, RDA submitted a demolition plan to the NAVFAC advising that,

> the combination pile cap and support pile will be extracted with the crane. . . . *In most cases under the load of the extraction process the pile will break between the mud line and existing pile jacket due to advanced pile section loss*[.] . . .  The resulting bottom pile section remaining will be extracted with the Manitowoc 4100 crane and a dive assist crew[.]

DX 108 at 4–5 (emphasis added).  The March 29, 2010 plan was submitted before RDA began pile removal.  DX 1 at 287, 290 (stating that approval of the demolition plan was required prior to beginning work).  Therefore, the evidence shows that, prior to removing any piles, RDA knew that its extraction method would cause most piles to break.

For these reasons, the court has determined that RDA did not prove that the NAVFAC *caused any change* to the contract work or the circumstances affecting that work, let alone a cardinal change that required RDA to perform duties materially different from those bargained for by the parties.  *See Allied Materials*, 569 F.2d at 563–64.  Accordingly, Count V of the May 7, 2015 Second Amended Complaint is dismissed.

### 5. Counts VI, VII and VIII: Whether The NAVFAC Violated The Duty Of Good Faith And Fair Dealing.

#### a. Plaintiff's Argument.

RDA argues that the NAVFAC breached the duty of good faith and fair dealing by: (1) not promptly and fairly adjusting the contract for changes in price and schedule, resulting from new information contained in the Appledore Report and FST Report about the wharf's ability to carry demolition equipment; (2) rescinding the NAVFAC's conditional approval of RDA's baseline schedule; (3) failing to provide instructions on how to remove the broken H-piles; (4) failing to authorize drilling that was required to bypass unanticipated obstructions blocking all progress on the project; (5) directing RDA to commence obstruction drilling before processing a contract modification for that work, then failing to compensate RDA for the additional drilling work; (6) directing RDA to remove all broken piles embedded in the sea floor, despite knowing that "such work was not necessary, was impractical to perform, and would cause RDA to incur prohibitive expense and further prolonged delay"; (7) shutting down the project in September 2011, based on "exaggerated safety concerns and maintaining such [a] shutdown for an unreasonable long period of time"; (8) failing to act on RDA's SSHO and QC proposals for months and then denying those proposals on "insubstantial or erroneous grounds"; and (9) demanding re-inspection of RDA's crane in January 2013, violating the October 13, 2009 Contract and prior practice.  Pl. PT Br. at 58–61.

### b.      The Government's Response.

The Government responds that the NAVFAC properly did not adjust the contract for changes in price and schedule, due to unanticipated site conditions.  Moreover, the NAVFAC was "overly generous" in granting RDA numerous modifications to the October 13, 2009 Contract and any delay in granting such modifications is remediable under the Disputes Clause, not as a breach of contract.  Gov't PT Resp. at 20.

Specifically, the NAVFAC did not breach the duty of good faith and fair dealing by insisting that RDA's baseline schedule include all of the contract work and enforcing the contractual requirement that RDA remove all of the H-piles in their entirety.  Gov't PT Resp. at 2–9, 20.

Nor did the NAVFAC breach the duty of good faith and fair dealing when it allegedly refused to instruct RDA on how to remove H-piles that broke beneath the mudline and failed to authorize drilling to bypass obstructions at the south and north bulkheads in a timely manner, since the October 13, 2009 Contract did not require the NAVFAC to provide instructions other than those contained in the Solicitation and RDA was free to drill through obstructions, without any NAVFAC authorization.  Gov't PT Resp. at 35.

Nor did the NAVFAC breach the duty of good faith and fair dealing by enforcing the October 13, 2009 Contract's safety requirements, particularly after RDA experienced a third accident onsite.  Gov't PT Resp. at 21.  In fact, the NAVFAC reasonably exercised its discretion in rejecting several RDA candidates for the QC and SSHO positions who did not have the necessary qualifications.  Gov't PT Resp. at 20, 25–29, 32–33, 43–44.

In addition, the NAVFAC's decision to request a crane re-inspection in January 2013 was consistent with the October 13, 2009 Contract and did not violate the duty of good faith and fair dealing.  Gov't PT Resp. at 22.

### c.      The Court's Resolution.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement."  *Metcalf Const. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (*quoting* RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)("RESTATEMENT")) (internal quotation marks omitted).  "Failure to fulfill that duty constitutes a breach of contract[.]"  *Id.* (*quoting* RESTATEMENT § 235)).  But, the duty of good faith and fair dealing  does not "expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions."  *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010).  For this reason, "an act will not be found to violate the duty [of good faith and fair dealing] . . . if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision."  *Metcalf*, 742 F.3d at 991.

In essence, the covenant of good faith and fair dealing "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."  *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  The Government

may breach this duty if it acts unreasonably under the circumstances. *See C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1542 (Fed. Cir. 1993) ("The government must avoid actions that unreasonably cause delay[.]"); *see also Commerce Int'l Co. v. United States*, 338 F.2d 81, 86 (Ct. Cl. 1964) (holding that actions that cause a "breach of [the] obligation of reasonable cooperation" depend upon the "particular contract, its context, and its surrounding circumstances").

### i. Regarding Price And Schedule Changes To The October 13, 2009 Contact, Because Of The NAVFAC's Failure To Disclose The Appledore Report And FST Report.

First, RDA argues that the NAVFAC breached the duty of good faith and fair dealing when it failed to "promptly and fairly adjust the contract for changes in price and schedule necessitated by the belated disclosure of material information [in the Appledore Report and FST Report] concerning actual Project conditions." Pl. PT Br. at 58. But, as discussed in sections of this Post Trial Memorandum Opinion and Final Order addressing Counts I–V, RDA was not entitled to an equitable adjustment, because, as a matter of law, the NAVFAC did not have a duty to disclose the Appledore Report and FST Report, and the Solicitation did not misrepresent the condition of the wharf.

Therefore, the court has determined that the NAVFAC did not breach the duty of good faith and fair dealing by refusing to adjust the October 13, 2009 Contract to compensate RDA for price and schedule changes as a result of not disclosing the Appledore Report and FST Report during the bidding process.

### ii. Regarding Rescinding Approval Of RDA Construction Corp.'s Baseline Schedule.

Second, RDA argues that the NAVFAC violated the covenant of good faith and fair dealing by "[a]pproving RDA's impacted schedule to permit work to begin[,] then rescinding such schedule approvals upon which depended RDA's ability to be timely paid for work commenced in reliance thereon." Pl. PT Br. at 59. The record shows that, on February 5, 2010, the NAVFAC conditionally approved RDA's baseline schedule *for the limited purpose* of allowing work to begin. PX 58 at 1. But, there is no evidence that the February 5, 2010 conditional approval was ever rescinded. In addition, the record evidence contradicts RDA's assertion that, based on the February 5, 2010 conditional approval, RDA reasonably expected to invoice the work it performed. In fact, the February 5, 2010 conditional approval expressly stated that RDA could begin work, but the NAVFAC would not process RDA's invoices until the NAVFAC completed a full review of RDA's proposed baseline schedule. PX 58 at 1.



PX 58 at 1.

It appears that RDA also contends that the NAVFAC breached its duty of good faith and fair dealing by allowing work to begin on February 5, 2010, but delaying approval of the baseline schedule necessary for payment until May 17, 2010, forcing RDA to work without payment for three months. The record, however, shows that RDA was responsible for most of the delay:

- On April 1, 2010, the NAVFAC informed RDA that its proposed baseline schedule contained thirty-four deficiencies. DX 111 at 2–3.

- On April 21, 2010, RDA submitted a revised baseline schedule. DX 121 at 1.

- On April 22, 2010, the NAVFAC rejected RDA's revised baseline schedule, because it contained many of the same deficiencies identified in the April 1, 2010 rejection and a few new deficiencies. DX 121 at 2.

- On April 28, 2017, RDA submitted a second revised baseline schedule. DX 130 at 1.

- On May 13, 2010, the NAVFAC rejected RDA's second revised schedule, because RDA still did not correct many of the deficiencies identified in the April 1, 2010 and April 21, 2010 rejections. DX 130 at 2–3.

- On May 14, 2010, RDA finally submitted a baseline schedule that addressed all of the NAVFAC's concerns. DX 134 at 1.

- Three days later, the NAVFAC approved the May 13, 2010 baseline schedule. DX 134 at 1.

Therefore, the court has determined that the NAVFAC did not violate the duty of good faith and fair dealing by rescinding the February 5, 2010 conditional approval of RDA's baseline schedule, nor did the NAVFAC cause any delay to the final approval of that schedule.

### iii.    Regarding Extraction Of The Broken H-Pile Sections.

Third, RDA argues that the NAVFAC violated the duty of good faith and fair dealing by refusing to help RDA develop a plan for extracting the H-piles that broke off beneath the mudline or, alternatively, waiving RDA's obligation to remove the piles in their entirety. Pl. PT Br. at 59. The October 13, 2009 Contract, however, expressly stated that RDA must formulate a plan to "remove all piles in their entirety." DX 1 at 82, 290. In other words, the October 13, 2009 Contract allocated the risks associated with formulating and executing a pile removal plan to RDA. A finding that the NAVFAC's failure to help RDA develop a removal plan, or otherwise waive RDA's obligation to "remove all piles in their entirety[,]" breached the October 13, 2009 Contract would force the NAVFAC to incur the costs of carrying out those activities. Accordingly, such a determination would transfer to the NAVFAC risks that the October 13, 2009 Contract allocated to RDA.

Therefore, the court has determined that the NAVFAC did not violate the duty of good faith and fair dealing by refusing to waive the contractual requirement that RDA remove all of the H-pile sections or to assist RDA in doing so.

### iv.    Regarding Obstruction Drilling.

Fourth, RDA argues that the NAVFAC violated the duty of good faith and fair dealing by failing to timely authorize obstruction drilling at the bulkhead, causing the project to come to a standstill. Pl. PT Br. at 59–60 (citing PX 83 at 2). RDA, however, fails to identify any contract provision that required the NAVFAC to authorize such work.

Moreover, the record shows that this delay was caused by RDA's refusal to drill through the obstructions without first receiving an equitable adjustment. On March 9, 2011, RDA's Project Manager advised the NAVFAC that "RDA will not continue to perform work on [the bulkhead] without . . . a Contract Modification." DX 273 at 1. Similarly, on August 16, 2012, RDA's President informed the NAVFAC, "I believe that [i]t is in RDA's and the Navy's best interest to hold off on the obstruction drilling . . . until we reach an agreement on a unilateral modification." DX 570 at 1. In short, RDA voluntarily stopped contract performance, hoping that the NAVFAC would modify the contract price and schedule to account for obstructions at the bulkhead. RDA pursued this strategy, despite the October 13, 2009 Contract's instruction that "[a] Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract[.]" DX 1 at 14 (incorporating 48 C.F.R. § 52.233-1(i)).

Conversely, RDA argues that the NAVFAC violated the duty of good faith and fair dealing by "[d]irecting RDA to commence obstruction drilling in February 2012, in advance of processing a contract modification, then failing to take any steps to compensate RDA for all such extra work through termination the following February." Pl. PT Br. at 60. But, RDA did not proffer any evidence that the NAVFAC ordered RDA to commence obstruction drilling in February 2012. To

the contrary, RDA appears to recognize that "[i]n February 2012 . . . RDA proceeded with the second round of obstruction drilling *in advance of receiving formal authorization.*"  Pl. PT Br. at 25 (emphasis added).[17]

---

[17] During the trial of this case the court questioned Mr. Rachupka, the NAVFAC's CO, about a related issue: a May 10, 2012 request for equitable adjustment that remained pending for ten months.  TR at 2134–35 (Rachupka).  Mr. Rachupka conceded that the NAVFAC's delay was unfair to RDA:

 [THE COURT]: Was there an occasion where you had an outstanding change order for ten months? . . .

[MR. RACHUPKA]: We did have, as I explained earlier this week in testimony, the change order that is being questioned right now where there were inaccuracies related to the amount of money being sought by RDA.  If you remember our conversation about the double dipping --

[THE COURT]: Right.

[MR. RACHUPKA]: -- that is specifically what Mr. O'Brien is referring to.

[THE COURT]: What I am saying is you didn't get it resolved because you didn't get the information from RDA?

[MR. RACHUPKA]: As you have seen, there has been a myriad of issues.  It's one of those things that we never got to sit down and address and work out.

[THE COURT]: In ten months?

[MR. RACHUPKA]: That is correct, Your Honor.

[THE COURT]: And was that because you didn't try?

[MR. RACHUPKA]: I had, I had done -- I believe I did some evaluation but never completed it.

[THE COURT]: I'm sorry?

[MR. RACHUPKA]: I probably did some evaluation as to the cost proposals but never completed it.

[THE COURT]: Do you think that was fair to the contractor?

[MR. RACHUPKA]: I wouldn't say it is fair but --

Therefore, the court has determined that the NAVFAC did not violate the duty of good faith and fair dealing by failing to award RDA an equitable adjustment prior to commencing obstruction drilling in February 2012 or withholding payment for that work.

> ### v.     Regarding Work Suspension After The September 14, 2011 Safety Mishap.

Fifth, RDA argues that the NAVFAC violated the duty of good faith and fair dealing when it suspended work, following an accident on September 14, 2011. Pl. PT Br. at 61. The September 14, 2011 accident was RDA's third safety incident. DX 413 at 1. The first accident occurred on August 10, 2010 and resulted in the injury of an RDA worker. DX 174 at 1. The second accident took place on February 22, 2011, when a vibratory hammer hit an employee breaking several of his ribs. DX 261 at 9. Moreover, RDA's QC and SSHO (safety officers) were not at the project site when the September 14, 2011 accident occurred. DX 413 at 1. In light of RDA's repeated failure to satisfy its contractual obligation to maintain a safe work site and have safety officers supervise all work (DX 1 at 192), and the NAVFAC's authority to stop work pending the investigation of a safety incident (DX 1 at 193), the court finds that it was reasonable for the NAVFAC to require a thorough investigation of the September 14, 2011 accident.

Therefore, the court has determined that the NAVFAC did not violate the duty of good faith and fair dealing by suspending work to investigate why RDA repeatedly experienced accidents that risked injury to individuals and damage to equipment at the Newport Naval Station.

> ### vi.    Regarding Approval Of RDA Construction Corp.'s Quality Control Manager And Site Safety And Health Officer.

Sixth, RDA argues that the NAVFAC violated the duty of good faith and fair dealing when it failed to evaluate RDA's QC and SSHO candidates in a timely manner and denied several of those candidates on "insubstantial or erroneous grounds." Pl. PT Br. at 60–61. These delays forced RDA to stop work, because the October 13, 2009 Contract required RDA to "[p]rovide a [SSHO] at the work site at all times." DX 1 at 192. The record, however, shows that the NAVFAC evaluated candidates in a reasonable time and promptly approved personnel that satisfied the October 13, 2009 Contract's experience and certification requirements. DX 1 at 192–93 (minimum qualifications for SSHO), 217–18 (minimum qualifications for QC). In fact, the

[THE COURT]: I didn't hear you. Would you please stop doing that[?]

[MR. RACHUPKA]: So I would not say it is fair. No, I wouldn't say that.

TR at 2134–35 (Rachupka).

RDA, however, did not argue that the NAVFAC's failure to timely address the May 10, 2012 request violated the duty of good faith and fair dealing in the November 8, 2016 Post Trial Brief. Therefore, the court does not address this issue. *See Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (holding that a party waives an argument when it fails to raise that argument in its principal brief).

NAVFAC approved Mr. Morrissette as QC and SSHO within five days (DX 327 at 1), Mr. Brewer as SSHO in seven days (DX 491 at 1), and Mr. Smith as QC in eighteen days (PX 156 at 2).

To the extent that delays occurred in the approval of RDA's candidates for the QC and SSHO roles, the record shows that RDA repeatedly submitted candidates that did not meet the contractual requirements for those roles. From March 31–May 2, 2011, RDA requested that the NAVFAC approve Mr. Meomartino, Ms. Amarantes, Mr. Rand, and Mr. DiRamio as QCs and SSHOs. DX 306–13, 316, 319–20. On May 9, 2011, the NAVFAC rejected all of these candidates, because they did not have the experience and/or certifications required by the October 13, 2009 Contract. DX 327 at 1–13. After Mr. Morrissette, the QC and SSHO from May 9, 2011 to late January 2012, had a heart attack on June 28, 2011, it became necessary for RDA to hire an alternative QC and SSHO on site. Instead of proposing a new candidate, RDA requested that the NAVFAC reconsider Ms. Amarantes and Mr. Rand. DX 345 at 1; DX 346 at 1; DX 348 at 1. Because RDA did not indicate that either candidate had acquired the necessary experience and/or certifications after they were first rejected, the NAVFAC rejected them a second time. DX 356 at 1 (rejecting Ms. Amarantes); DX 357 at 1 (rejecting Mr. Rand).

Moreover, the NAVFAC did not deny RDA's QC and SSHO candidates on insubstantial grounds. The October 13, 2009 Contract required QC candidates to have the following qualifications:

a minimum of 10 years combined experience in the following positions: Project Superintendent, QC Manager, Project Manager, Project Engineer or Construction Manager on similar size and type construction contracts which included the major trades that are part of this Contract. The individual must have at least two years experience as a QC Manager. The individual must be familiar with the requirements of, and have experience in the areas of hazard identification, safety compliance, and sustainability.

In addition to the above experience and education requirements, the QC Manager must have completed the course entitled "Construction Quality Management (CQM) for Contractors."

DX 1 at 217.

The October 13, 2009 Contract also required that SSHO have specific qualifications, including:

[a] minimum of 10 years safety work of a progressive nature with at least 5 years of experience on similar projects. 30-hour OSHA construction safety class or equivalent within the last 5 years. An average of at least 24 hours of formal safety training each year for the past 5 years with training for competent person status for at least the following 4 areas of competency: Excavation; Hazardous energy; Health hazard recognition, evaluation and control of chemical, physical and biological agents; Personal protective equipment and clothing to include selection, use and maintenance.

DX 1 at 192.

The NAVFAC denied Mr. Meomartino as QC and SSHO, because his resume did not indicate: (1) ten years of experience on projects of comparable size; (2) familiarization with United States Army Corp of Engineers safety guidelines; (3) completion of the "Construction Quality Management (CQM) for Contractors" course; (4) completion of thirty-hour OSHA construction safety class within the last five years; and (5) twenty-four hours of formal safety training each year for the past five years. DX 327 at 3–4.

Ms. Amarantes' background did not satisfy the contract requirements either, because her resume did not indicate: (1) ten years of combined experience as Project Superintendent, QC, Project Manager, Project Engineer or Construction Manager on projects of comparable size; (2) any experience as QC; (3) five years of safety work on similar projects; and (4) training for excavation, hazardous energy or personal protective equipment. DX 327 at 5–6. In addition, the NAVFAC noted that Ms. Amarantes did not provide documentation for fourteen hours of the formal safety training included on her resume. DX 327 at 6.

Similarly, Mr. Rand's resume did not indicate: (1) ten years of combined experience as Project Superintendent, QC, Project Manager, Project Engineer or Construction Manager; (2) any experience as QC; (3) any experience applying the United States Army Corp of Engineers safety guidelines; (4) completion of the "Construction Quality Management (CQM) for Contractors" course; (5) ten years of experience in safety work of a progressive nature; and (6) twenty-four hours of formal safety training each year for the past five years. DX 327 at 7–8.

Mr. DiRamio also was denied as QC and SSHO, because he: (1) did not complete the "Construction Quality Management (CQM) for Contractors" course; (2) only had seventeen months of experience in safety work; (3) did not complete the thirty-hour OSHA construction safety class within the past five years; and (4) did not provide proof of any formal safety training in the last five years. DX 327 at 10–11.

And, the NAVFAC also denied Mr. Wallis for the SSHO position, because his resume did not: (1) demonstrate ten years of experience in safety work; (2) provide certificates showing completion of the thirty-hour OSHA construction safety class; (3) indicate he had taken an average of twenty-four hours of formal safety training each year for the past five years; and (4) demonstrate competent person status in hazardous energy, health hazard recognition, or personal protective equipment. DX 486 at 1. Likewise, Mr. Wallis was denied the QC position, because in his past performance he failed to follow Navy guidelines during the recovery of a sunken RDA boat, leading to a fuel spill. DX 485 at 1. The NAVFAC considered this accident in finding that he was not competent to perform the role of QC. DX 485 at 1.

Therefore, the court has determined that the NAVFAC did not unreasonably delay the evaluation of RDA's candidates for the QC and SSHO positions or deny those candidates on insubstantial grounds.

### vii.   Regarding The Re-Inspection Of The Manitowoc 4100 Crane.

RDA also argues that the NAVFAC violated the duty of good faith and fair dealing by "[d]emanding re-inspection of RDA's crane in January 2013, violating both the applicable contract

standards (EM-385) and prior practice, resulting in prolonged, expensive repairs during which time RDA was unable to use this equipment." Pl. PT Br. at 61.   RDA's argument is based on a disagreement with the NAVFAC regarding whether an independent crane inspector was required to perform a second inspection of the Manitowoc 4100 Crane to ensure that RDA had properly repaired deficiencies that the crane inspector had identified during a previous inspection. DX 677 at 60, 104, 106.

The October 13, 2009 Contract incorporates the 2003 United States Army Corps of Engineers' Safety and Health Requirements, EM 385-1-1 ("EM 385-1-1"). DX 1 at 192. The EM 385-1-1 states that "[a]ll equipment shall be shut down and positive means taken to prevent its operation while repairs or manual lubrications are being done." EM 385-1-1 at ¶ 16.A.08b.  In addition, "[l]oad performance tests shall be conducted . . . [b]efore initial use of cranes in which a load bearing . . . or load controlling part or component, brake, travel component, or clutch have been altered, replaced, or repaired[.]" EM 385-1-1 at ¶ 16.C.13c(2)(a).  "A *qualified person* shall conduct [the] performance tests" (EM 385-1-1 at ¶ 16.C.13a (emphasis added)) and "[w]ritten reports of the performance test, showing test procedures and confirming the adequacy of repairs or alterations, shall be maintained with the crane" (EM 385-1-1 at ¶ 16.C.13c).

On November 28, 2012, J.P. Riley inspected RDA's Manitowoc 4100 Crane and found *inter alia* that the crane's brakes must be adjusted and/or repaired. DX 677 at 13.   According to the EM 385-1-1, the deficiencies required RDA to take the crane out of service while the repairs were being made (EM 385-1-1 at ¶ 16.A.08b) and a qualified person to conduct a load performance test on the crane before it could be placed back into service (EM 385-1-1 at ¶¶ 16.C.13a, 16.C.13c(2)(a)).   After RDA informed the NAVFAC that it had repaired all of the deficiencies identified by J.P. Riley, including the break adjustments, the NAVFAC instructed that the crane must remain out of service until J.P. Riley conducted a re-inspection and load performance test on the crane. DX 625 at 6; DX 677 at 28–29.   RDA argues that this request was not in good faith, because nothing in the October 13, 2009 Contract required RDA to hire J.P. Riley to conduct the re-inspection and performance test, instead of another qualified person. DX 625 at 3–6.

RDA requested that Steve Watt, one of RDA's mechanics, conduct the re-inspection and performance test, but failed to provide any evidence that Mr. Watt was a "qualified person" under EM 385-1-1. DX 625 at 3–4.  In fact, when the NAVFAC asked RDA for Mr. Watt's resume, Mr. Kelley responded:

> [o]nce again[,] Steve Watt has demonstrated to me . . . that he is qualified to inspect the recommended repairs to this crane.  I do not and will not have you dictate to me what you believe the standard to be.  You are wrong.  Neither OSHA nor the em385 require what you are asking.  You are overstepping your authority.  [Mr. Watt] has extensive knowledge and experience working on these cranes as my employee for nearly 20 years, and that makes him qualified.  I have been in in the marine and crane business all my working life I have the extensive knowledge, training and the experience to make the determination regarding Steve's qualifications[.]  I have gone thru dozens and dozens of crane inspections and OSHA inspections. RDA is complying with our contract.

DX 625 at 3.

In addition, RDA had a contractual duty to maintain a safe work environment.  But, by the end of 2012, RDA had experienced three safety mishaps, including one crane accident.  DX 398 at 1.  In light of RDA's questionable safety record, it was reasonable for the NAVFAC to require that RDA either: (1) prove that Mr. Watt was qualified to inspect the crane and conduct performance tests; or (2) hire a third-party crane inspector to conduct the re-inspection and tests.

RDA also argues that the October 13, 2009 Contract did not require the crane to be re-inspected at all.  Pl. PT Br. at 31.  But, the EM 385-1-1 expressly requires a "[w]ritten report[] . . . confirming the adequacy of repairs or alterations."  EM 385-1-1 at ¶ 16.C.13c.  In addition, it is undisputed that a qualified person had to conduct a load performance test on the crane, and that RDA had not conducted such a test when the NAVFAC requested that the crane be taken out of service.  In fact, RDA's response to this request stated that,

> [t]he referenced sections of EM-385-1-1 require that a written report documenting the tests be maintained before initial use of the 4100W as the brakes have been repaired.  This documentation will be provided as soon as the Operational Test has been completed.

DX 625 at 6.  In other words, the NAVFAC had a contractual right to take the crane out of service until a qualified person conducted a re-inspection and performance test on the crane, and did not act unreasonably when it exercised that right.

Therefore, the court has determined that the NAVFAC did not violate the duty of good faith and fair dealing by taking RDA's Manitowoc 4100 crane out of service.

In sum, the court has determined that the NAVFAC did not violate the duty of good faith and fair dealing in its administration of the October 13, 2009 Contract.  Accordingly, Count VI–VIII of the May 7, 2015 Second Amended Complaint are dismissed.

### 6. Count IX: Whether RDA Construction Corp. Was Entitled To An Extension Of The Contract Completion Date For Excusable Delays.

The May 7, 2015 Second Amended Complaint contains a "ninth cause of action."  5/7/2015 Sec. Am. Compl. at ¶¶ 128–34.  The so-called "ninth cause of action," however, asserts an affirmative defense.  Specifically, it alleges that the NAVFAC is not entitled to recover liquidated damages for RDA's failure to complete performance of the October 13, 2009 Contract by the modified completion date, *i.e.*, October 5, 2012, because the NAVFAC was required to extend the completion date by 313 days for excusable delays.  5/7/2015 Sec. Am. Compl. at ¶¶ 132–34.  Because the "ninth cause of action" is, in fact, an affirmative defense to the NAVFAC's counterclaim for liquidated damages, *i.e.*, Counterclaim I, the court addresses this issue in its discussion of the NAVFAC's counterclaims.  *See M. Maropakis Carpentry*, 609 F.3d at 1330 (characterizing allegation that plaintiff was entitled to adjustment of the contract completion date for excusable delays as an affirmative defense).

**IV.    DISCUSSION    OF    THE    COUNTERCLAIMS    ALLEGED    IN    THE GOVERNMENT'S JUNE 12, 2015 ANSWER.**

### A.    Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court." 28 U.S.C. § 1503. Likewise, the court has jurisdiction to adjudicate "any setoff, counterclaim, claim for damages, or other demand [that] is set up on the part of the United States against any plaintiff making claim against the United States[.]" 28 U.S.C. § 2508. The court's jurisdiction to adjudicate Government counterclaims, however, is subject to the prerequisite that the court have jurisdiction to adjudicate an underlying claim against the Government in the same case. *See Mulholland v. United States*, 361 F.2d 237, 245 (Ct. Cl. 1966). Therefore, if the court dismisses a claim alleged by plaintiff against the Government for lack of subject-matter jurisdiction, the court must also dismiss the Government's counterclaims. *Id.*

Because the court has determined that it has jurisdiction to adjudicate Counts I–VIII of RDA's May 7, 2015 Second Amended Complaint, the court also has jurisdiction to adjudicate the counterclaims alleged in the Government's June 12, 2015 Answer. *See Computer Wholesale Corp. v. United States*, 214 Ct. Cl. 786, 788 (1977) ("If plaintiff had pleaded a proper claim, defendant would be able to claim a setoff or counterclaim for the liquidated damages under 28 U.S.C. § 1503 or § 2508."); *see also Martin J. Simko Const., Inc. v. United States*, 852 F.2d 540, 547 (Fed. Cir. 1988) ("The Claims Court has jurisdiction to hear government counterclaims asserted under the False Claims Act."); *Daff v. United States*, 78 F.3d 1566, 1573 (Fed. Cir. 1996) ("[T]he court had jurisdiction with respect to . . . the government's . . . fraud claims.").

### B.    Standing.

The June 12, 2015 Answer alleges that the Government is entitled to recover liquidated damages for RDA's breach of the October 13, 2009 Contract and penalties, under the CDA and False Claims Act, for fraudulent claims that RDA submitted to the NAVFAC. 6/12/15 Gov't Answer ¶¶ at 174–90. Therefore, the June 12, 2015 Answer alleges that the Government has suffered economic injury that is concrete, particularized, and fairly traceable to RDA's actions. *See Friends of the Earth*, 528 U.S. at 180 ("[To establish standing,] plaintiff must show . . . it has suffered an 'injury in fact' that is . . . concrete and particularized . . . [and] fairly traceable to the challenged action[.]"). In addition, any financial injury established by the Government can be redressed by a monetary award. *See id.* at 181 (holding that, to establish standing, alleged injury can "be redressed by a favorable decision").

For these reasons, the court has determined that the Government has standing to seek an adjudication of the counterclaims alleged in the June 12, 2015 Answer.

### C. Counterclaim I: Whether The Naval Facilities Command Is Entitled To Recover Liquidated Damages For The Cost Of Completing The October 13, 2009 Contract.

#### 1. The Government's Argument.

The Government's June 12, 2015 Answer alleges that the NAVFAC is entitled to recover $3,531.26 in liquidated damages for each calendar day between the contract completion date and the date the contract work was actually completed. 6/12/15 Gov't Answer at ¶¶ 174–76. In addition, the Government argues that such liquidated damages continued to accrue after the October 13, 2009 Contract was terminated, because, at that time, RDA was in default for: (1) violating the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733 (Gov't PT Br. at 42–44); (2) failing to timely complete the project (Gov't PT Br. at 44–51); (3) not making progress toward completion (Gov't PT Br. at 51–56); (4) failing to provide adequate assurances in response to the NAVFAC's January 31, 2013 Show Cause Notice (Gov't PT Br. at 56–59); (5) repudiating a fundamental contract requirement to remove all the H-piles in their entirety (Gov't PT Br. at 59–67); and (6) not complying with a number of contract provisions, including removal of demolition debris from the bay, completion of rip removal and installation of sheet piles and soil anchors (Gov't PT Br. at 67–69).

In total, the Government argues that the NAVFAC is entitled to recover $2,514,072 for 712 days of delay.[18] Gov't PT Br. at 69. After subtracting $294,705 that the NAVFAC retained in payments owed to RDA and an $11,162.99 equitable adjustment to the October 13, 2009 Contract for unforeseen costs, the NAVFAC is owed $2,208,204.01. Gov't PT Br. at 69.

#### 2. Plaintiff's Response.

RDA responds that the Government did not prove by a preponderance of the evidence that the NAVFAC's February 21, 2013 default termination of the October 13, 2009 Contract was justified. Pl. PT Resp. at 12 (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987)). Under FAR 1.602-2(b), COs must "[e]nsure that contractors receive impartial, fair, and equitable treatment." Pl. PT Resp. at 13. This obligation requires that the CO "take ownership of all determinations included in the final [CO's] opinion." Pl. PT Resp. at 14 (quoting *CEMS, Inc. v. United States*, 65 Fed. Cl. 473, 479 (2005) (internal quotation marks omitted)). Ms. Kahler, the NAVFAC's Acquisition Director/Chief of the Contracting Office, violated this obligation, because she issued the February 21, 2013 Notice of Termination without knowledge of, and relying on incorrect information about, the NAVFAC's administration of the October 13, 2009 Contract. Pl. PT Resp. at 14–15.

---

[18] The Government calculates the amount of delay by adding: (1) the 441 days that elapsed between RDA's final contract completion date of October 5, 2012 and the December 20, 2013 execution of the Tender Agreement between the NAVFAC and RDA's surety; and (2) the 271 days between the execution of the completion contract between the NAVFAC and Haskell and the Haskell contract's original completion date of November 30, 2014. Gov't PT Br. at 69.

In addition, RDA argues that the NAVFAC was not justified in terminating the October 13, 2009 Contract for failure to complete work by the contract completion date, because RDA was entitled to a 313-day extension of time for excusable delays. Pl. PT Resp. at 17.  Nor could RDA's alleged lack of progress justify the February 21, 2013 default termination, because the NAVFAC contributed to RDA's lack of progress by: (1) refusing to approve obstruction drilling for long periods of time; (2) requiring re-inspection of the Manitowoc 4100 crane in violation of the October 13, 2009 Contract; and (3) forcing RDA to deplete its resources dealing with conditions that the NAVFAC knew about from the Appledore Report and FST Report, but did not disclose to bidders during the procurement process. Pl. PT Resp. at 20–23.  "It is simply not reasonable for NAVFAC to point to conditions which it had a role in creating as justification for default termination[.]"  Pl. PT Resp. at 22.

Moreover, the NAVFAC was not justified in terminating the October 13, 2009 Contract on the basis that RDA failed to provide adequate assurances in response to the NAVFAC's  January 31, 2013 Show Cause Notice. Pl. PT Resp. at 23.  In response to the January 31, 2013 Show Cause Notice, "RDA explained the major impediments to completing the project, which were all NAVFAC's responsibility, and stated unambiguously that 'RDA will continue to work diligently to complete the work.'  RDA is unsure what further assurance could be provided."  Pl. PT Resp. at 23 (internal citations omitted).

RDA also responds that it did not repudiate any obligation under the October 13, 2009 Contract. Pl. PT Resp. at 23.  Although the NAVFAC insisted that RDA remove all of the broken H-piles from below the sea floor, those instructions constituted a cardinal change. Pl. PT Br. at 23.  Therefore, RDA was not contractually obligated to perform that work. Pl. PT Br. at 23.  Moreover, the NAVFAC was not justified in terminating the October 13, 2009 Contract on the basis that RDA did not comply with its contractual obligation to: (1) remove all of the debris that fell into the bay during wharf demolition; (2) complete rip rap removal; and (3) install sheet piles and soil anchors. Pl. PT Resp. at 23–29.  First, RDA removed virtually all of the debris from the bay, and planned to remove the negligible amount remaining once the rest of the contract work was complete. Pl. PT Resp. at 23–25.  Second, RDA removed all the rip rap within twenty feet of the bulkhead, as required by the October 13, 2009 Contract. Pl. PT Resp. at 27.  Any additional rip rap was beyond the October 13, 2009 Contract's scope. Pl. PT Resp. at 27.  Third, RDA's failure to complete the installation of sheet piles and soil anchors at the bulkhead was caused by unforeseen obstructions and the NAVFAC's delay in approving work to drill through those obstructions. Pl. PT Resp. at 29.

But, even if the Government did demonstrate that the February 21, 2013 default termination was justified, "a contractor's failure to perform will be excused and the termination for default converted to a termination for convenience if the contractor can establish that the government materially breached the contract."  Pl. PT Br. at 37 (quoting *Fort Howard Senior Hous. Assocs., LLC v. United States*, 121 Fed. Cl. 636, 649 (2015)).  In this case, the NAVFAC breached the

October 13, 2009 Contract by: (1) effecting a cardinal change when it instructed RDA to remove all the H-piles in their entirety (Pl. PT Br. at 38); (2) failing to timely authorize obstruction drilling at the bulkhead (Pl. PT Br. at 42); (3) failing to disclose the Appledore Report and FST Report during the procurement process (Pl. PT Br. at 47–56); (4) including a defective specification in the October 13, 2009 Contract (Pl. PT Br. at 56); and (5) violating the duty of good faith and fair dealing (Pl. PT Br. at 57–61). Therefore, the court must convert the February 21, 2013 termination for default into a termination for convenience. Pl. PT Br. at 37–38.

### 3.     The Government's Reply.

The Government replies that "[n]one of RDA's arguments rebut [the Government's] showing that RDA was in default at the time of the termination." Gov't PT Resp. at 2. First, RDA was not excused from removing the H-piles in their entirety, because that contractual requirement was included in the original contract and never changed. Gov't PT Resp. at 2–9. In addition, RDA did not demonstrate that it was entitled to a 313-day extension of the contract completion date for work that RDA performed to drill through obstructions at the bulkhead. Although RDA's scheduling expert, Mr. Mitchell, testified that the project experienced a total of 821 calendar days of delay, he did not offer any opinion as to the causes of the delay. Gov't PT Resp. at 37. And, RDA failed to provide any evidence that the obstructions forced RDA to halt all contract work. Gov't PT Resp. at 35.

The Government adds that the NAVFAC's failure to disclose the Appledore Report and FST Report was not a material breach of the October 13, 2009 Contract. Gov't PT Resp. at 15. But, even if it was, "a party facing a material breach must choose between continuing to perform the contract or ceasing performance and asserting a breach[.] . . . Failure to [cease performance] results in waiver of any right to treat the alleged breach as having terminated the contract." Gov't PT Resp. at 15. In this case, RDA discovered that the NAVFAC withheld the Appledore Report and FST Report on November 18, 2009, but continued to perform on the October 13, 2009 Contract until February 14, 2013. "RDA cannot now [] claim that its 2013 default was excused by its November 2009 receipt of the Appledore [R]eport[.]" Gov't PT Resp. at 16.

The Government also replies that RDA was not excused from performing on the October 13, 2009 Contract by any alleged constructive change or differing site condition. Gov't PT Resp. at 16–17. "[C]ontingencies contemplated by various contract clauses are remediable under those clauses of the contract, not as a breach of the contract." Gov't PT Resp. at 17 (quoting *Triax-Pac. v. Stone*, 958 F.2d 351, 354 (Fed. Cir. 1992)). The October 13, 2009 Contract included a Changes Clause and differing site conditions clause. Gov't PT Resp. at 17. Therefore, any change in work or differing site condition that RDA encountered would be remediable as an equitable adjustment and not as a breach of contract. Gov't PT Resp. at 17.

Likewise, RDA was not excused from performing work under the October 13, 2009 Contract by alleged defects in the specification, because such defects are remediable as equitable adjustments. Gov't PT Resp. at 18. Alternatively, RDA failed to prove any of the elements of a defective specification claim; RDA did not demonstrate that the specification contained any errors or that RDA was actually misled by information contained in the specification. Gov't PT Resp. at

18.  Finally, the Government replies that the NAVFAC never breached the covenant of good faith and fair dealing.  Gov't PT Resp. at 19–22.

### 4.     The Court's Resolution.

The October 13, 2009 Contract includes the following liquidated damages provision:

(a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of [$3,531] for each calendar day of delay until the work is completed or accepted.

(b) If the Government terminates the Contractor's right to proceed, liquidated damages will continue to accrue until the work is completed.  These liquidated damages are in addition to excess costs of repurchase under the [t]ermination clause.

DX 1 at 17, 586 (incorporating 48 C.F.R. § 52.211-12).

Although FAR 52.211-12(b) does not distinguish between terminations for default and terminations for the convenience of the Government, the United States Court of Appeals for the Federal Circuit's predecessor held that the Government cannot recover prospective liquidated damages when it terminates a contract for its own convenience.  *See John A. Johnson Contracting Corp. v. United States*, 132 Ct. Cl. 645, 661 (1955) ("The plaintiff's . . . work was, in fact, terminated for the convenience of the Government.  The Government had, therefore, no right under the contract to charge the plaintiff with the excess costs of having [the work] completed[.]"); *see also Timberland Paving & Const. Co. v. United States*, 8 Cl. Ct. 653, 662 (1985) ("Where a termination for default is . . . in the contemplation of the law one for the convenience of the government, neither liquidated damages for any period following the termination nor common law damages for a breach may properly be assessed against a government contractor.").  In addition, the October 13, 2009 Contract provides that "[i]f, after termination, it is determined that the Contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government."  DX 1 at 15 (incorporating 48 C.F.R. § 52.249-10(c)).  Therefore, if the Contractor was not in default, or the default was excusable, the Government cannot recover liquidated damages under FAR 52.211-12(b).

In this case, the Government has proffered undisputed evidence that RDA did not substantially complete the October 13, 2009 Contract by the modified completion date, *i.e.*, October 5, 2012.  RDA, however, argues that it is not liable for any liquidated damages, because the NAVFAC should have extended the contract completion date by 313 days to account for excusable delays.  In the alternative, RDA argues that it is not liable for liquidated damages that accrued after the NAVFAC's February 21, 2013 Notice Of Termination, because RDA did not default on the October 13, 2009 Contract.

a.     **Whether RDA Was Entitled To An Extension Of The Contract Completion Date.**

"[A] party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled." *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1347 (Fed. Cir. 2000). Specifically, the party asserting the excusable delay, must show that: (1) the delay resulted from "unforeseeable causes beyond the control and without the fault or negligence of the [party]"; and (2) the party "took reasonable action to perform the contract notwithstanding the occurrence of such excuse." 48 C.F.R. § 52.249-10(b)(1); *see also International Elecs. Corp. v. United States*, 646 F.2d 496, 510 (Ct. Cl. 1981).

Regarding the first element, RDA argues that most of the excusable delay was caused by "unforeseen obstructions that prevented RDA from installing [sheet piles at the bulkhead]." Pl. PT Br. at 21. Although these obstructions may have been "unforeseen," RDA failed to demonstrate that they were "beyond the control and *without [RDA's] fault or negligence*." 48 C.F.R. § 52.249-10(b)(1) (emphasis added). The Government proffered the expert opinion of Mr. Helmes, P.E., that, "[t]he difficulties RDA encountered installing the sheet pile return walls *were largely a result of RDA's failure to properly complete its predecessor activities, which involve[d] removal of piles and all the required rock fill*." DX 729 at 25 (emphasis added) (Helmes Expert Report). RDA, however, did not present any evidence to rebut Mr. Helmes' opinion. At trial, RDA proffered two witnesses with experience in construction scheduling—Mr. Mitchell and Mr. Sivalogan—to testify that RDA's progress on the October 13, 2009 Contract was delayed. But, neither witness addressed what caused the obstructions. *See, e.g.*, TR at 1810 (Mitchell) ("[THE GOVERNMENT'S COUNSEL]: What about causation? You didn't determine the cause of each of the delays you identified, correct? [MR. MITCHELL]: That's correct.").

Regarding the second element, RDA failed to demonstrate that it "took reasonable action to perform the [October 13, 2009 Contract] notwithstanding the [obstructions]." *International Elecs. Corp.*, 646 F.2d at 510. RDA argues that it is entitled to a 313-day extension of the contract completion date, because RDA was forced to stop all contract work pending the NAVFAC's approval of obstruction drilling. Pl. PT Resp. at 18–19. RDA, however, does not cite a single piece of evidence that supports its assertion that obstruction drilling could not begin without the NAVFAC's authorization. To the contrary, the October 13, 2009 Contract expressly required RDA to begin drilling pending a formal modification. DX 1 at 14 (incorporating 48 C.F.R. § 52.233-1(i) ("The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.")). And, RDA's November 11, 2016 Post Trial Brief admits that, on at least one occasion, "RDA proceeded with . . . obstruction drilling *in advance of receiving formal authorization*." Pl. PT Br. at 25 (emphasis added).

In addition, the record evidence shows that RDA stopped contract performance voluntarily, because it hoped to secure a contract modification that fully compensated RDA for the necessary obstruction drilling before it performed such work. Indeed, RDA's Project Manager advised the NAVFAC that "RDA will not continue to perform work on [the bulkhead] without . . . a Contract Modification." DX 273 at 1. Similarly, RDA's President stated: "I believe that [i]t is in RDA's and the Navy's best interest to hold off on the obstruction drilling . . . until we reach an agreement on a unilateral modification." DX 570 at 1.

For these reasons, the court has determined that RDA was not entitled to an extension of the October 13, 2009 Contract's completion date for excusable delays.

> **b.   Whether The Naval Facilities Command's February 21, 2013 Termination Of The October 13, 2009 Contract For Default Should Be Converted Into A Termination For Convenience.**
>
> > **i.   Whether The February 21, 2013 Notice Of Termination Was "Fair And Impartial," Pursuant To 48 C.F.R. § 1.602-2.**

As an initial matter, RDA argues that The CO's February 21, 2013 default-termination decision should be set aside—regardless of the merits—because the decision was not a fair and impartial "product of [her] personal and independent judgment." Pl. PT Resp. at 14 (quoting *N. Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 209 (2007)).

Under the CDA, "[e]ach claim by the Federal Government against a contractor relating to a contract shall be the subject of a written decision by the contracting officer." 41 U.S.C. § 7103(a)(3). In addition, the CO's decision must be "fair and impartial." 48 C.F.R. § 1.602-2.[19] And, although there is no "implied prohibition against [the CO] first obtaining or even agreeing with the views of others," *Pac. Architects & Eng'rs, Inc. v. United States*, 491 F.2d 734, 744 (Ct. Cl. 1974), a CO's default termination decision must be the result of her personal and independent judgment, such that "a decision by someone else is a nullity." *N.Y. Shipbuilding v. United States*, 385 F.2d 427, 439 (Ct. Cl. 1967).

On February 21, 2013, the CO issued a written decision providing her reasons for terminating the contract for default, *i.e.*, RDA failed to complete the project by its contract completion date, and also affirmatively repudiated the contractual requirement to remove broken H-piles. DX 650 at 1–4. RDA argues that this decision demonstrates a "clear lack of independence," however, because the CO: (1) lacked technical construction knowledge; (2) relied on the advice of the field staff, including Mr. Germano, the Supervisory General Engineer for

---

[19] FAR 1.602-2 provides, in relevant part, that:

Contracting officers are responsible for ensuring performance of all necessary actions for effective contracting, ensuring compliance with the terms of the contract, and safeguarding the interests of the United States in its contractual relationships. In order to perform these responsibilities, contracting officers should be allowed wide latitude to exercise business judgment. Contracting officers shall—
. . .
(b) Ensure that contractors receive impartial, fair, and equitable treatment; and
(c) Request and consider the advice of specialists in audit, law, engineering, information security, transportation, and other fields, as appropriate.

48 C.F.R. § 1.602-2.

NAVFAC, and Mr. Rachupcka, the Construction Project Manager for NAVFAC; and (3) did not adopt RDA's arguments with respect to the removal of the H-piles. Pl. PT Resp. at 14–15.

In fact, that the CO did not have specialized construction knowledge, does not mean that her decision was not independent. As the FAR makes clear, COs are specialists in contract administration that "should be allowed wide latitude to exercise business judgment" in their dealings with contractors. 48 C.F.R. § 1.602-2. The FAR also recognizes that COs are not experts in other subject matter and states that they should "request and consider the advice of specialists in audit, law, engineering, information security, transportation, and other fields, as appropriate," "[s]ecure assistance from legal and other advisors," and "coordinate with the contract administration office or contracting office, as appropriate." 48 C.F.R. §§ 1.602-2(c), 33.211. It was for this reason that the CO relied on the advice of Mr. Germano and Mr. Rachupka, who had specialized construction knowledge and were involved in the day-to-day management of the October 13, 2009 contract. That she relied on this advice does not render her decision non-independent, despite RDA's arguments to the contrary.

RDA cites to several cases where the United States Court of Federal Claims found a CO's decision to be lacking independent judgment, but those cases are distinguishable. In *Fireman's Fund Ins. Co. v. United States*, 92 Fed. Cl. 598 (2010), the CO did not review a claim decision, prepared by counsel, before signing it. *Id.* at 697–98. Similarly, in *CEMS, Inc. v. United States*, 65 Fed. Cl. 473 (2005), the CO "releas[ed] authority to subordinates and remain[ed] remarkably detached from the decision-making process," and denied claims "in which even government error or changes were acknowledged." *Id.* at 479–80. Likewise in *North Star Alaska Housing Corp. v. United States*, 76 Fed. Cl. 158 (2007), the CO gave in to pressure from other Government officials to abdicate his responsibility to be impartial and agreed to support contract interpretations made by officials, who were openly contemptuous of the contractor. *Id.* at 210–11.

In this case, the CO's testimony shows no abdication of responsibility. Before making the default-termination decision, the CO reviewed the contract documents, the contract modifications, and letters sent by RDA, wherein RDA claimed entitlement to increased costs and time to complete the project. TR at 2498 (Kahler).[20] The CO then sent the January 31, 2013 Show Cause Letter, affording RDA an opportunity to explain why the contract should not be terminated for default. DX 636 at 1–2. But, the CO was not persuaded by RDA's February 1, 2013 Response, because RDA did not address her concerns in sufficient detail nor express urgency in getting the project done. TR at 2503 (Kahler). In addition, RDA's February 1, 2013 Response reiterated RDA's earlier position, as expressed in RDA's January 18, 2013 Letter, that RDA would not conduct any work related to H-pile removal without a change order. TR 2503–04 (Kahler); *see also* DX 637 at 1–2 (1/18/13 RDA letter). Based upon this record, the court finds that the CO used her

---

[20] RDA also asserts that Ms. Kahler's termination decision is defective because she did not review the claim file associated with RDA's April 21, 2010 Certified Claim. Pl. PT Resp. at 14. But, Ms. Kahler testified that she did not review that claim file because a final decision on that Certified Claim was issued by a NAVFAC CO on August 31, 2010. TR at 2606 (Kahler); *see also* DX 193 at 1–4 (8/31/10 Certified Claim denial decision).

independent judgment in deciding that RDA was in default, and she did not abdicate her decision-making responsibility.

RDA also asserts that the CO's default-termination decision was flawed because: she did not understand that removal of the H-piles would entail considerable cost; she was not aware that FST recommended that the H-piles be cut; and she mistakenly was informed by the Government's counsel that RDA intentionally broke H-piles.  Pl. PT Resp. at 15.  But, RDA's argument does not establish that the CO did not use independent decision-making.  And, as previously explained, the H-pile removal was required by the express terms of the October 13, 2009 contract.  DX 1 at 82 (Demolition Note 3: "REMOVE PILES IN THEIR ENTIRETY"); PX 12 at 3 (picture).  Moreover, the record evidences that RDA did in fact intentionally cut the H-piles, pursuant to RDA's March 29, 2010 removal plan.  DX 108 at 3–4.

For these reasons, the court has determined that the February 21, 2013 default-termination should not be set aside based upon a lack of independence or fairness on the part of the CO.

### ii. Whether The Naval Facilities Command Established That RDA Construction Was In Default As Of The Termination Date.

The October 13, 2009 Contract includes a default provision that allows the Government to terminate the Contract for default if "the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time[.]"  DX 1 at 15 (incorporating 48 C.F.R. § 52.249-10(a)).  In addition, the October 13, 2009 Contract's default clause states that the Government retains "any other rights and remedies provided by law[.]"  DX 1 at 15 (incorporating 48 C.F.R. § 52.249-10(d)).  This includes the right to terminate the October 13, 2009 Contract upon a material breach or repudiation of a contract requirement.  *See Dow Chem. Co. v. United States*, 226 F.3d 1334, 1346 (Fed. Cir. 2000) ("A material breach, or repudiation, gives rise to a right to exercise a termination provision in a contract[.]"); *see also Cities Serv. Helex, Inc. v. United States*, 543 F.2d 1306, 1313 (Ct. Cl. 1976) ("A material breach . . . gives the injured party the right to end the agreement[.]").

The Government bears the burden of proving that a termination for default was justified.  *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) ("[W]e conclude that the government should bear the burden of proof with respect to the issue of whether termination for default was justified[.]").  The Government satisfies this burden if it can demonstrate that "there was an existing ground for a default-termination, regardless of whether that ground was known to the contracting officer at the time of the termination."  *Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1357 (Fed. Cir. 2004); *see also Kelso v. Kirk Bros. Mech. Contractors, Inc.*, 16 F.3d 1173, 1175 (Fed. Cir. 1994) ("This court sustains a default termination if justified by the circumstances at the time of termination, regardless of whether the Government originally removed the contractor for another reason.").

Here, the Government argues that RDA defaulted on the October 13, 2009 Contract, because RDA failed to complete performance by the contract completion date, *i.e.*, October 5, 2012.  RDA does not dispute that it had not completed performance of the October 13, 2009

Contract by October 5, 2012. In fact, Mr. Sivalogan, a construction scheduling consultant employed by RDA, testified that as of November 8, 2012, one month after the completion date, RDA required 198 days to complete the October 13, 2009 Contract. TR at 957 (Sivalogan). Instead, RDA argues that it was not in default, because it was entitled to a 313-day extension of the completion date for excusable delays. For the reasons provided above, however, RDA has failed to demonstrate any excusable delays.

Alternatively, the Government argues that RDA repudiated the October 13, 2009 Contract's requirement to remove all of the H-piles in their entirety. "At common law, anticipatory repudiation of a contract required an unambiguous and unequivocal statement that the obligor would not or could not perform the contract." *Danzig v. AEC Corp.*, 224 F.3d 1333, 1337 (Fed. Cir. 2000). Under modern Government contract law, however,

> anticipatory repudiation includes cases in which *reasonable grounds support the obligee's belief that the obligor will breach the contract.* In that setting, the obligee 'may demand adequate assurance of due performance' and if the obligor does not give such assurances, the obligee may treat the failure to do so as a repudiation of the contract.

*Id.* at 1337–38 (emphasis added) (quoting Restatement (Second) of Contracts § 251 (1981)).

On November 7, 2012, the NAVFAC rejected a request from RDA to waive the October 13, 2009 Contract's requirement to "remove all piles in their entirety." PX 99 at 1. On January 18, 2013, RDA informed the NAVFAC that RDA would not remove any additional piles, unless the NAVFAC provided an equitable adjustment of $1,096,858.26 and three months to perform that work. DX 626 at 2. On January 31, 2013, in response to RDA's January 18, 2013 letter, the NAVFAC ordered RDA to show cause why the October 13, 2009 Contract should not be terminated on the basis that RDA repudiated its contractual obligation to remove all of the H-piles. DX 636 at 1. On February 1, 2013, RDA responded to the NAVFAC's Show Cause Letter stating that its position with regard to the H-piles remained the same, *i.e.*, RDA would not perform the work, without an equitable adjustment. DX 637 at 2. On February 21, 2013, NAVFAC terminated the October 13, 2009 Contract for default, citing anticipatory repudiation as one of the grounds. DX 650 at 2–3.

This sequence of events demonstrates that RDA's conduct leading up to the January 31, 2013 Show Cause Letter provided reasonable grounds for the NAVFAC to believe that RDA would not remove the H-piles in their entirety and thereby breach the October 13, 2009 Contract. Accordingly, the NAVFAC had a reasonable basis to "demand adequate assurance" that RDA would remove the remaining piles. RDA's February 1, 2013 Response to the January 31, 2013 Show Cause Letter clearly failed to provide such assurances, as it plainly stated that RDA would not perform the remaining work. DX 637 at 2.

For these reasons, the court has determined that the NAVFAC's February 21, 2013 default termination of the October 13, 2009 Contract was justified.[21]

> ### iii.  Whether The Naval Facilities Command Breached The October 13, 2009 Contract Thereby Relieving RDA Construction Corp. Of Any Consequences Stemming From The February 21, 2013 Default Termination.

A material breach of contract by the Government, "provides [the contractor] with a legal right to avoid the contract, discharges [the contractor's] duty to perform, and relieves [the contractor] of the default termination and its consequences." *Malone v. United States*, 849 F.2d 1441, 1446 (Fed. Cir. 1988). Here, RDA argues that it is relieved of the February 21, 2013 default termination and its consequences, because the NAVFAC breached the October 13, 2009 Contract by:

(1)     effecting a cardinal change to the October 13, 2009 Contract (Pl. PT Br. at 38);

(2)     failing to timely authorize obstruction drilling at the bulkhead (Pl. PT Br. at 42);

(3)     failing to disclose the Appledore Report and FST Report during the procurement process (Pl. PT Br. at 47–56);

(4)     including a defective specification in the October 13, 2009 Contract (Pl. PT Br. at 56); and

(5)     violating the duty of good faith and fair dealing (Pl. PT Br. at 57–61).

The court has addressed all of RDA's breach of contract arguments in its discussion of Counts I–VIII of the May 7, 2015 Second Amended Complaint, and has determined that the NAVFAC did not breach the October 13, 2009 Contract. Therefore, RDA is not relieved of the February 21, 2013 default termination and its consequences.

In sum, the court has determined that RDA is liable for liquidated damages.

---

[21] The Government provides six alternative grounds for the court to find that the NAVFAC's February 21, 2013 default termination was justified. Gov't PT Br. at 42. But, to demonstrate that a default termination was justified, the Government only needs to show that "there was *an* existing ground . . . at the time of the termination." *Empire Energy*, 362 F.3d at 1357. In other words, the Government only needs to succeed on one of its six alternative arguments. Here, the court has considered the Government's two strongest grounds in support of the February 21, 2013 default termination and has determined that either ground was sufficient to justify termination. For this reason, the court does not find it necessary to address the Government's four other grounds.

        **c.**       **The Quantum Of Liquidated Damages That The Naval Facilities Command Is Entitled To Recover.**

The Government argues that it is entitled to recover liquidated damages for 712 days of delay.  RDA responds that the October 13, 2009 Contract's completion date should be extended by 313 days for excusable delays, but otherwise does not dispute the amount claimed by the Government.  The court, however, previously rejected RDA's excusable-delay argument.  Therefore, the court has determined that the NAVFAC is entitled to liquidated damages for 712 days of delay.

The October 13, 2009 Contract provides that "the Contractor shall pay liquidated damages to the Government in the amount of [$3,531] for each calendar day of delay[.]"  DX 1 at 17, 586.  Applying the $3,531 daily rate, the NAVFAC is entitled to a total of $2,514,072 in liquidated damages.  This amount is offset by the NAVFAC's retention of $305,867.99 in payments owed to RDA. DX 711 at 1.  Accordingly, RDA owes the NAVFAC $2,208,204.01 in liquidated damages.

    **D.**     **Counterclaim II: Whether RDA Construction Corp. Is Liable For Damages Under The Contract Dispute Act's Anti-Fraud Provision, 41 U.S.C. § 7103(c)(2).**

The Government's June 12, 2015 Answer alleges that RDA is liable for $82,974.70 in damages for violating the CDA's anti-fraud provision, 41 U.S.C. § 7103(c)(2).[22]  6/12/15 Gov't Answer ¶¶ 177–182.

        **1.**       **The Government's Argument.**

On November 28, 2012, J.P. Riley inspected a Manitowoc 4100 crane that RDA was using and noted several items that needed repair.  DX 677 at 3.  On January 14, 2013, the NAVFAC directed RDA to take the crane out of service for a re-inspection.  DX 677 at 28.  On January 16, 2013, J.P. Riley conducted a second inspection and issued a Deficiency/Recommendation Report, finding that several problems identified in the November 28, 2012 report were not addressed and noting that "any Deficiency . . . Shall be repaired or defective parts be replaced before continued use."  DX 677 at 52.

---

[22]  The CDA, in relevant part, provides:

[i]f a contractor is unable to support any part of the contractor's claim and it is determined that the inability is attributable to a misrepresentation of fact or fraud by the contractor, then the contractor is liable to the Federal Government for an amount equal to the unsupported part of the claim plus all of the Federal Government' s costs attributable to reviewing the unsupported part of the claim. Liability under this paragraph shall be determined within 6 years of the commission of the misrepresentation of fact or fraud.

41 U.S.C. § 7103(c)(2).

On March 18, 2013, RDA sent a letter to the NAVFAC, certifying a claim for $82,974.70 in additional costs and requesting a 112-day contract time extension in order to comply with the NAVFAC's January 14, 2013 directive. Gov't PT Br. at 37–39; *see also* DX 677 at 114–15 (3/18/13 certified claim).

The Government contends that this claim was without merit, because "[t]here is no basis to hold [the NAVFAC] liable for RDA's inability to keep its crane in safe operating condition." Gov't PT Br. at 37. Indeed, RDA's witnesses had no explanation for claiming an "indefensibly inflated" $82,974.40 in costs. Gov't PT Br. at 70–71.

The Government also argues that the March 18, 2013 Certified Claim included two "blatantly false statements," *i.e.*, that: (1) RDA's "mechanics made [the] noted repairs" after the crane was first inspected on November 28, 2012; and (2) that "[J.P. Riley] did not take the crane out of service [after the November 28, 2012 inspection] or at any point thereafter." Gov't PT Br. at 37 (citing DX 677 at 114–15). RDA, however, did not make all of the noted repairs and "fully understood" that the crane inspector took the crane out of service after the January 16, 2013 re-inspection. Gov't PT Br. at 37–38.

The March 18, 2013 Certified Claim for crane re-inspection and repair costs subsequently was incorporated as PCO 47 in the July 3, 2013 Certified Claim (DX 691 at 30), which was in turn incorporated into the May 7, 2015 Second Amended Complaint (5/7/15 Sec. Am. Compl. at ¶ 92). As a matter of law, the Government is entitled to an "amount equal to the unsupported part of [a] claim." 41 U.S.C. § 7103(c)(2). Since the $82,974.70 claimed in the May 7, 2015 Second Amended Complaint is attributed solely to RDA's fraudulent activity, the Government is owed $82,974.70 in damages. Gov't PT Br. at 69, 72 (citing 41 U.S.C. § 7103(c)(2)).

### 2. Plaintiff's Response.

RDA responds that the Government cannot establish the requisite scienter for liability under the CDA, because the NAVFAC "injected itself into the crane inspection and re-inspection process and, hence, had full knowledge at all times of the status of the inspections and whether the crane had been taken out of service." Pl. PT Resp. at 47. "Back and forth correspondence" establishes that the NAVFAC was aware of all issues regarding repairs and re-inspections; therefore RDA could not have acted with intent to defraud. Pl. PT Resp. at 45–47.

With respect to whether RDA violated the CDA, by submitting an "indefensibly inflated" claim, RDA responds that its claim was made in good faith. Pl. PT Resp. at 47 (citing *Horn & Assoc., Inc., v. United States*, 123 Fed. Cl. 728, 783 (2015) (determining that a certified claim did not violate the CDA, when the contractor mislabeled costs as "actual costs incurred," so the contractor acted in good faith and did not submit certified claim to obtain "leverage" against the Government)).

### 3. The Court's Resolution.

Under the CDA's anti-fraud provision, a contractor that is "unable to support any part of the contractor's claim" as a result of "misrepresentation of fact or fraud" is liable to the Government for an amount equal "to the unsupported part of the claim plus all of the Federal Government's costs attributable to reviewing the unsupported part of the claim." 41 U.S.C. §

7103(c)(2). A "misrepresentation of fact" is "a false statement of substantive fact, or conduct that leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead." 41 U.S.C. § 7101(9); *see also Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed. Cir. 1998) ("To recover under the CDA, the government is required to establish that the contractor made false or fraudulent statements in its submitted claim with *an intent to deceive or mislead the government*." (emphasis added)); *see also Daewoo Engineering & Const. Co. v. United States*, 557 F.3d 1332, 1335 (Fed. Cir. 2009) ("The [G]overnment must establish this falsity and intent by a preponderance of the evidence."). In short, to establish a violation of the CDA, the Government must prove: (1) falsity, (2) materiality, and (3) intent to defraud. *See* 41 U.S.C. §§ 7101(9), 7103(c)(2).

In this case, the Government asserts that RDA's claim for crane re-inspection costs is fraudulent because it was: (1) "baseless"; (2) "indefensibly inflated"; and (3) "premised on misrepresentations of fact." Gov't PT Br. at 37, 70–71. The court will address each of these arguments in turn.

### a.   Whether RDA Construction Corp.'s Crane Re-Inspection Claim Was "Baseless."

The Government argues that RDA's claim for crane re-inspection costs and repair of the Manitowoc 4100W crane is fraudulent, because RDA lacked any "colorable basis to demand compensation" from the NAVFAC. Gov't PT Br. at 71. But, RDA's March 18, 2013 Certified Claim, July 3, 2013 Certified Claim and May 7, 2015 Amended Complaint are rooted in a long-running dispute about whether the NAVFAC acted within its authority, when it ordered the crane to be taken out of service. DX 677 at 114–115; *see also* Pl. PT Br. at 31, 61, 64 (arguing that the NAVFAC did not have any contractual basis for requiring the crane to be re-inspected and RDA incurred costs as a result).

The fact that RDA and the Government disagree about whether the NAVFAC acted properly does not render RDA's claim fraudulent. The Government cites to the United States Court of Appeals for the Federal Circuit's holding in *Daewoo* for the proposition that "[i]t is well established that a baseless certified claim is a fraudulent claim." 557 F.3d at 1339; *see also id.* at 1339–40 ("For instance . . . if a party knows that its claim that it is entitled to funds under a letter of credit 'has no plausible or colorable basis,' then the party's 'effort to obtain the money is fraudulent.'" (quoting *Itek Corp. v. First Nat'l Bank of Boston*, 730 F.2d 19, 25 (1st Cir. 1984)). RDA's claim, however, was not "baseless," in the manner of the contractor's claim in *Daewoo*. In that case, a contractor submitted an inflated claim as a "negotiating ploy" and did not honestly believe that the Government owed it the amounts claimed. *See Daewoo*, 557 F.3d at 1339 (quoting *Daewoo Engineering v. United States*, 73 Fed. Cl. 547, 588, 589 (2006)). In this case, the Government did not proffer any evidence that RDA certified this claim as a "negotiating ploy" or otherwise did not honestly believe that the NAVFAC acted improperly.

For these reasons, the court has determined that RDA's re-inspection claim was not "baseless."

####    b.    Whether RDA Construction Corp.'s Crane Re-Inspection Claim Was "Indefensibly Inflated."

Next, the Government argues that RDA's $82,974.70 claim for crane re-inspection costs was fraudulent, because "RDA's witnesses had no explanation for the amount claimed, [that] was indefensibly inflated."  Gov't PT Br. at 71.  Specifically, the Government cites the following testimony of RDA's Project Manager, Mark Wallis:

[THE GOVERNMENT'S COUNSEL]: Can you explain to me how you calculated [the $82,974.70?]  It might be on the same sheet, [DX] 657.14.

[MR. WALLIS]: It is.  The bottom, it's the bottom amount on total cost, Line 14.

[THE GOVERNMENT'S COUNSEL]: Look at rental equipment on Line 5. $52,823.  It's not rental equipment, right?

[MR. WALLIS]: No, it isn't.

[THE GOVERNMENT'S COUNSEL]: It's actually owned equipment?

[MR. WALLIS]: Correct.

[THE GOVERNMENT'S COUNSEL]: Where does that number come from?

[MR. WALLIS]: Worksheet one.

[THE GOVERNMENT'S COUNSEL]: Worksheet one on DX 657.15, can you explain the calculation for the 4100 crane?

[MR. WALLIS]: 640 at the 82.63.

[THE GOVERNMENT'S COUNSEL]: How did you get 640 hours? Based on a 40–hour workweek?

[MR. WALLIS]: Yes.  I believe so, yes.

[THE GOVERNMENT'S COUNSEL]: If you divide 640 by 40, how many weeks are you talking about? . . .

[MR. WALLIS]: 16.

[THE GOVERNMENT'S COUNSEL]: 16 weeks?

[MR. WALLIS]: Wait a minute.  16.

[THE GOVERNMENT'S COUNSEL]: 16 weeks, roughly four months?

[MR. WALLIS]: Correct.

[THE GOVERNMENT'S COUNSEL]: What date are we going to start that four months on?  Would it be December 13, 2012, from DX 657.14?

[MR. WALLIS]: Well according to what it says on the verbiage at the bottom, it would be starting December 13.

[THE GOVERNMENT'S COUNSEL]: So if you start December 13, 2012, and run about four months, where do you get to?

[MR. WALLIS]: Beyond that.  Middle of April.

[THE GOVERNMENT'S COUNSEL]: Why did you claim 640 for the crane?

[MR. WALLIS]: I can't answer that because I don't have — I can't answer that.

TR at 796–97.

As this testimony demonstrates, the cost data submitted with RDA's March 18, 2013 claim was both confusing and incorrect.  Specifically, RDA requested a time extension of "80 work days or 112 calendar days . . . based on the number of shifts that the Manitowoc 4100W was [not in service] from December 13, 2012[, *i.e.*, the date] when all repairs had been completed[,] until February 28, 2013 when the re-inspection [was] completed."  PX 148 at 14; DX 657 at 14 (same).  Eighty work days at eight hours equals 640 hours; RDA multiplied this figure by the Manitowoc 4100W crane's hourly "Standby Rate" of $82.63, to arrive at a total idle equipment cost of $52,883.20.  PX 148 at 14–15; DX 657 at 14–15.  This figure was added together with labor costs, overhead, a bond premium, and $5740.00 in unspecified sub-contractor costs to reach a total of $82,974.70.  PX 148 at 14; DX 657 at 14.

The record supports RDA's assertion that the repairs were made to the crane on December 13, 2012.  DX 677 at 13.  But, RDA's calculations are incorrect, because there were only 77 *calendar* days between December 13, 2012 and February 28, 2013, and not all were "work days."  An incorrect and confusing claim, however, is not necessarily fraudulent.  In order to demonstrate that the March 18, 2013 claim was submitted in violation of the CDA, the Government must establish by preponderant evidence that RDA acted with intent to deceive or mislead.  *See Daewoo*, 557 F.3d at 1335 ("The [G]overnment must establish . . . falsity and intent by a preponderance of the evidence.").

At trial, Mr. Kelley, RDA's President, testified that the 640 hour/80 work day figure was a "mistake," and admitted that it was impossible for 112 days to have passed between December 13, 2012, and February 28, 2013.  TR at 1691–92 (Kelley).  Mr. Kelley also testified that the work associated with RDA's broken-down "CAT 375" excavating machine may have been erroneously charged to the March 18, 2013 claim.  TR 1693 (Kelley) ("No, it's clearly inaccurate with the date and there was also some other issues with that once we started to dig into it. . . . . There were like some issues that were charged to it that shouldn't have been charged to it . . . [including] some work on the 375[.]").  But, Mr. Kelley maintained that the claim was submitted in good faith and he and Mr. Wallis believed that RDA was entitled to those costs, when the certified claims were submitted to the NAVFAC.  TR at 1694 (Kelley) ("I still stand that I in good faith was trying to

certify that claim . . . .  I relied on the people in good faith that we weren't defrauding anybody . . . .  We feel strongly that we're entitled to these numbers.").

The United States Court of Appeals for the Federal Circuit has held that a contractor may violate the CDA, if a claim is based on a "baseless calculation."  *Daewoo*, 577 F.3d at 1339.  But, Mr. Kelley's and Mr. Wallis's testimony is substantially different than the evidence in *Daewoo*.  *See id.* at 1335.  In that case, the contractor's witnesses gave false testimony and were found to be not credible.  *See Daewoo*, 73 Fed. Cl. at 569–570.  In addition, the testimony about the calculation of the certified claim in that case "left no doubt that [the claim] was unsupportable *and* was pursued by [the contractor] with fraudulent intent."  *Id.*  at 574 n.45 (emphasis added).

In the judgment of the court, Mr. Kelley and Mr. Wallis admitted and credibly explained that the March 18, 2013 claim was incorrect, but was not submitted with an intent to mislead or deceive the NAVFAC.  The Government has not offered preponderant evidence to the contrary.

For these reasons, the court has determined that RDA did not submit an "indefensibly inflated" claim.

> ### c.      Whether RDA Construction Corp.'s Crane Re-Inspection Claim Was "Premised On Affirmative Misrepresentations Of Fact."

In addition, the Government argues that RDA's March 18, 2013 Certified Claim was fraudulent, because it included "affirmative misrepresentations of fact regarding whether the repairs had been made after the first inspection and whether the crane inspector took the crane out of service."  Gov't PT Br. at 71.  Specifically, the March 18, 2013 Certified Claim included the following statements that the Government alleges were false, material, and made with the intent to defraud:

> (1) On November 28, 2012[,] we performed the "Annual Crane Inspection" on our Manitowoc 4100W.  The inspection was performed by J.P. Riley and both an annual crane inspection sticker and deficiency report were issued by the crane inspector.  *RDA's mechanics made the noted repairs* and the deficiency report was signed and returned to J.P. Riley as required on his inspection report to indicate that the deficiencies had been addressed.

> (2) In completing the annual [crane] inspection on November 28, 2012 J.P. Riley issued a certification.  Furthermore, it is important to acknowledge that as a qualified inspector J.P. Riley did not take the crane out of service at this point [*i.e.*, November

28, 2012] *or at any point thereafter*. NAVFAC interpreted the relevant documents and specification and directed RDA not to use the crane until it was re-inspected.

DX 677 at 114–15 (emphasis added).[23]

The statement that RDA's mechanics made the repairs identified by J.P. Riley after the November 28, 2012 inspection, *but prior* to the NAVFAC taking the crane out of service and J.P. Riley's second re-inspection, in fact, was false, because one of the noted "Deficiencies" was not repaired.   The November 28, 2012 Deficiency Report listed the following deficiencies: (1) "Hydraulic leaks"; (2) "Fire Extinguisher"; (3) "Brake Adjustments"; (4) "Wipers"; and (5) "Hook Rollers Need Adjustments."   DX 677 at 6.   The January 16, 2013 Deficiency/Recommendation Report listed the following deficiencies: (1) "*Fire Extinguisher (2ND time on reinspection)*[24]"; (2) "Paint/Corrosion Control (Boom Heal [*sic*])"; (3) "Hydraulic leaks (lower side at Pumps)"; (4) "Travel Locks (Left Side)"; and (5) "Lattice Members (10ft section near picture window)."   DX 677 at 52 (emphasis added).   Thus, although the March 18, 2013 letter states that RDA's mechanics made the noted repairs, there was one repair that was not made—a fire extinguisher was not installed.[25]

With respect to the second statement, RDA is correct that J.P. Riley did not take the crane out of service on November 28, 2012.   DX 677 at 3.[26]   But the latter part of the statement—that

---

[23]   The CDA defines a "misrepresentation of fact" as a "a false statement of substantive fact [that] leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead."   41 U.S.C. § 7101(9).

[24]   The Re-Inspection Deficiency/Recommendation Report, however, noted that the fire extinguisher was replaced on the same day that the inspection was conducted.   DX 677 at 52.

[25]   The November 28, 2012 Deficiency Report and January 16, 2013 Deficiency/ Recommendation Reports both noted "hydraulic leaks" in need of repair.   DX 677 at 6, 52.   The January 16, 2013 Deficiency/Recommendation Report, however, does not state that the hydraulic leaks found on January 16, 2013 were the same as the hydraulic leaks found on November 28, 2012.   DX 677 at 52.   At trial, both Mr. Wallis, Construction Manager for RDA, and Mr. Kelley, President of RDA, credibly testified that the leaks could have been located at different points on the crane.   TR at 792 (Wallis) ("The oil leaks are inconclusive, whether they were the same oil leaks on both times. It's an old machine."); *see also* TR at 1708–09 (Kelley) ("I would only think that the fire extinguisher was the same deficiency . . . . .   When we go to the other one [the Deficiency/Recommendation Report is] more specific, to the right side of the pump.").   Mr. Rachupka, the NAVFAC's Construction Manager, was present at the second re-inspection, and recorded that hydraulic leaks remained a problem.   DX 625 at 1.   But, at trial, Mr. Rachupka testified that he "couldn't say for certain" whether these were the same leaks, because he was not present at the first inspection, and only assumed that the leaks were the same.   TR at 2184 (Rachupka).

[26]   Although J.P. Riley issued a "Deficiency Report," that noted five deficiencies, this Report did not take the crane out of service.   DX 677 at 6.   The November 28, 2012 Deficiency Report only instructed RDA that all of the noted deficiencies required repair and that the Report

J.P. Riley did not take the Manitowoc 4100W crane out of service "at any point thereafter," was false.   On January 14, 2013, the NAVFAC took the crane out of service until J.P Riley "perform[ed] a re-inspection of the crane now that that the repairs have been made."  DX 677 at 17.  It was not until January 16, 2013 that J.P. Riley conducted a second inspection and issued a second Deficiency/Recommendation Report that actually took the crane out of service until certain repairs were made: "any Deficiency . . . Shall be repaired or defective parts be replaced before continued use."  DX 677 at 52.[27]

Although the aforementioned statements were false, they were not of the character or quality that falsely "leads to a belief of a substantive fact material to proper understanding of the matter in hand" nor were they made with "intent to deceive."  41 U.S.C. § 7101(9).  RDA's March 18, 2013 claim letter was submitted to bring the dispute about the Manitowoc crane to a head.

On January 16, 2013, Mr. Rachupka arrived for the re-inspection and saw that the missing fire extinguisher was not replaced.  DX 625 at 1.  But, the fire extinguisher was replaced shortly thereafter.   DX 625 at 1.   More importantly, Mr. Rachupka's summary of the re-inspection demonstrates that the NAVFAC decided to keep the Manitowoc 4100W crane out of service, because: (1) the EM-385-1-1 required a qualified person to perform a load test after the crane's brakes were repaired, but a load test could not be conducted on January 16, 2013, because of missing equipment; and (2) new defects were found during the re-inspection would require another re-inspection.[28]  DX 625 1–2.  In other words, while RDA's statement regarding its repairs was false, it was immaterial to the NAVFAC's approach to RDA's crane.  The crane was taken out of service and remained out of service, because of the NAVFAC's interpretation of the EM-385-1-1, and not because of J.P. Riley's November 28, 2012 inspection and deficiency report.  For these reasons, RDA's statements, although inaccurate, could not have misled the Government into forming a false belief about a "substantive fact material to the proper understanding of the matter in hand."  41 U.S.C. § 7101(9).

For these reasons, the court has determined that, although the March 18, 2013 claim was confusing and incorrect, as Mr. Kelley and Mr. Wallis testified, it was not made with the intent to mislead or deceive the NAVFAC.

---

should be signed and returned to J.P. Riley, within ten days of the repairs being made.  DX 677 at 6

[27] In context, however, RDA's statement can also be read as "J.P. Riley did not take the crane out of service on November 28, 2012, or at any point thereafter, *until the NAVFAC's January 14, 2013 order taking the crane out of service.*"

[28] Specifically, Mr. Rachupka found that the crane's boom lacing had to be replaced, so an additional load test would have to be conducted.  DX 625 at 1.  In addition, one of the cranes' tracks would not "lock" to allow proper turning.  DX 625 at 1.  RDA's repair to the track's locking mechanism would require an additional performance test.  DX 625 at 1.

E.    **Counterclaim III: Whether RDA Construction Corp. Forfeited All Claims Against The United States Under The Special Plea In Fraud Statute, 28 U.S.C. § 2514.**

The Government's June 12, 2015 Amended Answer alleges that RDA's July 3, 2013 Certified Claim should be forfeited under the Special Plea in Fraud, 28 U.S.C. § 2514.[29]  6/12/15 Gov't Answer ¶¶ 183–84.  To establish a violation of the Special Plea in Fraud statute, the Government must show by "clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims."  *Veridyne Corp. v. United States*, 758 F.3d 1371, 1367–77 (Fed Cir. 2014) (quoting *Daewoo*, 557 F.3d at 1341).  As a matter of law, however, proof of "negligence and ineptitude" does not evidence intent to defraud under the Special Plea in Fraud statute.  *See Miller v. United States*, 213 Ct. Cl. 59, 69 (1977) (holding that a contractor's "confused and incorrect" invoices, although evident of a "pattern of carelessness and slothfulness," did not rise to the level of deliberate fraud.).  In other words, the Government must prove three elements: (1) falsity; (2) knowledge of falsity; and (3) actual intent to defraud.

The Government argues that the July 3, 2013 Certified Claim incorporates RDA's earlier March 18, 2013 claim letter, and is fraudulent for the reasons previously addressed, *i.e.*, it was: (1) "baseless"; (2) "inexplicably inflated"; and (3) "premised on misrepresentations of fact."  Gov't PT Br. at 72–73.

For the reasons previously discussed, the court has determined that the Government failed to establish even by a preponderance of the evidence that the March 18, 2013 Certified Claim was submitted with an intent to defraud, much less section 2514's heightened "clear and convincing" evidentiary standard.

---

[29] The Special Plea in Fraud Statute provides:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514.

### F.     Counterclaim IV: Whether RDA Construction Corp. Violated The False Claims Act.

#### 1.     The Government's Argument.

The Government argues that RDA violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733,[30] by submitting: (1) invoices that falsely certified that RDA's concrete deck removal work complied with the October 13, 2009 Contract specifications (Invoices 2–21); (2) invoices that falsely certified that RDA's rock fill removal work complied with the October 13, 2009 Contract specifications (Invoices 5–21); (3) invoices that falsely certified that RDA made timely payments to its subcontractors and suppliers (Invoices 2 through 21); and (4) a July 3, 2013 Certified Claim for crane re-inspection costs that was baseless, inflated and premised on factual misrepresentations.  Gov't PT Br. at 27, 29, 36–37.

#### 2.     Plaintiff's Response.

First, RDA responds that it did not defraud the FCA by submitting invoices for concrete deck removal, because the NAVFAC paid those invoices in full despite knowing that RDA's work did not comply with the October 13, 2009 Contract's specifications.  Pl. PT Resp. at 36–39.

Second, RDA responds that it did not violate the FCA by submitting invoices for rock fill removal, because RDA's work satisfied the October 13, 2009 Contract's requirements.  Pl. PT Resp. at 39–40.  To the extent that RDA's rock fill removal did not satisfy all of the contract requirements, however, that failure does not constitute fraud, because it was premised on a reasonable interpretation of ambiguous contract terms.  Pl. PT Resp. at 39–40.  Moreover, the NAVFAC knew of the deficiencies in rock fill removal at the time that RDA submitted the challenged invoices, but nevertheless compensated RDA for that work.  Therefore, the NAVFAC was not defrauded by the submission of those invoices.  Pl. PT Resp. at 41, 43.

------

[30] The False Claims Act, in relevant part, provides:

(a) Liability for certain acts.--

   (1) In general. . . .  [A]ny person who--

      (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

      (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[,] . . .

      is liable to the United States Government for a civil penalty of not less than $5,000 and not more than [$11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a).

RDA also responds that it did not violate the FCA by falsely certifying that it made timely payments to its subcontractors and suppliers, because RDA's misrepresentation was not material to the NAVFAC's decision to pay the challenged invoices.  Pl. PT Resp. at 44.

Finally, RDA responds that the July 3, 2013 Certified Claim for crane re-inspection costs did not amount to fraud, because the NAVFAC had full knowledge of the facts underlying this dispute.  Pl. PT Resp. at 45–46.  Moreover, the July 3, 2013 Certified Claim was not inflated.  Pl. PT Resp. at 46.  At most, RDA made a good faith mistake in calculating damages.  Pl. PT Resp. at 46.

### 3. The Court's Resolution.

To establish a violation of the FCA, the Government must demonstrate that:

(1)     the contractor presented or caused to be presented to an agent of the United States a claim for payment;

(2)     the claim was false or fraudulent; [and]

(3)     the contractor knew the claim was false or fraudulent[.]

*Young-Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed. Cir. 1994).

The FCA defines "know" or "knowing" as "actual knowledge of the information," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).  Under the FCA, knowledge does not require "specific intent to defraud[.]"  31 U.S.C. § 3729(b)(1)(B).

In addition, the United States Supreme Court has held that an alleged "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]."  *Universal Health Services, Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016).  When evaluating materiality under the FCA,

> the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive.  Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement.  *Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.*  Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id*. at 2003–04 (emphasis added).

"In any action brought under [the FCA], the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence." 31 U.S.C. § 3731(d).

> a.   **Whether RDA Construction Corp. Falsely Certified That Its Deck Removal Work Complied With The October 13, 2009 Contract.**

The Government argues that on May 18, 2010 RDA submitted an invoice for deck demolition that violated the FCA by falsely certifying that RDA's demolition work complied with the October 13, 2009 Contract's specifications.  Gov't PT Br. at 29–32 (citing DX 80 at 26).  Specifically, the Government argues that RDA did not comply with the contractual requirement that "DEMOLITION DEBRIS SHALL NOT BE ALLOWED TO FALL INTO THE WATER," and that any "DEBRIS THAT FALLS INTO THE WATER SHALL BE REMOVED BEFORE THE END OF THE WORK DAY." DX 1 at 82.  The Government adds that, because RDA never removed the debris, the nineteen invoices RDA submitted after May 18, 2010 also violated the FCA.  Gov't PT Br. at 31–32.

The parties agree that RDA: (1) presented Invoices 2–21 to the NAVFAC; (2) failed to remove all of the debris as required by the October 13, 2009 Contract; and (3) knew that it had not complied with all of the requirements of the October 13, 2009 Contract.  RDA, however, argues that its misrepresentation did not violate the FCA, because it was not "material . . . to the Government's payment decision[.]" *Universal Health Services*, 136 S. Ct. at 2002.  The court agrees.

The United States Supreme Court has stated that "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id*. at 2003.  In this case, the NAVFAC did just that.  On May 18, 2010, RDA submitted its first invoice for deck demolition work.  DX 80 at 1.  The NAVFAC received that invoice two days later.  DX 80 at 1.  On May 25, 2010, the NAVFAC wrote to RDA stating that "RDA has been performing demolition since mid March 2010 and only as of last week did you start removing the debris. *Everyone has observed that RDA allowed the significant accumulation of construction demolition debris on your site without disposing of it as you went along*[.]" DX 140 at 1 (emphasis added).  The May 25, 2010 letter demonstrates that the NAVFAC had contemporary knowledge of RDA's failure to remove the demolition debris that fell into the Narragansett Bay.  The NAVFAC, however, nevertheless compensated RDA for the deck removal work included in the May 18, 2010 Invoice and all subsequent invoices.  Gov't PT Br. at 30 ("RDA invoiced for and received the full $100,000 allotted for disposal of the concrete from the demolition of the wharf."), 50 ("RDA had the opportunity to invoice, and was paid, for all work satisfactorily performed through the termination[.]").

For these reasons, the court has determined that RDA's misrepresentation regarding the debris that fell into the Narragansett Bay was not material to the Government's payment decision.

**b.** **Whether RDA Construction Corp. Falsely Certified That Its Rock Fill Removal Work Complied With The October 13, 2009 Contract.**

Next, the Government argues that RDA's September 28, 2010 Invoice (Invoice 5) violated the FCA by falsely certifying that RDA: (1) completed all of the rock fill removal work required by the October 13, 2009 Contract; and (2) submitted a hydrographic survey of the project site within seven days of completing rock fill removal.  Gov't PT Br. at 32–33.

**i.** **Regarding Rock Fill Removal.**

The Government has satisfied the first two elements of FCA liability.  First, the Government has demonstrated that, on September 28, 2010, RDA submitted an invoice claiming payment for all of the rock fill removal work required by the October 13, 2009 Contract.  DX 210 at 3.

Second, the Government established that the September 28, 2010 Invoice misrepresented that RDA completed the rock fill removal.  During trial, Lawrence Ahearn, the superintendent of the completion contract awarded to Haskell after RDA was terminated, testified that RDA failed to remove rock fill throughout the project site:

[THE GOVERNMENT'S COUNSEL]: Now, [Haskell] also removed significant quantities of rockfill and riprap?

[MR. AHEARN]: Correct. . . .

[THE GOVERNMENT'S COUNSEL]: Would it be fair to say you removed several truckloads of rockfill and riprap?

[MR. AHEARN]: *Yeah.  Rock, probably 30 truckloads*.

[THE GOVERNMENT'S COUNSEL]: *And did you encounter the rockfill across the entire length of the project*?

[MR. AHEARN]: *Yes*.  It was heavier in some areas than others.

TR at 1122–23 (emphases added) (Ahearn).

RDA does not dispute that it failed to remove all of the rock fill from the project site. Instead, RDA asserts that it was impossible to excavate all of the rock fill without some material falling back into the Narragansett Bay.  Pl. PT Br. at 41.  The material that fell back into the water frequently rolled outside of the "limits of excavation."  Pl. PT Br. at 41.  According to RDA, "[c]hasing those rocks . . . was not part of [the October 13, 2009] Contract."  Pl. PT Br. at 41.  But, RDA does not cite, and the court is unable to identify, any provision of the October 13, 2009 Contract that supports this argument.  Therefore, the court has determined that the Government satisfied the second element of its FCA claim.  *See Young-Montenay*, 15 F.3d at 1043.

The Government, however, failed to establish the third element of FCA liability. Here, the Government argues that RDA had "actual knowledge" of the September 28, 2010 Invoice's misrepresentations. Gov't PT Br. at 33. Specifically, the Government argues that RDA knew its rock fill removal work was incomplete when it submitted the September 28, 2010 Invoice, because RDA composed a draft schedule narrative the following month that stated, "the last pieces of the rip-rap . . . were removed *by October 22, 2010.*" DX 220 at 1 (emphasis added). The draft narrative also contained a comment from Mr. Sivalogan, RDA's scheduling consultant, advising: "check this [date]. This is the date included in the schedule. If this date is incorrect, then [I] suggest we . . . do not mention dates here." DX 220 at 1. The final schedule narrative does not contain the October 22, 2010 date. DX 219 at 4.

The Government asserts that RDA's removal of the October 22, 2010 date from the final schedule narrative is an admission that the rock fill work remained incomplete on October 22, 2010, *i.e.*, one month after RDA submitted the September 28, 2010 Invoice. But, the logic of this conclusion is flawed. Based on Mr. Sivalogan's comment, RDA's exclusion of the October 22, 2010 date only suggests that RDA believed that the October 22, 2010 completion date was incorrect; it does not, however, provide any insight into whether RDA believed the work was completed before or after that date. In other words, the absence of a completion date in the final schedule narrative equally supports two conclusions: (1) RDA believed that it completed the work some time before October 22, 2010 and possibly before it submitted the September 28, 2010 Invoice; or (2) RDA believed the work remained unfinished as of October 22, 2010. Therefore, the Government did not prove by a preponderance of the evidence, *i.e.*, that it is more likely than not, that RDA knew its rock fill work was incomplete when it submitted the September 28, 2010 Invoice.

For these reasons, the court has determined that RDA is not liable under the FCA for falsely certifying that it completed rock fill removal on, or before, September 28, 2010.

### ii.    Regarding The Hydrographic Survey.

The Government also argues that the September 28, 2010 Invoice falsely certified compliance with all of the October 13, 2009 Contract's requirements related to rock fill removal, because RDA did not submit a hydrographic survey of the project site within seven days of completing that work. Here, the parties do not dispute that the first three elements of FCA liability are satisfied. RDA, however, argues that the Government's FCA claim is not actionable, because the relevant misrepresentation was immaterial to the Government's payment decision. Pl. PT Resp. at 43. The court agrees.

"[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Universal Health Services*, 136 S. Ct. at 2003. In this case, the September 28, 2010 Invoice represented that RDA completed rock fill removal on July 21, 2010. DX 210 at 3. The NAVFAC did not receive a hydrographic report by July 28, 2010. And, it was well known that RDA did not plan on submitting a hydrographic report until the project was complete. In fact, Mr. Kelley, RDA's President, testified that "[it] was common knowledge among[] [everyone], the Navy included, that we were going to go back at the end of the project, [to] do a final hydrographic survey." TR at 1543 (Kelley). Nonetheless, the NAVFAC paid RDA the full amount of the

September 28, 2010 Invoice minus a ten percent penalty for falling 125 days behind schedule.  DX 210 at 1.  Therefore, the court finds that RDA's misrepresentation regarding the hydrographic survey was not material to the Government's payment decision.

For these reasons, the court has determined that RDA is not liable under the FCA for falsely certifying that it submitted a hydrographic survey of the project site within seven days of completing rock fill removal.

### c.      Whether RDA Construction Corp. Falsely Certified That It Made Timely Payments To Its Subcontractors.

The Government also argues that RDA falsely certified compliance with the Prompt Payment Act, 31 U.S.C. § 3905,[31] in its May 18, 2010 Invoice (Invoice 2), because RDA failed to pay several of its subcontractors within seven days of receiving payment from the NAVFAC.  Gov't PT Br. at 34–35.

Here, the Government has demonstrated that RDA presented a May 18, 2010 Invoice to the NAVFAC.  DX 80 at 1.  The Government has also established that the May 18, 2010 Invoice misrepresented that RDA paid its subcontractors on time, pursuant to the Prompt Payment Act.  In fact, RDA's President testified that, two years after the October 13, 2009 Contract was terminated, RDA still owed money to several subcontractors:

> [THE GOVERNMENT'S COUNSEL]: And RDA owes [] money to Hub [a subcontractor] regardless of whether it prevails in this case or not, right?

> [MR. KELLEY]: Yes.

> [THE GOVERNMENT'S COUNSEL]: There are other subcontractors or suppliers for the P-469 project that RDA also owes money to, right?

> [MR. KELLEY]: There was a few.

---

[31] The Prompt Payment Act, in relevant part, provides:

(b) Each construction contract awarded by an agency shall include a clause that requires the prime contractor to include in each subcontract for property or services entered into by the prime contractor and a subcontractor (including a material supplier) for the purpose of performing such construction contract—

> (1) a payment clause which obligates the prime contractor to pay the subcontractor for satisfactory performance under its subcontract within 7 days out of such amounts as are paid to the prime contractor by the agency under such contract[.]

31 U.S.C.A. § 3905(b)(1).

TR at 1535 (Kelley).  Mr. Kelley's testimony also demonstrates that RDA had actual knowledge that its Prompt Payment Act certifications were false.  TR at 1535.

Nevertheless, the Government has not established FCA liability, because it failed to prove by a preponderance of the evidence that RDA's false certification of compliance with the Prompt Payment Act was material to the NAVFAC's decision to pay the May 18, 2010 Invoice.  The Government must "prove all essential elements of [an FCA] cause of action . . . by a preponderance of the evidence."   31 U.S.C. § 3731(d).   One such element is whether the relevant misrepresentation was material to the Government's payment decision.  *See Universal Health Servs.*, 136 S. Ct. at 2002 ("[A] a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act.").  In this case, however, the Government failed to present any evidence to prove that compliance with the Prompt Payment Act was material to the NAVFAC's decision to pay the May 18, 2010 Invoice.  In fact, the Government's post-trial briefs do not mention materiality at all.  Therefore, the Government failed to satisfy its burden of proof with regard to an essential element of its FCA claim.  *See, e.g.*, *Cox v. Merit Sys. Prot. Bd.*, 817 F.2d 100, 101 (Fed. Cir. 1987) ("Because [the plaintiff] . . . offered no evidence in support of his assertion . . ., he failed to carry his burden of proof[.]").

For these reasons, the court has determined that RDA is not liable under the FCA for falsely certifying compliance with the Prompt Payment Act.

### d.   Whether RDA Construction Corp.'s July 3, 2013 Certified Claim For Costs Incurred To Re-Inspect The Manitowoc 4100 Crane Was Baseless, Inflated And Premised On Factual Misrepresentations.

The Government also argues that RDA violated the FCA by submitting a July 3, 2013 Certified Claim for crane inspection costs that was "baseless," "inexplicably inflated," and "premised on misrepresentations of fact."  Gov't PT Br. at 37.  Specifically, the Government argues that RDA claimed an equitable adjustment for delays incurred when the NAVFAC took its crane out of service pending repair of five deficiencies identified in a November 28, 2012 inspection. Gov't PT BR. at 37.  In an attempt to recover some of its losses, RDA misrepresented the underlying facts, falsely stating that the inspector never took the crane out of service.  Gov't PT Br. at 37–38.  And, claimed an equitable adjustment that exceeded the total amount of working hours between the inspection and RDA's default termination.  Gov't PT Br. 38–39.

Here, the Government has satisfied the first three elements of its FCA counterclaim.  First, the Government has demonstrated that RDA submitted an equitable adjustment claim to recover costs incurred while its crane was out service.  The July 3, 2013 Certified Claim incorporates a March 18, 2013 Certified Claim where RDA requested "compensation for . . . *the time associated with the crane being out of service as directed by NAVFAC*."  DX 691 at 1 (incorporating DX 663 at 7).  The March 18, 2013 Certified Claim justified its request, in part, by arguing that "[the crane] inspector . . . did not take the crane out of service at this point or any point thereafter."  DX 663 at 7.

Second, the Government has demonstrated that RDA's assertion that the inspector did not take the crane out of service was false.  At trial, Mr. Wallis, RDA's project manager at the time of the crane inspection, testified as follows:

> [THE GOVERNMENT'S COUNSEL]: [The March 18, 2013 Certified Claim includes] a sentence that says, 'Furthermore, it is important to acknowledge that as a qualified inspector J.P. Riley did not take the crane out of service at this point or at any point thereafter.'
>
> [THE COURT]: Is that a true statement or not?  You signed the letter.
>
> [Mr. Wallis]: Based on the information that I see now, no.  Based on the information I have been pointed out to, I would say . . . it was taken out of service.
>
> [THE COURT]: So you were misinformed when you wrote the letter?
>
> [THE WITNESS]: Yes.

TR at 790 (Wallis).

Third, the Government has demonstrated that RDA knew that it misrepresented the inspector's decision to take the crane out of service.  Indeed, on January 18, 2013, the crane inspector submitted a Deficiency Report that identified five deficiencies on the crane and instructed RDA that "any [d]eficiencies [must] be repaired . . . before continued use."  DX 677 at 59.  On January 23, 2013, RDA acknowledged receipt of the Deficiency Report and responded, "[w]e do not believe that the equipment should be taken out of service until the deficiencies . . . have been corrected."  DX 677 at 56.  The January 23, 2013 letter shows that RDA had actual knowledge that the inspector took its crane out of service before RDA submitted the March 18, 2013 Certified Claim or July 3, 2013 Certified Claim.

The Government, however, has failed to establish that RDA's misrepresentation of the underlying facts was material to the NAVFAC's payment decision.  Although RDA's statement that "[the crane] inspector . . . did not take the crane out of service" (DX 663 at 7) may have affected the NAVFAC's decision to equitably adjust the October 13, 2009 Contract, the Government did not address the issue of materiality during trial or in its post-trial briefs.  Therefore, the court has determined that the Government failed to carry its burden of proof with regard to this element of FCA liability.  *See, e.g.*, *Cox*, 817 F.2d at 101 ("Because [the plaintiff] . . . offered no evidence in support of his assertion . . ., he failed to carry his burden of proof[.]").

Similarly, the Government did not address whether the NAVFAC's decision to pay the July 3, 2013 Certified Claim was affected by miscalculations in the requested damages.  Therefore, the Government also failed to prove that the "inexplicably inflated" damages contained in the July 3, 2013 Certified Claim were material.

For these reasons, the court has determined that RDA's July 13, 2013 Certified Claim did not violate the FCA.

**V.      CONCLUSION.**

For these reasons, the court has determined that the NAVFAC did not breach the October 13, 2009 Contract, as alleged in Counts I, III–VIII of the May 7, 2015 Second Amended Complaint.  The court has also determined that RDA is not entitled to an equitable adjustment of the October 13, 2009 Contract, as alleged in Count II, or remission of withheld payments, as alleged in Count IX.

Regarding the Government's counterclaims, the court has determined that the NAVFAC is entitled to recover $2,208,204.01 in liquidated damages, as alleged in Counterclaim I of the Government's June 12, 2015 Answer.  But, RDA did not defraud the NAVFAC, as alleged in Counterclaims II–IV.

The Clerk of Court is directed to enter judgment in accordance with this disposition.

**IT IS SO ORDERED.**

*s/ Susan G. Braden*
**SUSAN G. BRADEN**
**Chief Judge.**
